## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANDREA SHAW

SHANTICIA NELSON

JANE DOE

PAUL THOMAS, M.D.
3515 SW 108th Ave.
Beaverton, OR 97005,

KENNETH P. STOLLER, M.D.
2410 Northview St.
Bozeman, MT 59715,

CHILDREN'S HEALTH DEFENSE,
a non-profit organization,
852 Franklin Ave., Suite 511
Franklin Lakes, NJ 07417,

            Plaintiffs,

   v.

AMERICAN ACADEMY OF PEDIATRICS
345 Park Boulevard
Itasca, IL 60143,

            Defendant.

Civil Action No.

Jury Trial Requested

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

### I.    INTRODUCTION AND SUMMARY OF ACTION

1.    This complaint is brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), against the American Academy of Pediatrics ("AAP") for its central role in an enterprise that has defrauded American families about the safety of the childhood vaccine schedule for several decades.

2.      The fraud set out hereinafter affects the U.S. childhood vaccine market, which one estimate puts at $15.08 billion in 2024.[1]  The vaccine schedule has expanded from 11 doses targeting four diseases in 1983, to over 72 doses targeting 18 diseases (until recent action by the government discussed below). This expansion dramatically accelerated after the National Childhood Vaccine Injury Act of 1986 granted manufacturers immunity from liability, allowing unfettered growth of the childhood immunization schedule, and transforming AAP into a co-beneficiary of the vaccine enterprise. (Section IV, Factual Background, E.)[2]

3.      To help fuel this explosive growth in childhood vaccine products, AAP has repeatedly represented through its official journal *Pediatrics*, the Red Book, policy statements, and public communications that the childhood vaccine schedule has been fully tested and proven safe.

4.      These representations are false and fraudulent. In 2002, the Institute of Medicine ("IOM")[3] found that no study had ever compared health outcomes between vaccinated and unvaccinated children, and recommended such studies be conducted. In 2013, the IOM found

---

[1]      Nova One Advisor, "Pediatric Vaccines Market Size, Share & Trends Analysis Report By Type (Monovalent, Multivalent), By Technology (Live Attenuated Vaccines), By Application (Cancer), By Region,- Industry Analysis, Share, Growth, Regional Outlook and Forecasts, 2025-2034," https://www.novaoneadvisor.com/report/pediatric-vaccines-market, perma.cc/C5FB-968H. CDC's Vaccine for Children program obligated $4.7 billion in 2023 on childhood vaccines for Medicaid and other programs covering children. KFF, "CDC's Funding for State and Local Public Health: How Much and Where Does it Go?" Published April 7, 2025, https://www.kff.org/other-health/cdcs-funding-for-state-and-local-public-health-how-much-and-where-does-it-go/ (last visited Jan. 12, 2026).

[2]      Unless otherwise indicated, all section references are to the Factual Background.

[3]      The Institute of Medicine, renamed the National Academy of Medicine in 2015, was established by Congress in 1970 to provide unbiased, evidence-based advice to policymakers and the public. Its recommendations on vaccine safety carry weight as it is supposed to operate independently of both government and industry.

that the recommended studies have not been undertaken, and again recommended them. (*See* ¶¶ 58-59 for the citations and discussion of these reports.)

5.      Despite IOM's recommendations, the Defendant directly and through enterprise participants forcefully argued against conducting the IOM recommended studies by fraudulent misdirection. Section A.

6.      AAP participates in an association-in-fact enterprise with vaccine manufacturers (including Pfizer, Merck, GlaxoSmithKline, and Sanofi Pasteur), aligned entities such as the American Board of Pediatrics, and key spokespersons including members of AAP's Committee on Infectious Diseases. The enterprise's common purpose is to maintain and expand vaccine uptake by assuring pediatricians, hospitals, parents, and policymakers that the schedule is categorically safe, while concealing material facts about the lack of testing, inadequacies in the vaccine safety monitoring programs, and financial incentives tied to vaccine schedule compliance.

7.      This scheme is anchored by a foundational fraud AAP published: a January 2002 article in *Pediatrics* claiming infants could "theoretically" respond to 10,000 vaccines at once, a calculation about B-cell capacity that deflected from the safety questions parents were asking. For twenty-four years, AAP has deployed this theoretical reassurance to block the studies the IOM recommended. *See* Section A.

8.      The AAP is the enterprise's primary information distribution network. Its 67,000 members (virtually every pediatrician in America) deliver the enterprise's safety claims directly to families as their own medical advice. Physicians who deviate face professional destruction, as Plaintiffs Paul Thomas, M.D. and Kenneth P. Stoller, M.D. experienced. ¶¶ 34-44.

9.    When the Department of Health and Human Services has attempted reform, AAP leads the opposition: it sued to restore the childhood COVID-19 vaccine recommendation after the CDC removed it and issued inflated statistics about the effects of the December 2025 ACIP hepatitis B decision. ¶¶ 111-114. AAP and its enterprise associates' lawsuit to derail the CDC's January 5, 2026 announcement bringing its vaccine schedule more in line with other industrialized countries (and U.S. states) is the latest evidence of its racketeering activities. ¶¶ 115-123.

10.    The same pharmaceutical conglomerates that serve as enterprise participants in manufacturing childhood vaccines have systematically acquired companies treating the chronic conditions those vaccines cause, creating a closed-loop system that financializes childhood illness. Section D.

11.    Military medicine has recognized what AAP denies. Following the Gulf War, research linked multiple simultaneous vaccinations to chronic illness in soldiers. At various times, military regulations have limited healthy adults, selected for physical resilience, to five vaccines at a time. Infants face no limit whatsoever. ¶¶ 78-79.

12.    Plaintiffs Andrea Shaw and Shanticia Nelson are mothers whose children died following routine vaccinations administered according to AAP guidelines. Plaintiff Jane Doe is a mother whose daughter held a valid medical exemption based on documented anaphylaxis for nearly a decade. A school medical consultant applying the narrow ACIP contraindications framework that AAP's paradigm justifies, overrode two treating physicians and forced the catch-up vaccination, resulting in documented injuries.

13.    Plaintiffs Shaw and Nelson's stories show what happens when AAP's paradigm corrupts medical judgment at the point of care. AAP assured parents (through its Fellows) that

4

multiple vaccines were safe because infants can theoretically handle 10,000 vaccines at once. See ¶¶ 51-53. Three children died. Jane Doe's story shows what happens when treating physicians get it right and the AAP paradigm overrides them. Doe's daughter's pediatrician and a board-certified allergist each concluded vaccination was contraindicated. A school medical consultant with no treating relationship rejected both opinions because AAP's framework does not recognize their reasons.

14.    Plaintiffs Thomas and Stoller are pediatricians whose licenses were revoked or suspended for conducting research contradicting AAP's safety claims or issuing individualized medical exemptions based on clinical judgment rather than AAP-endorsed criteria. Plaintiff Children's Health Defense sues in its associational capacity for declaratory and injunctive relief on behalf of families harmed by AAP's fraud.

15.    This action is based on successful RICO civil cases, most notably this circuit's *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006), *aff'd,* 566 F.3d 1095 (D.C. Cir. 2009), wherein the district court found non-profit tobacco trade associations liable for decades of fraudulent health-risk denials. The parallels include suppression of adverse research, use of "independent" scientific voices to block studies, and coordinated enterprise activity to mislead the public.[4] Section J.

## II.    JURISDICTION AND VENUE

16.    This Court has jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964(c), 28 U.S.C. § 2201, and possesses inherent equitable authority to grant necessary injunctive relief.

---

[4]    The *Philip Morris* district court's judgment against the two non-profits, the Tobacco Institute and the Center for Tobacco Research, was vacated as moot because both organizations had dissolved and were winding down before the case reached the circuit court.

Venue is proper under 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965 because Defendant maintains offices and conducts business in this District.

## III.    THE PARTIES

### A.    The Plaintiffs

17.    Andrea Shaw is the mother of fraternal twins Dallas and Tyson Shaw, who both died May 1, 2025, eight days after receiving their 18-month vaccines. On April 23, 2025, both twins were administered hepatitis A, influenza, and DTaP vaccines at their pediatrician's office in Payette, Idaho.[5] Prior to vaccination, Mrs. Shaw and her mother-in-law warned the pediatrician about a family history of adverse reactions to the flu vaccine on the father's side. The pediatrician dismissed these concerns, consistent with AAP's contraindications framework, which does not generally recognize family history of vaccine reactions as a basis for delaying or declining vaccination.[6]

---

[5]    The Shaw family previously resided in Payette, Idaho, where their children's deaths occurred. Local police appeared on television implying wrongdoing. The family received death threats and was forced to relocate.

[6]    AAP's Red Book lists contraindications and precautions for vaccination, but family history of adverse vaccine reactions is not among them. AAP Committee on Infectious Diseases, *Red Book: 2024–2027 Report of the Committee on Infectious Diseases* at 85-91 (33d ed. 2024); CDC, "Guide to Contraindications and Precautions to Commonly Used Vaccines," https://www.cdc.gov/vaccines/hcp/imz-best-practices/contraindications-precautions.html. The only recognized contraindications in the Red Book are severe allergic reaction (anaphylaxis) to a prior dose or vaccine component, and certain specific conditions for vaccines (e.g., immunocompromise for live vaccines). A parent's report that family members have experienced adverse reactions—even serious ones (with two exceptions that do not apply here)—is classified as a "condition commonly misperceived as a contraindication" that should *not* delay vaccination. CDC, *General Best Practice Guidelines for Immunization*, Table 4-2 ("Conditions Incorrectly Perceived as Contraindications") https://www.cdc.gov/vaccines/hcp/imz-best-practices/contraindications-precautions.html. Thus, when Mrs. Shaw warned her pediatrician about the father's family history of flu vaccine adverse reactions, the pediatrician followed AAP guidance in dismissing her concern. The framework is designed to override justifiable parental caution.

18.    The following day, April 24, 2025, both twins were brought to the St. Luke's Emergency Room with severe symptoms including blue lips, lethargy, and sunken eyes. The treating emergency room physician documented the diagnosis as "post-immunization reaction, initial encounter."

19.    On May 1, 2025, both Dallas and Tyson Shaw died. Their autopsies are pending. No alternative cause of death has been identified for either child.

20.    Rather than investigating the documented post-immunization reaction as a potential cause of death, local authorities opened a homicide investigation targeting Mrs. Shaw. Prosecutors have theorized that she caused her children's deaths through a "postpartum blackout" or that "the house was too hot." This criminal investigation is a foreseeable consequence of AAP's fraudulent safety claims: when the medical system has been told that vaccines cannot cause serious injury or death, grieving parents become suspects rather than victims.

21.    Plaintiff Shaw's injuries are the foreseeable and proximate result of AAP's racketeering scheme. AAP's categorical safety claims, disseminated through pediatricians and public-facing materials, induced Mrs. Shaw to consent to vaccination despite her expressed concerns about family history. Those same categorical claims now form the basis for criminal suspicion against her, as investigators assume vaccines could not have caused her children's deaths. Mrs. Shaw's injuries are continuing because AAP continues to disseminate the same false safety claims that induced her consent and that now imperil her liberty.

22.    Shanticia Nelson is the mother of Sa'Niya Carter, who died on March 27, 2025, less than twelve hours after receiving six injections containing twelve antigens at the Golisano Children's Hospital Pediatric Practice. The vaccines included Pediarix (DTaP-HepB-IPV),

ActHIB (Hib), Prevnar 20 (PCV20), MMR, varicella, and hepatitis A. At this appointment Sa'Niya also received a topical fluoride application. The vaccines were administered at approximately 4:00 p.m. on March 26, 2025, as part of a "catch-up" protocol following Sa'Niya's first birthday.[7] Sa'Niya was ill at the time of the appointment, and Ms. Nelson expressed concern about proceeding. Clinic staff assured her that vaccinating a mildly ill child was safe and standard per AAP guidelines. Ms. Nelson was told by clinic staff relying on AAP guidelines and Red Book recommendations that this aggressive schedule was "completely safe."

23.    Later that evening, while Ms. Nelson was driving, Sa'Niya began having seizures. Emergency responders transported her by ambulance to the hospital, where she went into cardiac arrest and died, less than twelve hours after vaccination.

24.    The death certificate listed SUDC (sudden unexpected death in childhood) as the cause of death. However, the coroner verbally informed witnesses that he found a swollen brain consistent with encephalitis which is a known adverse event listed on the DTaP package insert and is a recognized Table Injury for DTaP vaccines when occurring within 72 hours of vaccine administration under the National Childhood Vaccine Injury Act. The discrepancy shows the

_____

[7]    The catch-up immunization schedule is developed by ACIP and published jointly by CDC and AAP as Table 2 of the annual immunization schedule. AAP, "Recommended Childhood and Adolescent Immunization Schedule: United States, 2025," *Pediatrics* 2025;155(2):e2024069987. Neither the catch-up schedule nor the Red Book imposes any upper limit on the number of vaccines that may be administered at a single visit. AAP Committee on Infectious Diseases, *Red Book: 2024–2027 Report of the Committee on Infectious Diseases* at 63 (33d ed. 2024) ("Simultaneous administration of most vaccines according to the recommended immunization schedule is safe and effective. Infants and children have sufficient immunologic capacity to respond to multiple vaccine antigens administered at the same time."); CDC, *General Best Practice Guidelines for Immunization* ("As a general rule, almost all vaccines can be administered at the same visit."). Despite authorizing unlimited simultaneous vaccine loading, as stated (¶¶ 58-59 below), the Institute of Medicine found that the vaccine schedule had not been safety tested. The aggressive catch-up protocol administered to Sa'Niya Carter, six multi-antigen injections targeting twelve separate diseases in a single visit, has never been studied for safety.

concealment AAP's categorical safety claims produce: when the medical system is told vaccines cannot cause harm, documented injuries are reclassified or erased.

25.    Ms. Nelson did not know that the IOM (now the National Academy of Medicine) twice concluded, in 2002 and 2013, that the cumulative safety of the full childhood vaccine schedule had never been studied. She also did not know that the AAP and its leading spokesperson, Paul Offit, M.D., publicly opposed such studies while continuing to claim the schedule was fully tested. These revelations directly contradicted the assurances she relied upon when consenting to Sa'Niya's fatal vaccinations.

26.    As a result of AAP's fraudulent representations, Ms. Nelson suffered recoverable economic injuries, including funeral expenses, unreimbursed medical costs, lost income, and diversion of family resources to public advocacy and legal efforts seeking accountability. She has since participated in public awareness efforts on CHD.TV and in CHD-supported campaigns to obtain recognition of vaccine-related infant deaths.

27.    Her injuries are the proximate result of AAP's racketeering scheme: false and misleading statements transmitted through pediatric offices to parents to maintain vaccine uptake despite the absence of required safety evidence. Ms. Nelson's injuries are continuing and fall within the limitations period because AAP continues to disseminate the same false safety claims that induced her to consent to Sa'Niya's vaccinations, including through its HealthyChildren.org website and ongoing public statements asserting that the childhood vaccine schedule is "thoroughly tested for safety" despite the absence of cumulative safety studies.

28.    Jane Doe is the mother of E, a minor child currently in high school. E experienced anaphylaxis following a HepA-Adult vaccine in 2012. In 2014, E experienced another allergic reaction, this time to the Polio vaccine. Because of her severe reaction to these two egg-based

vaccines, she received an exemption from all egg-based vaccines.  In 2022, E experienced an anaphylactic reaction, causing vaccine injuries from the DTaP shot, which is not egg-based. As a result, she received a medical exemption from all further vaccines.

29.    In late 2024, the medical consultant of E's school revoked E's medical exemption. He is a family practice physician who serves as school consultant/medical director for multiple school districts. He never examined her and had no statutory authority to reject a medical exemption issued by a licensed physician.

30.    Operating under AAP's paradigm, the consultant arrogated that authority to himself. He demanded another medical exemption from the treating pediatrician. Plaintiff Doe complied, but the consultant rejected it and demanded documentation from an allergist. Doe complied and supplied the additional (and legally unnecessary) confirmation. But the consultant rejected that exemption letter also, justified by a paradigm that says treating physicians who identify contraindications outside the approved ACIP/AAP guidelines must be wrong.

31.    Barred from school and threatened with exclusion, E expressed feelings of self-harm. Jane Doe's family faced an impossible choice: keep her daughter out of school indefinitely, or consent to vaccination against the medical judgment of two treating physicians. The family chose to vaccinate. Between January and March 2025, E received the MMR, Varicella, and Meningococcal vaccines on an AAP approved catch-up schedule. The allergist performed allergy testing before each dose. However, even with these precautions, the treating physicians' original judgment proved correct.

32.    Following vaccination, E developed hives covering her back and chest, then progressive joint stiffness and difficulty walking, exacerbating a prior vaccine injury. She was eventually diagnosed with a torn meniscus in four places and a stress fracture in her foot.

Arthropathy (a disease or abnormal condition affecting a joint) is a documented adverse event following MMR vaccination in patients over age 12 receiving the vaccine for the first time. E had surgery in April 2025 for this MMR package insert-listed side effect. E will need ongoing care for this and other side effects related to the administration of the vaccines she received in 2025.

33.     Jane Doe's loss to property flows directly from AAP's fraudulent scheme. The medical consultant had no legal authority to override E's treating physicians. He claimed it anyway, based on AAP's paradigm and the narrow contraindication and precaution it promoted. Jane Doe has suffered and continues to suffer economic injury including medical expenses, and other costs resulting from E's vaccine injuries.

34.     Plaintiff Paul Thomas is a resident of Beaverton, Oregon. He was a licensed, board-certified pediatrician, and a Fellow of the American Academy of Pediatrics (FAAP). He founded and operated a large pediatric practice serving thousands of families.

35.     In late 2020, Dr. Thomas published a study comparing chronic health outcomes in vaccinated and unvaccinated pediatric patients. The study addressed the vaccinated-versus-unvaccinated comparative research that the IOM had twice recommended federal health authorities undertake, and that Defendant and its affiliates had publicly opposed.

36.     Eleven days after publication, in December 2020, the Oregon Medical Board emergency-suspended Dr. Thomas's medical license based on his being a "threat to public health." The suspension targeted his individualized vaccination practices contrary to the Red Book, and the scientific conclusions of his research, which contradicted Defendant's categorical public claims that the childhood vaccine schedule is fully tested and safe.

37.     Following the emergency suspension, the Oregon Medical Board conducted an extended investigation and enforcement proceeding that continued for more than two years. His license was temporarily reinstated with restrictions.

38.     After it became clear the Board would not let him continue to practice outside of the CDC/AAP vaccine guidelines, Dr. Thomas agreed to "voluntarily" surrender his license.

39.     Following the surrender, AAP revoked his membership. The surrender permanently ended his ability to practice pediatrics, destroyed the goodwill of his medical practice, eliminated his primary source of income, and caused concrete injury to his business and property.

40.     Dr. Thomas was injured by the racketeering conduct: the suppression of opposing scientific views, branding legitimate research as "misinformation," and professional discipline to enforce conformity. As a proximate result of Defendant's conduct, Dr. Thomas suffered loss of licensure, destruction of his medical practice, loss of income, loss of business expectancy, and enduring reputational injury.

41.     Plaintiff Kenneth P. Stoller is a resident of Bozeman, Montana. He is formerly a licensed, board certified, and AAP fellow physician. He practiced pediatric integrative and hyperbaric medicine for over four decades, specializing in treating children with neurological and immunological injuries, including vaccine-related conditions. Until 2021, Dr. Stoller held an active California medical license, which was revoked following disciplinary proceedings arising from his issuance of individualized medical exemptions that deviated from CDC and AAP guidelines. In 2023, New Mexico revoked his New Mexico license because of the California action, at which point he became unable to practice medicine.

42.     Dr. Stoller's approach relied on peer-reviewed research and genetic testing to identify children at risk for vaccine injury, including mitochondrial dysfunction and immune system irregularities. He issued medical exemptions only after clinical evaluation, family history review, and genetic confirmation of risk factors. His "professional misconduct" was using individualized medical judgment in violation of the standard of care.

43.     The disciplinary actions caused Dr. Stoller severe economic injury. He lost his patient base, clinical income, and professional reputation. Following the revocations, he incurred substantial costs relocating and attempting to regain licensure in other states. Dr. Stoller remains unable to resume full medical practice and continues to lose income and business expectancy.

44.     Dr. Stoller's ongoing inability to practice, his loss of income, and reputational harm constitute concrete injuries to business and property under 18 U.S.C. § 1964(c). His injuries are continuing.

45.     Children's Health Defense ("CHD"), a nonprofit organization headquartered in Franklin Lakes, New Jersey, has employees, volunteers, participants, donors, and followers nationwide and throughout the world.  Its mission is to end the epidemic of childhood chronic disease caused by toxic environmental exposures. It seeks to hold responsible parties accountable and to establish safeguards to prevent future harm to children's health. It has over 20 state chapters, most of which are incorporated within CHD, as well as a chapter dedicated to military members, and several international chapters. The chapters, *inter alia*, act as a communication channel by which members of the CHD community impact the policies, advocacy, actions, and lawsuits the organization files.

46.     CHD has a vibrant community of over 500,000 people in the United States who interact with CHD through a variety of channels. These community members bring potential

education, advocacy, litigation, and science projects to the organization for funding,

collaboration, and publicity on a constant basis, as well as topics of interest for publications by

CHD's online news sources, The Defender and CHD TV.

47.     Attorneys within the CHD community bring potential lawsuits to the CHD

litigation committee for potential funding; scientists within the community bring potential

scientific studies to the CHD science committee for funding. Advocates and educators who are

part of the CHD community bring advocacy efforts and articles to CHD for support and

publication. In this way, the CHD community directly shapes the organization's priorities,

determines which cases CHD pursues, and guides its advocacy, educational, and publication

initiatives.

48.     CHD exists solely because of donations of its supporters. If CHD did not serve the

interests of its community, it would cease to exist. A strong financial nexus binds CHD and its

supporters to end the epidemic of childhood chronic disease. AAP's actions, as described herein,

harm the financial well-being of CHD community members, limiting the resources they would

otherwise choose to devote to CHD. CHD sues in its associational capacity on behalf of its

community members for declaratory and injunctive relief only.

**B.     The Defendant**

49.     Upon information and belief, the AAP is a non-profit corporation headquartered in

Itasca, Illinois, with an office in the District of Columbia. AAP generates $115-125 million in

annual revenue, employs 475 staff, and represents approximately 67,000 pediatricians, which is

virtually the entire specialty.

IV.     **FACTUAL BACKGROUND**

A.     **AAP's Foundational Fraud: Substitute Theory for Testing, Immunogenicity for Safety**

50.     The childhood vaccine schedule expanded from 11 doses targeting four diseases in 1983 to 20 doses by 2000, with more additions imminent. By the late 1990s and early 2000s, there was widespread concern among parents that cumulative exposure to multiple vaccines and their adjuvants might pose risks to infants and young children. Surveys found that 23% of parents questioned the number of shots their children received, and 25% were concerned that vaccines might weaken the immune system. AAP needed a response.

51.     In January 2002, AAP published its response in its journal *Pediatrics*: an article with lead author  Paul A. Offit, M.D., FAAP, a member of AAP's Committee on Infectious Diseases, titled "Addressing Parents' Concerns: Do Multiple Vaccines Overwhelm or Weaken the Infant's Immune System?" Offit PA, et al. (hereinafter "Offit"), *Pediatrics* 2002;109(1):124-129, https://publications.aap.org/pediatrics/article/109/1/124/79755/Addressing-Parents-Concerns-Do-Multiple-Vaccines, https://pubmed.ncbi.nlm.nih.gov/11773551/ (last visited Jan. 13, 2026).

52.     The title reveals the article's purpose:  public relations to reassure worried parents. The article contained theoretical and modeling extrapolations for the 67,000 AAP member pediatricians to use to reassure parents with concerns.

53.     Parents were asking a toxicological and clinical question: *Is it safe to inject my infant with multiple vaccines containing aluminum adjuvants, thimerosal, formaldehyde, polysorbate 80, residual DNA fragments, and other components?* Offit answered a different question, an immunological one about whether the immune system could theoretically generate antibody responses. Offit produced a purely theoretical calculation about B-cell epitope capacity,

concluding that "each infant would have the theoretical capacity to respond to about 10,000 vaccines at any one time." This is like answering "Is it safe to drink ten beers?" with "The liver can theoretically process unlimited water," a response about organ capacity, but non-responsive to the actual safety question. Offit's calculation said nothing about cumulative aluminum dose and tissue retention in developing brains, mercury toxicokinetics in infants, synergistic effects of multiple adjuvants, neuroinflammation, autoimmune activation, or any clinical safety endpoint.

54.     This is fraud: using the trappings of science to deceive parents (or providing AAP's Fellows a document to help them effectuate the fraud). Offit's paper created the illusion that parents' safety concerns about the cumulative effect of the vaccine schedule had been resolved when they had been misdirected. Offit's theoretical PR article did not study, and could not prove, the safety of the cumulative schedule. It just changed the subject.

55.     But the misdirection accomplished something more insidious. It created a framework that made the question appear illegitimate. Under Offit's paradigm, concerns about cumulative vaccine load became anti-science; the paradigm declared that immunological capacity was theoretically infinite. Questioning the schedule was no longer a scientific inquiry to be resolved by evidence; it was a failure to understand basic immunology. The paradigm foreclosed the safety question.

56.     This foreclosure had immediate practical consequences. The contraindication framework, which determines when vaccination should be delayed or avoided, was already narrow before 2002, limited essentially to anaphylaxis following a prior dose and unexplained encephalopathy. But as the schedule expanded from 20 doses to 30 to 40 to 70, the question arose: Should contraindications expand to account for cumulative load? Family history of adverse reactions? Prior non-anaphylactic events? Concurrent illness? Offit's paradigm

answered: No. If infants can theoretically handle 10,000 vaccines, then there is no biological basis for expanded contraindications regardless of how many vaccines are added to the schedule. The narrow framework designed for 11 doses became locked in for 72+ doses.

57.    AAP then distributed this paradigm through its 67,000-member network. Pediatricians learned to cite the 10,000 vaccines figure when parents expressed concern. The Red Book incorporated it. HealthyChildren.org repeated it. Board certification and continuing medical education reinforced it. The American Academy of Family Physicians co-signed these recommendations without independent analysis. Within months, a speculative calculation in a journal article had become the standard response to any question about cumulative vaccine safety, delivered by trusted physicians in examination rooms across America.

58.    One month after Offit's paper, the IOM issued its first report on vaccine schedule safety. The IOM acknowledged that no study had ever compared health outcomes between vaccinated and unvaccinated children, which is the question Offit's article and paradigm foreclosed. The IOM recommended studying the safety of the entire schedule. *Immunization Safety Review: Multiple Immunizations and Immune Dysfunction*. https://www.ncbi.nlm.nih.gov/books/NBK220490/ ("IOM 2002"), at 14-15 (Executive Summary), and 107-108 (Recommendations for Public Health Response, Research). Anticipating the objection, the IOM explicitly stated it was *not* calling for new prospective trials that would withhold vaccines from children. The IOM specifically told CDC to "explor[e] the feasibility of using existing vaccine surveillance systems," naming the Vaccine Safety Datalink ("VSD"), to study "safety questions about the immunization schedule." The VSD already contained health records for millions of children, some fully vaccinated, some partially vaccinated, some

17

unvaccinated. The data existed in this giant digital filing cabinet. The IOM was just asking the CDC to analyze the data.

59.     In 2013, the IOM returned to this issue and concluded that the studies had not been done; the filing cabinet remained unexamined. *The Childhood Immunization Schedule and Safety: Stakeholder Concerns, Scientific Evidence, and* **Future Studies**, https://doi.org/10.17226/13563 ("IOM 2013") IOM 2013 at 6, 12 (emphasis added). Presumably for emphasis, "Future Studies" was added to the title. And again, IOM explicitly said it was not recommending randomized controlled trials. IOM 2013 at 13.

60.     When pressed to explain why the recommended studies had never been conducted, Offit argued publicly that it would be "unethical" to conduct placebo-controlled trials withholding vaccines from children. As demonstrated above, this answered a recommendation that the IOM had never made. The children in the VSD had already been vaccinated or not. The health outcomes had already occurred. No one needed to withhold anything from anyone. But by conflating database analysis with randomized trials, Offit made an easy study sound impossible and an ethical study sound unethical. The misdirection worked. Twenty-four years later, the filing cabinet remains unexamined.

61.     And twenty-four years later, Offit's theoretical calculation remains the cornerstone citation for the proposition that vaccines cannot overwhelm the immune system. The Children's Hospital of Philadelphia Vaccine Education Center, which Offit directs—continues to cite it today, stating that "infants have the theoretical capacity to respond to at least 10,000 vaccines at one time." https://www.chop.edu/vaccine-education-center/human-immune-system/immune-system-and-vaccines, https://perma.cc/VCT8-2XRW.  GAVI, the Vaccine Alliance (a partnership of WHO, UNICEF, the World Bank, and the Bill & Melinda Gates Foundation),

describes Offit 2002 article as a landmark study confirming that children's immune systems are not "overloaded" by multiple vaccines. https://www.gavi.org/vaccineswork/do-multiple-vaccines-overload-childs-immune-system-heres-what-science-says, https://perma.cc/T73E-JEBZ. The History of Vaccines project cites it to rebut the "misconception" that vaccines can overwhelm immune systems. https://historyofvaccines.org/vaccines-101/misconceptions-about-vaccines/, https://perma.cc/PM97-5XMP. AAP and the RICO enterprise created this fraudulent misdirection, published it in AAP's own journal, and has deployed it for twenty-four years to allow its trade organization's member "Fellows" to allay parents' concerns, to sell the ever-expanding vaccine schedule.

62.    The fraud was creating an intellectual framework that made the truth unreachable within the system it established. Questioning cumulative effects marks one as unethical and scientifically illiterate; demanding safety studies is unnecessary because the paradigm proves safety theoretically; pointing to injured children is mere anecdote.

63.    The *Philip Morris* defendants employed similar tactics. While Offit's framework created false certainty by deflection, the tobacco research institutes created false uncertainty to generate doubt.

**B.    Protecting the Fraud: Block the Studies, Exaggerate the Risks**

64.    Having published a theoretical calculation as proof of safety, AAP's task became ensuring that actual safety studies would never challenge the deflection to the theoretical. Offit became the enterprise's primary voice for blocking research, declaring that randomized vaccinated-versus-unvaccinated studies would be "highly unethical" and that "no Institutional Review Board, and frankly no ethical researcher, could ever do that study…." PBS Frontline interview, Offit P., interview with PBS Frontline, "The Vaccine War," April 27, 2010,

https://www.pbs.org/wgbh/frontline/article/paul-offit-a-choice-not-to-get-a-vaccine-is-not-a-risk-free-choice/ (last visited Jan. 12, 2026).

65.     But Offit failed to mention that observational studies comparing health outcomes in existing vaccinated and unvaccinated populations require no withholding of vaccines.

66.     Paul Offit's financial conflicts may explain his obstruction. As co-inventor of the RotaTeq rotavirus vaccine, he received substantial royalties, according to one detailed analysis, approximately $10 million through 2009, with potential lifetime earnings estimated between $13-35 million. He holds the Maurice R. Hilleman Chair of Vaccinology at Children's Hospital of Philadelphia, a position funded by a $1.5 million endowment from Merck, RotaTeq's manufacturer. Olmsted D. & Blaxill M., "Counting Offit's Millions: More on How Merck's Rotateq Vaccine Made Paul Offit Wealthy," Age of Autism, Dec. 2009, https://web.archive.org/web/20191230160433/https://www.ageofautism.com/2009/12/counting-offits-millions-more-on-how-mercks-rotateq-vaccine-made-paul-offit-wealthy.html; Attkisson S., "How Independent Are Vaccine Defenders?" CBS News, July 25, 2008, https://www.cbsnews.com/news/how-independent-are-vaccine-defenders/, https://perma.cc/CZQ8-S4TJ.

67.     The fraud continues today. On December 5, 2025, while ACIP was meeting to consider the hepatitis B birth dose recommendation, Paul Offit appeared on CNN and PBS and stated that before universal infant vaccination, "30,000 children under the age of 10" contracted hepatitis B annually. The CDC surveillance data show actual cases in that age group were approximately 400 per year, a 75-fold exaggeration. Demasi M., "EXCLUSIVE: Internal documents show Paul Offit made false claims on CNN," MD Reports, Dec. 10, 2025,

https://blog.maryannedemasi.com/p/exclusive-internal-documents-show, perma.cc/NW48-ZZFW.

68.     The causation chain is direct: Offit publishes theoretical reassurance to preempt safety concerns. AAP amplifies it as a scientific consensus answering the parents' concerns. When the IOM calls for observational studies using existing records, Paul Offit declares vaxed vs. unvaxed studies unethical and insists "you can't do that study"; when reform is proposed, Paul Offit exaggerates risks to block it.

### C.     The Suppressed Studies Show the Harm

69.     While AAP blocked the IOM-recommended safety studies of the cumulative schedule, independent researchers worldwide have conducted exactly such comparative analyses, consistently finding superior health outcomes in unvaccinated children.

70.     A 2025 systematic review by McCullough et al., "Determinants of Autism Spectrum Disorder," McCullough Foundation Report, Oct. 27, 2025, https://doi.org/10.5281/zenodo.17451259, analyzed 136 studies examining vaccines or their excipients, finding 107 (79%) inferred possible links between immunization or vaccine components and ASD or other neurodevelopmental disorders through mechanistic, clinical, or epidemiologic evidence. Similar findings emerged from Mawson et al., "Pilot comparative study on the health of vaccinated and unvaccinated 6- to 12-year-old U.S. children," J. Transl. Sci. 2017;3(3), DOI: 10.15761/JTS.1000186; Hooker & Miller, SAGE Open Medicine 2020;8:2050312120925344, PMID: 32537156; and Plaintiff Dr. Thomas's study (Lyons-Weiler

& Thomas, Int J Environ Res Public Health 2020;17(22):8674, subsequently retracted), all showing better health outcomes in unvaccinated populations.[8]

71.    The most recent evidence that the childhood vaccine schedule may be harming infants comes from Louisiana state vaccination records. In December 2025, researchers employed by Plaintiff Children's Health Defense analyzed Louisiana Department of Health records linking infant deaths to vaccination histories for over 1,200 children who died between 2013 and 2024. They found that infants vaccinated at two months of age were significantly more likely to die in their third month of life than infants who were not vaccinated during that window. Infants who received all six vaccines recommended for two-month-olds were 68% more likely to die in the following month, which is a statistically significant finding. The disparity was even starker in certain groups: Black infants showed 68% higher mortality, and female infants showed 112% higher mortality. Jablonowski K, Hooker B, "Increased Mortality Associated with 2-Month-Old Infant Vaccinations," https://zenodo.org/records/18262931. (Last visited Jan. 20, 2026). (Originally preprinted with another service, but withdrawn by the advisory board for unspecified reasons. Another example of the point of this section.)

72.    This study analyzed the very type of linked immunization-mortality data that federal health authorities possess. The pattern is consistent: when researchers conduct the studies AAP insists are impossible, the results contradict AAP's safety assurances.

73.    The consistency of these findings across different methodologies and populations explains the enterprise's suppression efforts. Widespread knowledge that AAP's "impossible"

---

[8]    Mawson's article was initially withdrawn under pressure from Frontiers in Public Health before republication in Journal of Translational Science. Lyons-Weiler & Thomas was retracted 11 days after publication. The publication history of these studies is itself evidence of the suppression alleged herein.

studies have been done *with damaging results*, would undermine the vaccine schedule's credibility.

74.     Dr. Peter Aaby has conducted decades of vaccine research in Guinea-Bissau, publishing hundreds of peer-reviewed studies on vaccine effects. His research found that vaccines have "non-specific effects" beyond protection against the target disease, and that these effects are not always beneficial.

75.     His research found that while the DTP vaccine protected against its target diseases, children who received it had five-fold higher all-cause mortality than unvaccinated children. In short, the vaccine worked as intended, but caused overall net harm (i.e., more death). Mogensen SW, et al., "The Introduction of Diphtheria-Tetanus-Pertussis and Oral Polio Vaccine Among Young Infants in an Urban African Community: A Natural Experiment," EBioMedicine 2017;17:192-198. https://pmc.ncbi.nlm.nih.gov/articles/PMC5360569/.

76.     The World Health Organization's Strategic Advisory Group of Experts (SAGE) reviewed these non-specific effects and acknowledged that "the majority of studies found a detrimental effect of DTP," but dismissed the findings as "inconsistent" and took no action.

77.     But the pattern is consistent: when researchers study what vaccine authorities claim cannot be studied, and the results contradict categorical safety claims, the research is marginalized rather than replicated. AAP is the American franchise of an international enterprise that protects the vaccine schedule by discrediting any science that threatens it.

78.     Finally, unlike U.S. pediatric medicine, military medicine has grappled with the safety of administering multiple vaccines simultaneously. Following the 1991 Gulf War, a British Medical Journal study of UK veterans found "a specific relation between multiple vaccinations given during deployment and later ill health," with the strongest association for

multisymptomatic illness (odds ratio 5.0). Hotopf M, et al., BMJ 2000;320:1363-67, https://pmc.ncbi.nlm.nih.gov/articles/PMC27378/.

79.     The U.S. Marine Corps operationally limits simultaneous vaccinations: a November 2025 Officer Candidates School preparation letter states that "[m]edical restrictions prevent officer candidates from receiving more than five immunizations over a short period of time." U.S. Marine Corps, Officer Candidates School, "Officer Candidates Class 251 Pre-Ship Preparation Letter" § 13(a)(2) (Nov. 12, 2025), *available at* https://www.ocs.marines.mil/Information/Candidates/.

80.     The disparity is indefensible. Marine candidates selected for physical resilience have been limited to five vaccines in one sitting. Infants with immature immune systems face no limit whatsoever, because consensus science created and promoted by the enterprise has established that the immune system can handle 10,000 vaccines at once, (theoretically).

**D.     The Vaccine Racket: Create the Condition, Sell the Treatment, Keep the Sick Customer for Life**

81.     A racket is a service that creates its own demand. The same pharmaceutical conglomerates that serve as enterprise participants in manufacturing childhood vaccines have systematically acquired companies developing treatments for autoimmune disorders, allergies, and neurodevelopmental conditions, many of which are listed as adverse events in vaccine package inserts produced by them.

82.     In 2016, Pfizer acquired Anacor Pharmaceuticals for $5.2 billion, gaining Eucrisa for pediatric eczema in children two years old (subsequently expanded to as young as three months). Eczema is listed as a postmarketing adverse event in vaccines manufactured by other enterprise participants, such as GlaxoSmithKline's ENGERIX-B. Pfizer manufactures Prevnar. In 2020, Sanofi acquired Principia Biopharma for $3.7 billion, securing rilzabrutinib for immune

thrombocytopenia, an autoimmune blood disorder is which listed as an adverse event in vaccines manufactured by enterprise participants, including Merck's M-M-R II and GlaxoSmithKline's PEDIARIX.

83.    In 2012, GSK acquired Human Genome Sciences for $3.6 billion, obtaining Benlysta for systemic lupus, later expanded to treat children as young as five (vasculitis and arthritis are listed as adverse events in vaccines manufactured by enterprise participants, such as Merck's M-M-R II and GlaxoSmithKline's ENGERIX-B). GSK manufactures Pediarix and Kinrix. In 2021, Merck bought Pandion Therapeutics for $1.85 billion, adding treatments for inflammatory bowel disease (IBD, including ulcerative colitis and Crohn's disease, is listed in clinical trial safety data for Merck's GARDASIL 9).

84.    These acquisitions create a closed-loop revenue system across the enterprise. The vaccine serves as the customer acquisition mechanism. A child who develops eczema after vaccination with an enterprise participant's vaccine becomes a customer for another participant's eczema treatment. A child who develops an autoimmune disease becomes a customer for the enterprise's immunosuppressants. These are just a few of many examples. The enterprise profits from the vaccines, and profits again from the treatment of the vaccine package insert documented side effects.

85.    The *Philip Morris* defendants sold cigarettes knowing they caused lung cancer, but they did not own oncology clinics. AAP helps the enterprise financialize childhood illness.

86.    AAP ensures this revenue stream continues. It blocks studies that might reveal connections between schedule expansion and chronic disease. It promotes ever-expanding schedules. The $115-125 million AAP generates annually is a fraction of the tens of billions at stake.

E.     **AAP: The Racketeering Enterprise's Distribution Network**

87.     AAP controls pediatric medicine and dominates childhood vaccine policy. Its Red Book defines the standard of care. Section G below. Its Bright Futures guidelines dictate the content and timing of well-child visits. Physicians who deviate from AAP guidelines face medical board discipline, loss of hospital privileges, exclusion from insurance networks, and professional destruction, as Plaintiffs Thomas and Stoller experienced.  ¶¶ 34-44, 100.

88.     And when HHS attempts reform, AAP leads the opposition, suing to restore the childhood COVID-19 vaccine recommendation after the CDC removed it, issuing false and alarmist statements about the ACIP hepatitis B decision, and publicly attacking every effort to introduce flexibility into the schedule. ¶¶ 111-123.

89.     AAP's 67,000 members control the information families receive about vaccines. This is the enterprise's distribution network: trusted physicians delivering the enterprise's safety claims as medical advice. The enterprise's purpose is to control the information the families receive, and AAP's Fellows do the job.

90.     On information and belief, AAP was not always this powerful. It was founded in 1930 by 35 pediatricians in Detroit, a small professional society that grew modestly for its first fifty years: 834 members by 1935, approximately 1,300 by 1940, and 20,000 by 1980. Its first publication, an eight-page pamphlet in 1938 titled "Immunization Procedures" (later the Red Book), recommended vaccines against just four diseases. For many decades, vaccines were a minor part of pediatric practice.

91.     The National Childhood Vaccine Injury Act of 1986 transformed both the vaccine market and AAP's role in it. The Act shielded manufacturers from liability claims, which both fueled the vaccine schedule expansion, and eliminated accountability for safety. In 1993,

Congress created the Vaccines for Children program, now a $4.7 billion annual federal program providing free vaccines to practices while allowing administration fees. And in 1995, AAP, ACIP, and the American Academy of Family Physicians jointly launched the first "harmonized" schedule, creating the unified standard that state mandates, insurance metrics, and medical board enforcement would treat as obligatory. The post-1986 framework made AAP a co-beneficiary of the vaccine enterprise.

92.     AAP's growth after 1986 tracks the schedule expansion. In 1983, the schedule required 11 doses of 4 vaccines. By 1995, it had grown to 19 doses. Today, children can receive over 72 or more doses before age 18. AAP membership more than tripled during this period, from 20,000 in 1980 to 67,000 today, while its institutional infrastructure expanded correspondingly. So did its revenues, now between $115 and $125 million annually. https://www.aap.org/en/membership-application/faq/; perma.cc/KBY4-JTPW.

93.     The 1986 Act also locked pediatric practices into this increasing vaccination model. Pediatricians are among the lowest-paid physician specialties in America, earning on average around $265,000 annually, less than half what top specialists earn.[9]  This economic vulnerability made the specialty susceptible to capture. Well-child visits became vaccine delivery appointments. Administration fees, multiplied across dozens of vaccines, became essential revenue. Insurance payments tied to vaccination rates created further dependency. Pediatricians who question the schedule risk professional discipline and financial ruin. AAP offers practice management resources designed to help pediatricians stay current on healthcare trends;

---

[9]     Doximity, "2025 Physician Compensation Report" https://www.doximity.com/reports/physician-compensation-report/2025, perma.cc/FKM9-TPE7.

effectively manage their careers, and practices and patient panels. These resources specifically address vaccine hesitancy and refusal.

**F.    The Racket's Financial Trap: Why Pediatricians Cannot Say No**

94.    Vaccine administration is essential revenue for pediatric practices. Pediatricians collect administration fees for each injection, performance bonuses tied to vaccination rates, and bill for the well-child visits into which vaccinations are bundled. Major insurers enforce the schedule through incentive programs; Blue Cross and Blue Shield of Michigan, for example, pays $175 for each child achieving full immunization status. Blue Cross Blue Shield of Michigan, *2024 Quality Rewards: Performance Recognition Program and Physician Group Incentive Program* (Winter 2024), https://uopdocs.com/wp-content/uploads/2024/07/BCN_2024-Quality-Rewards-Booklet.pdf, perma.cc/Y5J7-KCQY.

95.    AAP acknowledges these pressures. In its 2024 clinical report, AAP stated: "under value-based care models, pediatricians may receive a significant part of their payments based on performance metrics, one of which is completion of childhood and adolescent immunizations" and that "[c]urrent pay-for-performance models do not recognize the impact of vaccine refusal on pediatricians' metrics, which can lead to reduced payments despite pediatricians' best efforts." O'Leary ST, et al., "Strategies for Improving Vaccine Communication and Uptake," *Pediatrics* 2024;153(3):e2023065483, https://publications.aap.org/pediatrics/article/153/3/e2023065483/196695/Strategies-for-Improving-Vaccine-Communication-and (last visited Jan. 10, 2026). In other words, doctors who cannot talk parents into full vaccine schedule compliance lose money.

96.    Yet AAP publicly denies that pediatricians profit from vaccines. In July 2025, AAP posted on social media: "Pediatricians do not profit off vaccines," adding that "most

pediatricians either break even or even lose money when they offer vaccines." American

Academy of Pediatrics (@AmerAcadPeds), X post (July 16, 2025),

https://x.com/AmerAcadPeds/status/1945522940839178504, perma.cc/FQ3Y-LQHK. This is

like a car salesman who swears he sells "below cost" while collecting manufacturer rebates and

volume bonuses. AAP's denial focuses on vaccine product margins while omitting administration

fees, quality bonuses, and the well-child visits into which vaccinations are bundled. The

dealership would not exist if the math worked as claimed. Neither would pediatric practices.

**G.    The Racket's Rulebook: How the Red Book Became the Law**

97.    AAP's Committee on Infectious Diseases publishes the Red Book, which AAP

markets as "the authoritative guide" to pediatric infectious disease prevention, management, and

control. The 2024-2027 edition provides guidance on more than 200 childhood conditions and is

"updated to be consistent with 2024 AAP and the CDC vaccine recommendations." AAP, Red

Book: 2024-2027 Report of the Committee on Infectious Diseases (33rd ed.),

https://publications.aap.org/aapbooks/monograph/756/. It is sold for $175 to pediatricians,

hospitals, and public health departments nationwide. For pediatricians, the Red Book is their

Bible, the definitive reference that establishes what the profession considers the standard of care.

98.    But the Red Book incorporates the CDC schedule without acknowledging what

IOM found in 2013: that "studies designed to examine the long-term effects of the cumulative

number of vaccines or other aspects of the immunization schedule have not been conducted."

IOM 2013 at 6. The schedule the Red Book endorses as standard of care has never been tested.

Pediatricians following it are not following science. They are following an untested, long-term,

multi-agent biologic protocol blessed by their trade organization.

99.    The American Board of Pediatrics requires physicians to pass certification examinations and complete Maintenance of Certification to remain board-certified. ABP, Maintenance of Certification (MOC), https://www.abp.org/content/maintenance-certification-moc (last visited Jan. 12, 2026); ABP, General Pediatrics Content Outline, https://www.abp.org/content/general-pediatrics-content-outline, https://perma.cc/7MFB-DN6S. Hospitals typically require board certification for privileges. Insurers reference vaccination rates for quality metrics and pay-for-performance bonuses. Deviation from the schedule is not treated as a difference of medical opinion; it is a disciplinary offense.

100.    Medical boards enforce AAP's guidelines as the benchmark for acceptable practice. Physicians who publicly question vaccine safety, offer alternative schedules, or write medical exemptions inconsistent with ACIP contraindications face investigation, suspension, or license revocation, as Plaintiffs Thomas and Stoller can attest. The message to every pediatrician is clear: publish research contradicting the schedule, lose your license. Write exemptions based on individual patient assessment rather than ACIP criteria, lose your license. Question the safety of the untested schedule, lose your livelihood. AAP's Red Book is the racket's rulebook. The penalty for breaking the rules is professional annihilation.

**H.    Protecting the Racket: How Scientific Debate Became "Misinformation"**

101.    AAP conducts a coordinated campaign to brand scientific dissent as "misinformation." Through its parent-targeted website (HealthyChildren.org), policy statements, press releases, and media appearances, AAP promotes the vaccine schedule as categorically safe while labeling critics, dissenting research, and documented adverse events as dangerous falsehoods requiring suppression.

102.    In 2016, AAP published "Countering Vaccine Hesitancy," a policy statement that framed vaccine safety questions as "misinformation" to be countered rather than answered. *Pediatrics* 2016;138(3):e20162146, https://doi.org/10.1542/peds.2016-2146. In February 2019, AAP President Kyle Yasuda sent a public letter urging Facebook, Google, and Pinterest to "combat vaccine misinformation" by suppressing content that questions vaccine safety. AAP News Release, "AAP Urges Social Media Platforms to Combat Vaccine Misinformation," February 14, 2019, https://healthychildren.org/English/news/Pages/AAP-Urges-Major-Technology-Companies-to-Combat-Vaccine-Misinformation.aspx, perma.cc/AR22-ZVHE. The letter did not define "misinformation." It did not distinguish between fabricated claims and peer-reviewed research. It asked tech platforms to silence debate AAP could not win on the merits.

103.    The strategy has worked. AAP blocks the IOM-recommended safety studies. When independent researchers conduct those studies and find concerning results, AAP and its enterprise associates label them "misinformation." When physicians cite that research to support individualized patient care, the enterprise brands them dangerous. When those physicians lose their licenses, AAP points to the revocations as proof the physicians were wrong. The racket ensures that the only permissible science is the science that supports the racket.

104.    AAP's categorical claims are themselves misinformation. AAP states on HealthyChildren.org: "Vaccines are not associated with autism or developmental delay. Multiple studies have proven this." https://www.healthychildren.org/English/safety-prevention/immunizations/Pages/vaccine-studies-examine-the-evidence.aspx, perma.cc/W3LJ-W8ZY. ("URL") This is false. The IOM's 2012 report concluded that for most vaccine-autism hypotheses, evidence was "inadequate to accept or reject a causal relationship." https://nap.nationalacademies.org/catalog/13164. The federal Vaccine Injury Compensation

Program conceded compensation in the Hannah Poling case (2008) for vaccine-induced encephalopathy with autism features. On November 19, 2025, the CDC itself revised its position, stating: "The statement 'Vaccines do not cause autism' is not an evidence-based claim because studies have not ruled out the possibility that infant vaccines cause autism." https://doi.org/10.17226/13164. Yet AAP continues to assert the issue is "proven" and "settled."

### I.    The Lies Exposed: AAP's Material Misrepresentations/Omissions of Fact

### 1.    The Foundational Misdirection: Paul Offit's Claim that Infants Can Safely Receive 10,000 Vaccines at Once

105.    As detailed in Section A above, AAP published in *Pediatrics* a speculative calculation by Offit et al. claiming infants could "theoretically" respond to 10,000 vaccines at once. This substituted immunogenicity for safety, addressing B-cell capacity rather than parents' actual concerns about cumulative toxicological effects. AAP deployed this theory to preempt and block the IOM-recommended studies, creating a false consensus that made actual research seem unnecessary, mirroring tobacco industry tactics. For twenty-four years, AAP has disseminated this fraud through mail and wire, so their Fellows could assure parents that their children can receive all the vaccines in the vaccine schedule since they could "respond" to 10,000 vaccines at once.

### 2.    "The Schedule Is Fully Tested and Safe"

106.    On multiple occasions, AAP has falsely represented that the childhood vaccine schedule has been fully tested and proven safe. In its official policy position, AAP states: "The AAP believes immunizations are safe and effective for children." (URL at ¶ 104).

107.    In its clinical report "Countering Vaccine Hesitancy," published in *Pediatrics* and distributed to members nationwide, AAP instructs pediatricians that "[t]he clear message parents should hear is that vaccines are safe and effective," and describes the CDC schedule as "the only

evidence-based schedule that has been tested and approved by multiple authoritative experts for safety and efficacy." AAP, "Countering Vaccine Hesitancy," *Pediatrics* 2016;138(3):e20162146, https://doi.org/10.1542/peds.2016-2146.

108.    Remarkably, the same clinical report claims "[t]he safety of the currently recommended vaccines administered according to their established schedules was strongly affirmed by the [IOM] in 2013." *Id.* This is a material omission of fact. AAP omits the report's central finding: "studies designed to examine the long-term effects of the cumulative number of vaccines or other aspects of the immunization schedule have not been conducted." IOM 2013 at 6, which the IOM had recommended be undertaken back in 2002 (as detailed *supra* ¶ 58.) AAP omitted this so that its pediatrician Fellows would misinform the parents of their patients that IOM had "strongly affirmed" the schedule's safety.

109.    On HealthyChildren.org (AAP's parent-targeted website), in an article titled "Vaccine Safety: Examine the Evidence," AAP represents that "[f]or a vaccine to be recommended—as part of the childhood and adolescent immunization schedule, it must be tested, found safe and closely monitored." (URL at ¶ 104). The article claims "[r]esearch continues to confirm that vaccines are safe and effective." These representations omit that no study has ever compared health outcomes between children receiving the complete schedule and unvaccinated children, the very gap IOM identified in 2002 and confirmed as unresolved in 2013.

110.    These statements are materially false: no study has ever tested the cumulative safety of the 72+ dose schedule. AAP knew this since it cites the report.

3.    **AAP's Fraudulent Alarmism**

a.    **December 2025: The Hepatitis B Dress Rehearsal**

111.    On December 5, 2025, ACIP voted eight-three to recommend individual decision-making for hepatitis B birth doses in low-risk infants (99.6% of U.S. births), vaccinating no earlier than two months. https://www.cdc.gov/media/releases/2025/2025-acip-recommends-individual-based-decision-making-for-hepatitis-b-vaccine-for-infants-born-to-women.html. This aligns with practices in the UK and Canada, where similar delays have caused no infection increases.

112.    AAP immediately issued false warnings. AAP President Susan Kressly declared the decision "irresponsible and purposely misleading," claiming it would cause "99,000 preventable hepatitis B infections" and "devastating results" including chronic disease, liver cancer, and death.[10] Committee member José Romero claimed that delaying the birth dose would cause "children [to] die preventable deaths" and result in "liver cancers."[11]

113.    These projections derive from unpublished models, not observed outcomes. The United Kingdom, Canada, and seventeen EU member states delay birth doses without infection surges or increased liver cancers. AAP knew that 99.5% of U.S. infants face no hepatitis B transmission risk at birth (CDC data shows 0.5% of pregnancies are HBsAg-positive).

---

[10]    AAP: "Changes to hepatitis B recommendations 'irresponsible and purposely misleading,'" *AAP News* (Dec. 5, 2025), https://publications.aap.org/aapnews/news/33915 (last visited Jan. 10, 2026); "Report: Hepatitis B vaccine safe; delaying would lead to increased infections," *AAP News* (Dec. 2, 2025), https://publications.aap.org/aapnews/news/33888 (last visited Jan. 10, 2026).

[11]    J. Fitch, "ACIP delays vote on hepatitis B virus vaccine to December 5," *Contemporary Pediatrics* (Dec. 4, 2025), https://www.contemporarypediatrics.com/view/acip-delays-vote-on-hepatitis-b-virus-vaccine-to-december-5, perma.cc/D9L7-AC6Q.

114.   These December 2025 transmissions constitute fresh predicate acts of mail and wire fraud, knowingly false statements designed to maintain revenue streams by preventing even minimal schedule modifications.

**b.      January 2026: A Very Dark Day for Vaccine Revenue**

115.   One month later, AAP's conduct became even more revealing. On January 5, 2026, Acting CDC Director Jim O'Neill signed a decision memorandum revising the childhood immunization schedule, moving six vaccines — rotavirus, influenza, hepatitis A, hepatitis B, meningococcal disease, and COVID-19  — from universal recommendations to "shared clinical decision-making." The revision does not remove any vaccine from availability; all remain fully covered by insurance without cost-sharing. HHS's scientific assessment found that the United States was "a global outlier" in recommended doses, yet "does not have higher vaccination rates" than peer nations relying on recommendation-only models. Seventeen EU member states, the United Kingdom, and Japan use such models while maintaining rates exceeding 90%.

116.   AAP's response was immediate. Sean O'Leary, chair of AAP's Committee on Infectious Diseases, instructed parents to "trust the professional societies like the American Academy of Pediatrics," but "for now, unfortunately, we have to ignore everything about vaccines that is coming from our federal government." He described the announcement as "a very dark day for children and for their parents and for our country generally" and predicted "[t]here will be more diseases, more infection, more hospitalization." CIDRAP, "HHS announces unprecedented overhaul of US childhood vaccine schedule" (Jan. 5, 2026), https://www.cidrap.umn.edu/childhood-vaccines/hhs-announces-unprecedented-overhaul-us-childhood-vaccine-schedule (last visited Jan. 16, 2026).

117.    AAP announced it would publish its own schedule contradicting CDC guidance, positioning itself not as a scientific organization deferring to federal health authorities but as a competing authority that supersedes the government when government policy threatens AAP's member interests. The policies AAP opposes threaten the enterprise's revenue model: under shared decision-making, physicians must discuss rather than simply administer, the bundled well-child visit becomes less efficient, and pay-for-performance metrics become harder to achieve.

118.    AAP has added to its existing lawsuit seeking to overturn this reduction of recommended vaccines with a hearing scheduled for February 13, 2026. CNN, "Medical Group will ask court to block new CDC recommendation." (Jan. 14, 2026), https://www.cnn.com/2026/01/15/health/vaccine-recommendation-aap-block (last visited Jan. 16, 2026).

> c.    If CDC's Recommendations for 11 Diseases is "Dangerous," What Is California's 10?

119.    AAP's representations are false and fraudulent. California law requires vaccines for only 10 diseases for school entry (diphtheria, Haemophilus influenzae type b, measles, mumps, pertussis, poliomyelitis, rubella, tetanus, hepatitis B, and varicella). Cal. Health & Safety Code § 120335(b)(1)–(10). California eliminated all personal belief exemptions in 2015, creating the strictest vaccine mandate in the nation. The new schedule that the AAP calls "dangerous" recommends 11 vaccines for all children, one more than California mandates.

120.    If recommending 11 vaccines is "dangerous," "a very dark day for children," " and will cause "more disease, more infection, more hospitalizations," then California's 10 vaccines mandate is even more dangerous. Except that California children have not suffered the catastrophic outcomes AAP predicts. AAP has never called California's schedule dangerous,

never sought to enjoin California officials, and has never told parents to "ignore everything" from the California Department of Public Health.

121.    AAP filed its lawsuit in the District of Massachusetts seeking to enjoin a federal schedule recommending vaccines for 11 diseases. Ironically, Massachusetts requires only vaccines for 9 diseases for grades K-6, and 10 for grades 7-12. Massachusetts Department of Public Health, Immunization Requirements for School Entry (updated Apr. 16, 2025), available at https://www.mass.gov/doc/immunization-requirements-for-school-entry-1/download. AAP has never sued Massachusetts. AAP has never called Massachusetts' schedule dangerous. It is currently in federal court, but it is not seeking to overturn Massachusetts' 10 disease mandate and is not telling Massachusetts parents to ignore the Massachusetts Department of Public Health.

122.    This inconsistency is fatal to AAP's credibility, and explains its true motive: Money, selling more vaccines, and protecting the ever-growing vaccine schedule that has taken it from a small organization to the chief architect of the dramatic and worrisome decline of the health of American children.

123.    AAP's stated concerns are pretextual. This action presents them as predicate acts of racketeering.

### 4.    AAP's False Attribution of Mortality Declines to Vaccines

124.    AAP claims that its vaccine recommendations "have saved millions of lives." Sean O'Leary, MD, Chair of AAP's Committee on Infectious Diseases, stated on AAP's HealthyChildren.org website: "The AAP recommendations, based on decades of ongoing research, have saved millions of lives." https://www.healthychildren.org/English/tips-tools/ask-

the-pediatrician/Pages/what-is-the-difference-between-the-AAP-recommended-immunization-schedule-and-other-vaccine-schedules.aspx (last updated Jan. 18, 2026).

125.    This representation is false or highly misleading. A  study from Johns Hopkins and CDC researchers, Guyer et al., "Annual Summary of Vital Statistics: Trends in the Health of Americans During the 20th Century," *Pediatrics* 2000;106(6):1307-1317, https://doi.org/10.1542/peds.106.6.1307, analyzed 100 years of U.S. mortality data. The conclusion: nearly 90% of all mortality reductions from infectious diseases occurred before 1940, which is before almost all of the vaccines on the current vaccine schedule were invented or in widespread use.[12]

126.    Measles mortality dropped 97% before the vaccine was licensed. Pertussis and polio mortality fell dramatically before their vaccines. Scarlet fever mortality plummeted along the same timeline, and no vaccine has ever been developed for that disease. The CDC's own report attributes these declines to sanitation, nutrition, housing, and antibiotics—not vaccination. "Achievements in Public Health, 1900–1999," MMWR 1999;48(29):621-629, https://www.cdc.gov/mmwr/preview/mmwrhtml/mm4829a1.htm.

127.    McKinlay and McKinlay's landmark 1977 study estimated that all medical interventions, including vaccines and antibiotics combined, accounted for less than 3.5% of mortality decline from infectious disease. Clean water, sanitation, refrigeration, nutrition, and flush toilets caused the other 96.5%. McKinlay JB & McKinlay SM, "The Questionable Contribution of Medical Measures to the Decline of Mortality in the United States in the

---

[12]    Diphtheria was available from the mid-1930s, Tetanus since the late 1930s, and Pertussis was available but still experimental in the early 1940s.

Twentieth Century," *Milbank Memorial Fund Quarterly* 1977;55(3):405-428,

https://pubmed.ncbi.nlm.nih.gov/413067/.

128.   By claiming credit for mortality reductions caused by sanitation and public health

infrastructure, AAP knowingly misattributes historical fact to support the enterprise's

commercial objectives.

### 5.      Pointing to VAERS/VSD as "Proof of Safety"

129.   AAP represents to parents and pediatricians that post-licensure monitoring

systems, specifically the Vaccine Adverse Event Reporting System (VAERS) and VSD,

demonstrate that vaccines are safe. On August 29, 2016, AAP published in AAP News that

"[p]ost-licensure monitoring includes the Vaccine Adverse Events Reporting System (VAERS),

the [VSD]," and other systems—implying these mechanisms validate vaccine safety. AAP News,

"How to address vaccine hesitancy," https://publications.aap.org/aapnews/news/11050. (Last

visited Jan. 10, 2026).

130.   These representations are fraudulent because AAP exploits the limitations of these

systems asymmetrically, citing them as proof of safety while invoking those same limitations to

dismiss evidence of harm.

### a.      The VAERS Double Standard

131.   AAP's own 2024 Clinical Report "Strategies for Improving Vaccine

Communication and Uptake" acknowledges that VAERS "cannot generally assess causality" and

"serves as a hypothesis-generating system." *Pediatrics* 2024;153(3):e2023065483,

https://doi.org/10.1542/peds.2023-065483. CDC's website similarly states: "VAERS data alone

cannot determine if the vaccine caused the reported adverse event."

https://www.cdc.gov/vaccine-safety-systems/vaers/index.html.

132.    Yet AAP directs parents to rely on VAERS as evidence of vaccine safety, assuring them that "based on VAERS reports, vaccine safety professionals continuously look for any problem with a vaccine" and that VAERS monitoring ensures vaccines "remain safe." American Academy of Pediatrics, *Vaccine Safety: Parent Handout* (2008), http://www.rainbowvt.com/forms/AAP_Vaccine_Safety_Parent_Handout.pdf; AAP, *Fact Checked: Childhood Vaccines Are Carefully Studied* (2024), https://www.aap.org/en/news-room/fact-checked/fact-checked-childhood-vaccines-are-carefully-studiedincluding-with-placebosto-ensure-theyre-safe-and-effective/. But when parents cite VAERS reports of deaths and serious adverse events, AAP dismisses the same data as incapable of determining causation. *A system that cannot assess causality cannot prove safety any more than it can prove harm.* AAP's selective use of VAERS, asserting safety while dismissing harm, constitutes knowing misrepresentation.

133.    The inadequacy of VAERS is compounded by severe underreporting. A 2010 Harvard Pilgrim Health Care study funded by HHS estimated that "fewer than 1% of vaccine adverse events are reported" to VAERS. The study developed an automated system to improve capture rates, but the project was abandoned when CDC stopped responding. Ross Lazarus, *Electronic Support for Public Health--Vaccine Adverse Event Reporting System (ESP:VAERS): Final Report*, Grant No. R18 HS 017045 (2010), https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf. CDC refused to improve a system it knew captured less than 1% of adverse events. AAP continued to cite that system as proof of safety.

b.    **The VSD Fraud**

134.    The VSD is not a safety system. It is a database, a collection of electronic health records from eleven healthcare organizations covering approximately 12 million Americans. The VSD contains vaccination records alongside subsequent health outcomes: doctor visits, diagnoses, hospitalizations, deaths. It is like a giant filing cabinet containing the medical history of millions of children. The files are there. But a filing cabinet does not "monitor" anything. It sits there. Whether those files reveal safety or danger depends entirely on whether anyone opens the filing cabinet and examines what is inside.

135.    As detailed above (¶ 58), in 2002, the IOM told CDC to "explor[e] the feasibility of using existing vaccine surveillance systems"—specifically naming VSD—to study "safety questions related to … the immunization schedule" to address the gap in vaccine safety. *Id.* The IOM was asking the CDC to open its filing cabinet and analyze the records.

136.    As indicated, the IOM checked back in 2013 and found that the CDC never opened the filing cabinet: "studies designed to examine the long-term effects of the cumulative number of vaccines or other aspects of the immunization schedule have not been conducted." *Supra,* ¶ 59. As of 2026, twenty-four years after the IOM's recommendation, the CDC has still not used VSD to answer the fundamental question: Is the cumulative vaccine schedule safe and creates an overall benefit? The filing cabinet has grown larger; more files accumulate every year. And no one is permitted to examine them; but the AAP keeps saying that this filing cabinet proves the safety of the vaccine schedule.

c.    **Deflecting and Conflating the Studies**

137.    The AAP used an asserted ethical problem of using an unvaccinated cohort in a randomized prospective clinical trial (vaxed vs. unvaxed) with the IOM twice recommending

retrospective studies using VSD data to determine safety and net benefit (if any) of the vaccine schedule. S*upra,* ¶¶ 58-60. These statements are fraudulent.

### 6.    "Vaccines do not cause autism — this has been proven."

138.    On its HealthyChildren.org website, the AAP states: "Vaccines are not associated with autism or developmental delay," and "[r]esearch continues to confirm that vaccines are safe and effective." (URL at ¶ 104).

139.    On November 20, 2025, one day after the CDC admitted that "vaccines do not cause autism" was "not an evidence-based claim,"[13] the AAP updated this page with a statement from its President, Dr. Susan Kressly: "Parents deserve peace of mind. Decades of rigorous research have shown vaccines do not cause autism." (URL at ¶ 104). The AAP thus doubled down on its categorical denial with actual knowledge that the CDC had just retracted the same claim.

140.    These categorical claims are false. The IOM's 2012 report *Adverse Effects of Vaccines* concluded that for DTaP and autism, evidence was "inadequate to accept or reject a causal relationship"; for other infant vaccines (HepB, Hib, IPV, PCV), no studies examining autism were even reviewed because none existed. https://nap.nationalacademies.org/catalog/13164.

141.    In 2008, the federal Vaccine Injury Compensation Program conceded compensation in the Hannah Poling case for vaccine-induced encephalopathy resulting in autism features. These findings long predate the current administration. In November 2025, the CDC acknowledged what the IOM found thirteen years earlier: "The claim 'vaccines do not cause autism' is not an evidence-based claim." https://www.cdc.gov/vaccine-safety/about/autism.html.

---

[13]    https://www.cdc.gov/vaccine-safety/about/autism.html.

142.    The AAP knew or should have known these limitations. Its committee members participate in National Academy reviews and are aware of the "inadequate to accept or reject" findings. The AAP was notified of the Poling concession. The AAP knows the CDC has retracted its categorical denial. Yet the AAP continues to claim the issue is "proven" and "settled." That the AAP transmitted this categorical denial via its website to millions of parents, one day after the CDC finally admitted the claim was "not evidence-based," constitutes wire fraud in furtherance of the enterprise.

### 7.    AAP's Fraudulent Marketing of the Red Book as "Authoritative"

143.    The AAP markets its Red Book as "the most authoritative and comprehensive" resource for pediatric infectious diseases, with "evidence-based policy recommendations" updated throughout. The 2024 Red Book (33rd Edition) provides recommendations from "the combined expertise of the CDC, the FDA, the NIH, and hundreds of physician contributors." https://shop.aap.org, perma.cc/L3SA-UGLX. The Red Book is sold for $175.00 to pediatricians, hospitals, and public health departments across all states.

144.    These representations of authority and evidence are false. As detailed in Section G, the Red Book presents the CDC schedule as fully tested without disclosing the National Academy of Medicine's finding that "studies designed to examine the long-term effects of the cumulative number of vaccines have not been conducted." IOM 2013 at 5. The Red Book recommends vaccines as "safe and effective" without disclosing that most were licensed without true saline placebo controls. AAP Committee members participated in the IOM review and knew these limitations when publishing the 2024 Red Book. Yet it continues to present untested recommendations as "authoritative" and "evidence-based."

**J.    Tobacco Litigation Precedent with Comparable Fraudulent Statements**

145.    The misrepresentations alleged herein are not novel. Federal courts have already found that materially identical statements (categorical safety assurances, false claims of adequate testing, denials of known risk, and assertions of independent scientific validation) constitute actionable fraud under 18 U.S.C. §§ 1341 and 1343 when used to mislead the public through coordinated enterprise activity. *See United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006), *aff'd*, 566 F.3d 1095 (D.C. Cir. 2009); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 113 F. Supp. 2d 345 (E.D.N.Y. 2000).

146.    In *Philip Morris*, the courts found that cigarette manufacturers and allied "research" organizations operated a RICO enterprise by: (a) falsely denying known health risks while internally acknowledging them; (b) representing that "independent" scientific investigation had failed to establish any causal link between smoking and disease, while suppressing adverse research; and (c) using purportedly independent entities like the Council for Tobacco Research to conduct "objective" research while concealing adverse findings. 566 F.3d at 1105-08, 1119-20, 1122-24; *Blue Cross*, 113 F. Supp. 2d at 356-57, 359-60.

147.    AAP's conduct tracks this pattern. The tobacco defendants assured the public that decades of "independent" research had failed to establish harm, while suppressing contrary evidence. AAP assures parents that the schedule is "fully tested" and "safe," and blocks the studies that would test it, while marginalizing research showing harm. Both enterprises used the apparatus of science to foreclose scientific inquiry.

148.    Based on *Philip Morris* and *Blue Cross*, AAP's categorical safety claims, if proven, are actionable mail and wire fraud when used as part of a coordinated enterprise scheme to mislead the public.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF RICO, 18 U.S.C. § 1962(c)

149.    Plaintiffs reallege and incorporate by reference paragraphs 1-148

150.    Section 1962(c) of RICO provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity …."

151.    To establish a civil RICO violation, Plaintiffs must prove: (1) an enterprise; (2) defendant's conduct of the enterprise's affairs; (3) through a pattern of racketeering activity; and (4) injury to business or property caused thereby.

### A.    The Enterprise Exists

152.    As detailed in the above (¶¶ 6-10, 50-144), Defendant and other enterprise participants including vaccine manufacturers form an association-in-fact enterprise. An association-in-fact enterprise must have at least three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

153.    The coordinated conduct described in the Factual Background establishes all three features. AAP and the other enterprise members share a common purpose: maximizing vaccine uptake regardless of unresolved safety questions. They pursued this purpose: the Offit Article's deflection "10,000 vaccines" claim that substituted immunogenicity theory for actual safety testing (¶¶ 51-63); blocking IOM-recommended cumulative safety studies for over two decades (¶¶ 64-68); the Red Book pricing and administration standard that makes vaccines the financial backbone of pediatric practice (¶¶ 97-100); enforcement against dissenting physicians through

45

medical board complaints and hospital credentialing challenges (¶ 34-45); insurance incentive programs that penalize practices failing to meet vaccination targets (¶¶ 94-96); and coordinated "misinformation" campaigns to suppress safety concerns (¶¶ 101-104). This conduct spans more than two decades, thus satisfying *Boyle*'s longevity requirement.

154.    These relationships are reinforced by financial ties. Vaccine manufacturers fund AAP through multiple channels, including direct donations via the "Friends of Children Fund"— where Pfizer, Merck, and Sanofi are "President's Circle" donors ($50,000 or more annually) and GlaxoSmithKline is a "Patron" donor—as well as conference sponsorships, educational program funding, and grants for vaccine-related initiatives. *See* American Academy of Pediatrics, Current Partners, https://www.aap.org/en/philanthropy/corporate-and-organizational-partners/current-partners, perma.cc/6X6L-WXKD.  It does not appear that AAP publicly discloses aggregate industry funding.

155.    AAP serves as the functional equivalent as the Tobacco Institute and Center for Tobacco Research which conducted the cigarette manufacturers' joint public relations and funded "special projects" research, and then conveyed the unified message about the asserted unresolved questions about smoking and cancer. *See* ¶¶ 145-148.

156.    For more than sixty years AAP and its enterprise associates have controlled federal vaccine policy through membership on the CDC's Advisory Committee on Immunization Practices. AAP has had a liaison seat from ACIP's founding in 1964. CDC, "History and Evolution of the Advisory Committee on Immunization Practices, United States, 1964–2014," MMWR Oct. 24, 2014. From 1995 until mid-2025, AAP and the CDC harmonized their immunization schedules, operating as a unified voice on vaccine recommendations.

Congressional Research Service, "The Advisory Committee on Immunization Practices (ACIP),"
IF12317.

157.   On June 9, 2025, HHS Secretary Kennedy removed all seventeen ACIP members.
AAP liaisons were subsequently disinvited from ACIP workgroups. AAP has filed suit to restore
its position. The six decades of control and institutional coordination satisfy *Boyle*'s "longevity"
requirement. The lawsuit by AAP and other members of the enterprise against HHS shows how
the enterprise operates.

158.   The control was evidenced by the endemic conflicts of interest when the schedule
expanded most rapidly. A 2000 House Committee on Government Reform report found that
CDC routinely granted conflict-of-interest waivers to ACIP members and that seven of ten
members of the rotavirus working group had financial conflicts. U.S. House of Representatives,
Committee on Government Reform, "Conflicts of Interest in Vaccine Policy Making," Majority
Staff Report, 106th Cong., June 15, 2000. A 2025 JAMA study documented that conflicts among
ACIP members peaked at 42.8% in 2000, declining to 5% by 2024. Kanter GP, Mankowitz T &
Lurie P, "Conflicts of Interest in Federal Vaccine Advisory Committees," JAMA
2025;334(14):1295-97. It was during this high-conflict of interest era that AAP's Paul Offit
served on ACIP (1998-2003) while holding Merck-funded patents on a rotavirus vaccine. It was
also the period when AAP argued against safety studies of the cumulative effect (net benefit or
harm) of the IOM-recommended safety studies. ¶¶ 60-63.

159.   In sum, AAP and vaccine manufacturers constitute an association-in-fact
enterprise under 18 U.S.C. § 1961(4): they share a common purpose, maintain ongoing financial
and institutional relationships, and have coordinated conduct affecting interstate commerce for
more than two decades.

## B.    AAP Conducts the Enterprise's Affairs

160.    AAP directs the enterprise through multiple mechanisms detailed in the Factual Background: publishing the Red Book as 'authoritative' guidance that pediatricians must follow (¶¶ 97-98); maintaining financial pressure through insurance reimbursement structures (¶¶ 94-96); controlling the information 67,000 pediatricians deliver to families and opposing federal reform efforts (¶¶ 87-93, 111-123); and most critically, blocking safety studies while claiming the schedule is "fully tested" (¶¶ 64-77).

## C.    Through a Pattern of Racketeering Activity

161.    Mail and wire fraud occur when one makes material misrepresentations with intent to defraud. 18 U.S.C. §§ 1341, 1343. Each fraudulent statement transmitted interstate constitutes a predicate act.

162.    AAP committed dozens of predicate acts from 2002-2025, as detailed in Section I, "The Lies Exposed: AAP's Material Misrepresentations and Omissions of Fact" (¶¶ 105-148). Key examples include: January 2002, publishing Offit's "10,000 vaccines" article in *Pediatrics*, substituting a theoretical calculation about B-cell capacity for actual safety testing (¶¶ 51-62); November 20, 2025, publishing AAP President Susan Kressly's statement that "decades of rigorous research have shown vaccines do not cause autism, one day after the CDC admitted this was "not an evidence-based claim" (¶¶ 138-139); December 5, 2025, further fraudulent claims about the effects of moving the Hep b shot from birth to day 60 to block ACIP reform (¶¶ 112-113).

163.    Each misrepresentation was transmitted interstate to AAP's 67,000 members and millions of parents, constituting predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.

48

164.    These acts demonstrate both continuity spanning 24 years and relatedness through common purpose, methods, and victims. *H.J. Inc. v. Northwestern Bell*, 492 U.S. 229, 239 (1989). As in *Philip Morris*, where the enterprise's fraud continued through trial, AAP's December 2025 exaggerations and January 2026 actions demonstrate ongoing racketeering activity, defeating any limitations defense. *Philip Morris*, 566 F.3d at 1134.

**D.    Causation: AAP's Intended Chain of Reliance**

165.    AAP designed a coercive system where its fraudulent statements would reach parents through pediatricians. The causation chain operates exactly as intended.

166.    A 2025 KFF/Washington Post survey found that 85% of parents trust their child's pediatrician "a great deal" or "a fair amount" for vaccine information—making pediatricians the most trusted source, ranking above local health departments (64%), the CDC (59%), and the FDA (55%). KFF/The Washington Post, "Survey of Parents," Oct. 10, 2025, https://www.kff.org/public-opinion/kff-the-washington-post-survey-of-parents/. *See also* Kempe et al., "Parental Hesitancy About Routine Childhood and Influenza Vaccinations," *Pediatrics* 2020;146(1):e20193852, https://doi.org/10.1542/peds.2019-3852 (parents consistently rank healthcare providers as their most trusted source for vaccine information, with studies showing 74-82% citing their child's doctor as the most influential factor in vaccine decision-making).

167.    RICO requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). That standard is satisfied here. AAP publishes false safety claims knowing pediatricians must follow its guidelines or face loss of board certification, insurance participation, and hospital privileges. Pediatricians, economically dependent on vaccine administration and quality bonuses tied to AAP benchmarks, present AAP's claims to parents as medical fact. Parents consent based on

what their pediatricians tell them. Children suffer injuries from the untested schedule, causing families economic harm.

168.    The Supreme Court held in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 656-58 (2008), that first-party reliance is not an element of RICO claims predicated on mail or wire fraud. A plaintiff can be injured "by reason of" a fraud scheme even without receiving or relying on any misrepresentation. *Id.* at 649. What matters is whether the defendant's conduct proximately caused the injury, not whether the plaintiff relied on anything.

169.    The First Circuit applied *Bridge* to pharmaceutical fraud transmitted through prescribing physicians in *Kaiser Found. Health Plan, Inc. v. Pfizer, Inc.*, 712 F.3d 21 (1st Cir. 2013) ("*Kaiser*"). Pfizer made misrepresentations to physicians, who prescribed based on those misrepresentations, injuring the payor that reimbursed for those prescriptions. The circuit court upheld that physician intermediaries do not render causation too remote when the defendant intended the scheme to operate through them. *Id.* at 36-39.

170.    The parent Plaintiffs have stronger causation than the *Kaiser* plaintiffs. Pfizer influenced independent physicians through marketing. AAP exercises direct control over pediatricians through board certification, insurance participation requirements, and economic compulsion. Pediatricians who deviate from AAP guidelines face loss of livelihood. *Kaiser* established that influence suffices for proximate cause. This case involves control, which is more than sufficient.

171.    As shown in Section D (¶¶ 81-86), vaccine manufacturers have acquired companies treating the side effects their vaccines cause. The enterprise profits from the problem, then profits again from treating it.

E.    **Concrete Injuries to Business or Property**

172.    Plaintiffs suffered economic injuries as detailed in ¶¶ 21-22 for Plaintiff Shaw,

¶¶ 26-27 for Plaintiff Nelson, ¶ 33 for Plaintiff Doe, ¶ 42 for Plaintiff Thomas, and ¶¶ 43-44 for

Plaintiff Stoller, under *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593 (2025).

173.    Defendant violated 18 U.S.C. § 1962(c), causing Plaintiffs damages subject to

trebling under 18 U.S.C. § 1964(c).

**SECOND CLAIM FOR RELIEF**
**CONSPIRACY TO VIOLATE RICO (18 U.S.C. § 1962(D))**

174.    Plaintiffs reallege and incorporate by reference paragraphs 1-173.

175.    18 U.S.C. § 1962(d) provides: "It shall be unlawful for any person to conspire to

violate any of the provisions of subsection (a), (b), or (c) of this section."

176.    To establish RICO conspiracy, Plaintiffs must prove that Defendant knowingly

agreed to participate in the conduct of an enterprise's affairs through a pattern of racketeering

activity; here, mail and wire fraud. *Salinas v. United States*, 522 U.S. 52, 65 (1997). The

agreement "need not be express, but may be inferred from the defendants' conduct." *United*

*States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir. 1984). "Circumstantial evidence showing a unity

of purpose or a common design and understanding among conspirators to commit the crime is

sufficient to prove a conspiracy." *United States v. Maloney*, 71 F.3d 645, 652 (7th Cir. 1995).

177.    The object of the conspiracy is to maintain and expand vaccine uptake by

disseminating false safety assurances though AAP's pediatrician's network while blocking

studies that might reveal harm. AAP's knowledge is established by its awareness of the IOM's

2002 and 2013 findings that cumulative safety studies had not been conducted, and its continued

dissemination of categorical safety claims despite this knowledge. The co-conspirators are the

enterprise participants identified in ¶¶ 6 and 152-159 above.

178.    The evidence of agreement is overt coordinated action. AAP and other professional trade groups are presently engaged in joint litigation against HHS to restore the vaccine recommendations the enterprise depends upon (¶¶ 118, 157). This lawsuit is an agreement reduced to a filed complaint. Some of the enterprise participants have identified themselves, aligned their interests in a single legal action, and stated their common purpose: preserving the vaccine schedule that generates their revenue. They have hoisted themselves with their own petard.

179.    Additional conduct from which agreement can be inferred includes: six decades of joint participation in ACIP, with AAP holding a liaison seat since 1964 (¶ 156); the 1995 "harmonized" schedule jointly launched by AAP, ACIP, and AAFP that created the unified standard state mandates enforce (¶ 91); annual funding flows from Pfizer, Merck, Sanofi, and GSK through AAP's "Friends of Children Fund" and other channels (¶ 154); Merck's $1.5 million endowment funding the position held by AAP's primary spokesman on vaccine safety (¶ 66); Offit's simultaneous service on ACIP while holding Merck-funded patents and publishing in AAP's journal (¶ 158); synchronized public statements during the December 2025 ACIP deliberations (¶¶ 67, 112); and AAP's 2019 campaign urging tech platforms to suppress vaccine safety content, a campaign that served manufacturers' interests as much as AAP's (¶¶ 101-103).

180.    In *Philip Morris*, the court inferred agreement from similar evidence: decades of parallel conduct, joint funding arrangements, and coordinated public statements. 449 F. Supp. 2d at 851-906, *aff'd*, 566 F.3d 1095, 1118 (D.C. Cir. 2009).

181.    Plaintiffs suffered injuries detailed above, entitling them to treble damages under 18 U.S.C. § 1964(c).

182.    Defendant violated 18 U.S.C. § 1962(d), entitling Plaintiffs to treble damages under 18 U.S.C. § 1964(c).

## VI.    CONCLUSION

183.    For over twenty-five years, the AAP has told parents, physicians, and policymakers that the childhood vaccine schedule is safe, even though no one had ever studied whether vaccines created a net benefit or harm to children. The AAP's sleight-of-hand was to pass-off the *apparatus* of data collection as *proof* of safety. The fraud is that it looked like science: VAERS sounds like surveillance, but is a passive, woefully under-reporting system that was never designed to establish causation. The VSD sounds like a safety monitoring system, but it is just a giant digital filing cabinet.

184.    When the IOM twice told the CDC to analyze the files in the filing cabinet, AAP's deflection sounded like ethics, claiming prospective studies with an unvaccinated control group would be unethical, even though the IOM specifically rejected such studies in favor of analysis of existing records. And AAP dismissed as methodologically flawed every study that found unvaccinated children healthier. The strategy was to mischaracterize unanalyzed safety systems as proof of the safety of the vaccine schedule, to sell more vaccines.

185.    The AAP's January 2026 conduct strips away any remaining pretense. AAP calls reducing the CDC schedule down to eleven vaccines "dangerous" — one more than California and Massachusetts require. The inconsistency is dispositive. AAP's position is about control and revenue, not childhood safety.

186.    AAP claims that recent federal changes to vaccine schedule policy endanger children. The real threat is to member revenue. AAP is presenting these concerns to a

Massachusetts federal court, where they should be recognized for what they are: the latest predicate acts in a quarter-century racketeering enterprise.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that upon trial of this action, the Court enter judgment in their favor and against Defendant, and grant the following relief:

**Declaratory Relief:** A declaration that no studies have established the safety of the entire childhood immunization schedule; that the specific representations and omissions detailed in Section I of this Complaint are materially false and misleading; and that Defendant's broader claims (including that the schedule is "fully tested and proven safe," vaccines are categorically "safe and effective," questioning physicians spread "misinformation," and pediatricians "lose money on vaccines") are predicate acts under RICO.

**Injunctive Relief:** An injunction requiring Defendant to publish corrective statements in vaccine-related publications (e.g., the Red Book and HealthyChildren.org) disclosing the lack of comprehensive safety testing and insurer incentive programs, and prohibiting further unqualified safety claims without such disclosures.

**Damages:** Treble damages under 18 U.S.C. § 1964(c) for economic injuries to business or property suffered by Plaintiffs Shaw, Nelson, Doe, Thomas, and Stoller.

**Attorneys' Fees and Costs:** An award of reasonable attorneys' fees, expert fees, and costs pursuant to 18 U.S.C. § 1964(c), and such other and further relief as the Court deems just and proper.

Dated January 21, 2026

Respectfully submitted,
/s/ Richard Jaffe

RICHARD JAFFE, ESQ.
428 J Street 4th Floor
Sacramento, California 95814
Tel: 916-492-6038
Fax: 713-626-9420
rickjaffeesquire@gmail.com

CA Bar No. 289362
DC District Court ID No. CA00224

Attorney for Plaintiffs