**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANDREA SHAW, *et al.*,<br><br>                    Plaintiffs,<br><br>     v.<br><br>AMERICAN ACADEMY OF PEDIATRICS,<br><br>                   Defendant. | Civil Action No. 1:26:cv-00171 (TJK) |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

    A.    The American Academy Of Pediatrics............................................................ 3

    B.    The Alleged Racketeering Activities ............................................................. 4

    C.    This Lawsuit And Plaintiffs' Alleged RICO Injuries .................................... 6

LEGAL STANDARDS............................................................................................................ 7

ARGUMENT ........................................................................................................................... 8

I.    PLAINTIFFS' RICO CLAIMS FAIL FOR MULTIPLE, INDEPENDENT REASONS ... 8

    A.    Plaintiffs Fail To Allege Any Predicate Acts ................................................ 9

        1.    Plaintiffs Have Not Adequately Alleged That The AAP Made False Statements. 10

        2.    Plaintiffs Have Not Pleaded Predicate Acts Of Mail And Wire Fraud ................. 14

        3.    Plaintiffs Have Not Pleaded The Requisite Intent ................................................ 23

    B.    Plaintiffs Fail To Allege That The AAP "Conduct[ed] Or Participate[d]" In The Alleged Enterprise's Affairs........................................................................................ 24

        1.    Plaintiffs Fail To Allege The Existence Of An Association-In-Fact Enterprise Because They Fail To Allege A Decisionmaking Structure ................................. 25

        2.    In Any Event, Plaintiffs Fail To Allege That The AAP "Conduct[ed] Or Participate[d]" In The Alleged Enterprise's Affairs............................................. 26

    C.    Plaintiffs Do Not Adequately Allege Either But-For Or Proximate Causation .......... 27

        1.    Plaintiffs Fail To Allege Proximate Causation..................................................... 27

            a.    Parents' "Derivative" Injuries Are Insufficiently Direct................................ 28

            b.    Physicians' Injuries Are Indirect Because They Depend On Separate Actions Of Separate Actors ...................................................................................... 30

2.     Plaintiffs Fail To Allege That Predicate Acts Actually Caused Their Purported Injuries ................................................................................................... 32

3.     Other Causation And Injury Issues Abound........................................................... 35

D.     Plaintiffs' RICO Conspiracy Claims Should Also Be Dismissed ............................... 37

II.     PLAINTIFFS LACK ARTICLE III STANDING............................................................... 38

A.     Plaintiffs Cannot Satisfy Article III's Causation Requirement ................................... 38

B.     Plaintiff CHD Lacks Standing For An Additional And Independent Reason ............. 40

III.     REGARDLESS, PLAINTIFFS CANNOT SEEK DECLARATORY AND INJUNCTIVE RELIEF ..................................................................................................... 41

CONCLUSION..................................................................................................................... 45

**TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach,*
    469 F.3d 129 (D.C. Cir. 2006) .................................................................................42

*Am. Chemistry Council v. DOT,*
    468 F.3d 810 (D.C. Cir. 2006) .................................................................................42

*Am. Fed'n of Gov't Emps., AFL-CIO v. United States,*
    104 F. Supp. 2d 58 (D.D.C. 2000) ...........................................................................40

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam,*
    406 F. Supp. 3d 72 (D.D.C. 2019), *aff'd*, 2020 WL 873574
    (D.C. Cir. Feb. 14, 2020) ...................................................................................20, 24

*Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.,*
    64 F.4th 1354 (D.C. Cir. 2023) ................................................................................46

*Anza v. Ideal Steal Supply Co.,*
    547 U.S. 451 (2006) ...........................................................................................31, 32

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) ...................................................................................44

*W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.,*
    235 F.3d 629 (D.C. Cir. 2001) ...............................................................................9, 15

*Bates v. Nw. Hum. Servs., Inc.,*
    466 F. Supp. 2d. 69 (D.D.C. 2006) ...............................................................15, 16, 17

*Bauman v. Butowsky,*
    377 F. Supp. 3d 1 (D.D.C. 2019) .............................................................................16

*Bennett v. Spear,*
    520 U.S. 154 (1997) ................................................................................................40

*Boyle v. United States,*
    556 U.S. 938 (2009) ................................................................................................26

*Bridge v. Phoenix Bond & Indem. Co.,*
    553 U.S. 639 (2008) ................................................................................................32

*Bruesewitz v. Wyeth LLC,*
    562 U.S. 223 (2011) ...........................................................................................11, 19

**TABLE OF AUTHORITIES — Continued**

*Byrne v. Brock*,
No. 19-7120, 2020 WL 1487757 (D.C. Cir. Feb. 27, 2020)....................................................38

*California v. Texas*,
593 U.S. 659 (2021)..........................................................................................................40

*Cent. Am. Bank for Econ. Integration v. Mossi*,
No. 24-CV-2544 (CRC), 2025 WL 2732731 (D.D.C. Sept. 25, 2025) ............................27, 28

*Chalabi v. Hashemite Kingdom of Jordan*,
503 F. Supp. 2d 267 (D.D.C. 2007) ......................................................................................37

*Ciminelli v. United States*,
598 U.S. 306 (2023)..........................................................................................10, 23, 25

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)..................................................................................................16

*Ctr. for Immigr. Studies v. Cohen*,
410 F. Supp. 3d 183 (D.D.C. 2019)......................................................................................14

*E. Sav. Bank, FSB v. Papageorge*,
31 F. Supp. 3d 1 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015).........................20, 21

*E.Q. v. DHS*,
No. 25-CV-791 (CRC), 2025 WL 1768208 (D.D.C. June 26, 2025) .....................................40

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
902 F.3d 132 (2d Cir. 2018)..................................................................................................31

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)..............................................................................................................40

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) (en banc) ..................................................................................8

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*,
586 U.S. 296 (2019)..............................................................................................................44

*In re Fredeman Litig.*,
843 F.2d 821 (5th Cir. 1988) ................................................................................................43

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*,
528 U.S. 167 (2000)..................................................................................................40, 44, 45

*Gen. Motors, LLC v. FCA US, LLC*,
44 F.4th 548 (6th Cir. 2022) ............................................................................................31, 32

iv

**TABLE OF AUTHORITIES — Continued**

*U.S. ex rel. Geschrey v. Generations Healthcare, LLC*,
  922 F. Supp. 2d 695 (N.D. Ill. 2012) ..............................................................12

*Gotham Print, Inc. v. Am. Speedy Printing Ctrs., Inc.*,
  863 F. Supp. 447 (E.D. Mich. 1994)................................................................17

*Harford Mut. Ins. Co. v. New Ledroit Park Building Co.*,
  313 F. Supp. 3d 40 (D.D.C. 2018)..................................................................46

*Hemi Grp., LLC v. City of New York, N.Y.*,
  559 U.S. 1 (2010)...................................................................................31, 32

*Hengle v. Treppa*,
  19 F.4th 324 (4th Cir. 2021) ....................................................................43, 44

*Holmes v. SIPC*,
  503 U.S. 258 (1992)...........................................................................28, 29, 30

*James v. District of Columbia*,
  869 F. Supp. 2d 119 (D.D.C. 2012) ...................................................................8

*Kaempe v. Myers*,
  367 F.3d 958 (D.C. Cir. 2004)...........................................................................8

*Kaiser Found. Health Plan, Inc. v. Pfizer (In re Neurontin Mktg. and Sales Prac. Litig.)*,
  712 F.3d 21 (1st Cir. 2013)..............................................................................31

*Kelly v. United States*,
  590 U.S. 391 (2020)...................................................................................24, 25

*Kowal v. MCI Commc'ns Corp.*,
  16 F.3d 1271 (D.C. Cir. 1994)............................................................................8

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  No. CV 25-0946 (CKK), 2026 WL 252420 (D.D.C. Jan. 30, 2026)............41, 42, 46

*Med. Marijuana, Inc. v. Horn*,
  604 U.S. 593 (2025)...............................................................................28, 31, 37

*Michigan Welfare Rights Org. v. Trump*,
  600 F. Supp. 3d 85 (D.D.C. 2022) ...................................................................44

*MSP Recovery Claims, Series LLC v. Lundbeck LLC*,
  130 F.4th 91 (4th Cir. 2025) ...........................................................................31

**TABLE OF AUTHORITIES — Continued**

*MSP Recovery Claims v. Pfizer, Inc.*,
　728 F. Supp. 3d 89 (D.D.C. 2024)............................................................10, 23, 24

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
　585 U.S. 755 (2018)..................................................................................11

*Nicholson v. Mabus*,
　257 F. Supp. 3d 6 (D.D.C. 2017)...............................................................8

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
　720 F.3d 490 (2d Cir. 2013)......................................................................11

*Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
　583 F. Supp. 3d 654 (D.N.J. 2022), *aff'd*, 63 F.4th 240 (3d Cir. 2023) ...........................11, 18

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
　63 F.4th 240 (3d Cir. 2023) ......................................................................12, 23

*Padnes v. Scios Nova Inc.*,
　No. C 95-1693 MHP, 1996 WL 539711 (N.D. Cal. Sept. 18, 1996).....................................12

*Religious Tech. Ctr. v. Wollersheim*,
　796 F.2d 1076 (9th Cir. 1986) ..................................................................43, 44

*Ret. Sys. of Rhode Island v. Williams Companies, Inc.*,
　889 F.3d 1153 (10th Cir. 2018) ................................................................16

*Reves v. Ernst & Young*,
　507 U.S. 170 (1993)..................................................................................27, 28

*\*RSM Prods. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
　682 F.3d 1043 (D.C. Cir. 2012)...............................................................39

*Sandza v. Barclays Bank PLC*,
　151 F. Supp. 3d 94 (D.D.C. 2015)............................................................8

*Scheidler v. Nat'l Org. for Women, Inc.*,
　537 U.S. 393 (2003)..................................................................................43

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
　806 F.3d 71 (2d Cir. 2015).......................................................................33, 35

*\*Serv. Emps. Int'l Union Health & Welfare Fund v. Phillip Morris, Inc.*,
　249 F.3d 1068 (D.C. Cir. 2001)...............................................................29, 30, 31

*Solomon v. Dechert LLP*,
　No. 22-3137 (JEB), 2023 WL 6065025 (D.D.C. Sept. 18, 2023).........................................32

**TABLE OF AUTHORITIES — Continued**

*Stankevich v. Kaplan*,
  156 F. Supp. 3d 86 (D.D.C. 2016), *aff'd*, 707 F. App'x 717 (D.C. Cir. 2017).........................26

*\*Torrey v. Infectious Diseases Soc'y of Am.*,
  86 F.4th 701 (5th Cir. 2023) ...............................................................................11, 12, 13, 18

*U.S. Ecology, Inc. v. Dep't of Interior*,
  231 F.3d 20 (D.C. Cir. 2000) ....................................................................................................7

*\*United Food & Com. Workers Union & Emps. Midwest Health Benefits Fund v. Walgreen Co.*,
  719 F.3d 849 (7th Cir. 2013) ...................................................................................16, 27, 39

*United States v. Philip Morris Inc.*,
  116 F. Supp. 2d 131 (D.D.C. 2000)........................................................................................26

*United States v. Philip Morris USA, Inc.*,
  449 F. Supp. 2d 1 (D.D.C. 2006), *aff'd in part*, 566 F.3d 1095
  (D.C. Cir. 2009) ...............................................................................................................13, 14

*United States v. Philip Morris USA Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009) (per curiam) ....................................................................25, 43

*Williams v. Veneman*,
  No. CV 03-2245 (CKK), 2005 WL 8177882 (D.D.C. July 5, 2005).......................................45

*Wilson v. On the Rise Enters., LLC*,
  305 F. Supp. 3d 5 (D.D.C. 2018) ...........................................................................................43

**Statutes & Rules**

18 U.S.C. § 1341.........................................................................................................................9

18 U.S.C. § 1962..................................................................................................................25, 38

18 U.S.C. § 1964.........................................................................................................7, 9, 28, 43

42 U.S.C. § 262...........................................................................................................................4

42 U.S.C. § 300.........................................................................................................................19

Fed. R. Civ. P. 8.......................................................................................................................20

Fed. R. Civ. P. 9...........................................................................................................1, 8, 15, 20

Fed. R. Civ. P. 12....................................................................................................................7, 8

**TABLE OF AUTHORITIES — Continued**

**Other Authorities**

13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal
Practice and Procedure (3d ed. 2025) ......................................................................40

**INTRODUCTION**

This lawsuit is the latest missive in a campaign targeting the American Academy of Pediatrics and its use of science-backed evidence in vaccine policy.  Summarizing the case exposes the absurdity and recklessness—not to mention the legal deficiencies—of its allegations.

In short, Plaintiffs allege that a non-profit organization dedicated to promoting children's health—including by providing guidance about childhood vaccines—has perpetrated multiple criminal frauds as part of a wide-ranging and long-running criminal racketeering enterprise.  That is because Plaintiff Children's Health Defense—which has long sought to criticize and undermine the American Academy of Pediatrics (the "AAP")—disagrees with decades of evidence-backed medicine and science and, unable to prevail through scientific discourse and debate, has instead chosen to weaponize the RICO statute to silence its opponents.  Political and scientific disputes are a part of modern life, but accusing people you disagree with of being criminal racketeers—and at the expense of children's lives no less—is beyond the pale and a profound abuse of the legal system.

The Court should reject this latest tactic because it rests on a series of fundamental defects. Each independently requires dismissal, including for lack of Article III standing.

*First*, Plaintiffs fail to sufficiently allege any predicate acts of mail or wire fraud—much less plead them with the particularity required by Rule 9(b)—and thus fail to allege a pattern of racketeering.  The complaint's central theory, buried beneath a barrage of accusations of criminality, is that Plaintiffs disagree with the AAP's research-backed statements about the safety and efficacy of childhood vaccines. Instead of accepting that disagreement, Plaintiffs insist that their own beliefs render the AAP's scientific views knowingly false.  In doing so, Plaintiffs repeatedly mischaracterize what the AAP actually said—quoting statements out of context or

1

attributing claims the AAP never made—while advancing a theory that largely amounts to the assertion that it is criminally fraudulent to draw scientific conclusions from existing research unless additional studies of Plaintiffs' choosing are conducted.  They ask the Court to wade into scientific debates, deem the AAP's scientific opinions knowingly false, and treat those opinions as acts of criminal racketeering.  But, at most, Plaintiffs have pleaded facts that amount to a dispute between them and the AAP about public health—not a scheme to defraud.

*Second*, Plaintiffs fail to plead the existence of a RICO enterprise, much less that the AAP "conduct[ed]" or "participate[d]" in that enterprise's affairs.  Their sweeping "association-in-fact" theory lumps together independent actors—vaccine manufacturers, professional organizations, individual physicians, and more—without alleging any common decisionmaking structure, hierarchy, or mechanism for directing conduct, as RICO requires.  And, what's more, RICO requires participation in the conduct of an *enterprise's* affairs—not merely one's own affairs—and Plaintiffs' own allegations show only that the AAP was acting in furtherance of its own mission to promote children's health by providing evidence-backed medical guidance and advocacy.

*Third*, Plaintiffs' claims independently fail for lack of causation.  Plaintiffs fail to allege but-for causation because they do not plausibly allege that their injuries would not have occurred had the AAP's challenged statements been different—particularly where those statements (many of which are mischaracterized) have no connection whatsoever to the injuries Plaintiffs allege and many aspects of vaccine science and guidance are not challenged at all.

Regardless, and independently fatal, Plaintiffs cannot allege proximate causation because their injuries aren't direct.  Their theories depend on a chain of intervening actions by independent actors, including physicians exercising individualized medical judgment, federal government agencies and state medical licensing bodies, and the vaccines themselves.  Moreover, the Parent

2

Plaintiffs allege harm entirely derivative of their children's injuries. These are precisely the type of attenuated RICO proximate cause theories that the Supreme Court and D.C. Circuit have rejected, because they would require this Court to disentangle multiple layers of harm across numerous actors—exactly what RICO's proximate cause requirement is intended to prevent.

Indeed, Plaintiffs' causation theories are so attenuated that they also fail Article III's "fairly traceable" requirement, even apart from RICO's more demanding standard. Thus, while Plaintiffs' claims fail for multiple independent reasons on the merits, the Court need not even reach those issues because Plaintiffs lack Article III standing.

*Finally*, the complaint suffers from numerous other flaws. The conspiracy claim should be dismissed because Plaintiffs' substantive RICO claims fail and, in any event, because merely alleging parties pursued their own legitimate interests is not sufficient to plead a RICO conspiracy. And Plaintiffs' requests for injunctive and declaratory relief are legally unavailable.

***

Allowing this lawsuit to proceed will neither advance children's health nor settle Plaintiffs' skepticism about childhood vaccines. It will only intimidate scientific and medical organizations from publishing evidence-based guidance, chilling their ability to participate in the scientific endeavors and conversations underway to improve the nation's health. It should be dismissed.

**BACKGROUND**

**A.      The American Academy Of Pediatrics**

The AAP is a non-profit organization whose mission is to attain optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults. *See* Cplt. ¶ 49; https://www.aap.org/en/about-the-aap. Founded in 1930, the AAP today has approximately 67,000 members nationwide. *Id.* ¶ 92. Among other activities, the AAP publishes educational materials about children's health for pediatricians, parents, and the public, including the Red Book,

3

which provides clinical guidance on pediatric infectious disease prevention, management, and control.  *Id.* ¶¶ 3; 97.

Consistent with its mission, the AAP also publishes clinical guidance and policy statements about childhood vaccines.  It does not, however, license vaccines or set the federal government's recommended immunization policy, responsibilities which fall to the Department of Health and Human Services ("HHS") and its operating agencies.  Among other things, the Food and Drug Administration (the "FDA") reviews applications to market new vaccines and decides whether to license them for use, including based on its evaluation of safety and efficacy data.  *See* 42 U.S.C. § 262(2).  And the Centers for Disease Control and Prevention (the "CDC") also publishes the federal recommended immunization schedule, as well as guidance regarding the implementation of those recommendations.  *See, e.g.*, Cplt. ¶ 115.[1]  Historically, the AAP's guidance on vaccines has often been consistent with, and has cited to, these federal government recommendations.  *See, e.g., id.* ¶¶ 17 n.6; 22 n.7; 97-98; 107; 143; 156.

### B.    The Alleged Racketeering Activities

According to Plaintiffs, the AAP's guidance is at the center of a vast, decades-long criminal racketeering conspiracy between the AAP, vaccine manufacturers, and others.  Cplt. ¶ 6. Specifically, Plaintiffs claim that the AAP and others have been disseminating false and misleading information about vaccines not to protect children but to maintain the enterprise participants' bottom lines.  *See, e.g., id.* ¶ 178.

The Complaint alleges that this RICO scheme was carried out through a series of purported mail-and-wire fraud predicates.  *Id.* ¶¶ 105-48.  These allegedly fraudulent statements include:

---

[1] Until a recent action by HHS Secretary Kennedy, the AAP had a "liaison seat" on the Advisory Committee on Immunization Practices ("ACIP"), which makes recommendations to the CDC about the childhood vaccine schedule.  Cplt. ¶¶ 156-57.

- A 2002 article authored by physicians and other professionals affiliated with hospitals, academic institutions, and government agencies, and published in *Pediatrics*, the AAP's peer-reviewed (and editorial independent) journal. *Id.* ¶ 105; Ex. 1 (Article).

- Various materials in which the AAP stated its belief that immunizations are "'safe and effective.'" *Id.* ¶¶ 106-10.

- Statements from individuals affiliated with the AAP voicing concern about: (1) a vote by the CDC's ACIP to "recommend individual decision-making for hepatitis B birth doses in low-risk infants . . . , vaccinating no earlier than two months"; and (2) revisions to the CDC's childhood immunization schedule. *Id.* ¶¶ 111; 115-23.

- Statements attributing mortality declines to vaccines. *Id.* ¶¶ 124-28.

- Statements that post-licensure monitoring of vaccines includes the Vaccine Adverse Events Reporting System. *Id.* ¶¶ 129-37.

- Statements expressing the AAP's views regarding the absence of credible scientific evidence proving that vaccines cause autism. *Id.* ¶¶ 138-42.

- The description of the Red Book "as 'the most authoritative and comprehensive' resource for pediatric infectious diseases, with 'evidence-based policy recommendations' updated throughout." *Id.* ¶¶ 143-44.

Although Plaintiffs raise a range of concerns about the AAP's vaccine-related activities (many of which are irrelevant to their RICO claims), their theory primarily rests on the assertion that the challenged statements were fraudulent because they did not *also* disclose the absence of certain studies that they believe should have been conducted.

### C.    This Lawsuit And Plaintiffs' Alleged RICO Injuries

Founded by current HHS Secretary Robert F. Kennedy Jr., Children Health's Defense ("CHD") has been a frequent critic of the AAP.  In public social media posts, CHD has repeatedly criticized the AAP as "in the business of propaganda," "medically reckless," an "assault on childhood itself," "abandon[ing] children for industry profit," and "pushing . . . [a] sinister agenda."[2]  CHD also publicly supported the December 2025 decision from HHS (run by Kennedy) to cut nearly $12 million in government funding to the AAP, after the AAP spoke out against certain of the administration's actions,[3] stating "[t]heir defunding is necessary and appropriate" because the AAP "is a front organization for the pharmaceutical industry." Children's Health Defense (@ChildrensHD), X (Dec. 17, 2025, at 8:53pm ET), https://perma.cc/U4GX-PGYE.

In January, CHD moved its campaign against the AAP into litigation by filing this lawsuit along with a number of individual plaintiffs.  They allege two counts: (1) violation of RICO Section 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity"; and (2) violation of RICO Section 1962(d), which makes it "unlawful for any person to conspire" to violate any RICO provision.  The Complaint seeks declaratory relief, injunctive relief, treble damages, and attorneys' fees and costs.

---

[2] Children's Health Defense (@ChildrensHD), X (Sept. 18, 2025, at 11:34am ET), https://perma.cc/DP9G-H9FF; Children's Health Defense (@ChildrensHD), X (Sept. 3, 2025, at 9:00am ET), https://perma.cc/ZT32-DANT; Children's Health Defense (@ChildrensHD), X (Aug. 26, 2025, at 8:00pm ET), https://perma.cc/82AJ-4R7V; Children's Health Defense (@ChildrensHD), X (Aug. 20, 2025, at 11:00pm ET), https://perma.cc/36GZ-LN6P.

[3] Another court in this district issued a preliminary injunction reinstating this funding after the AAP sued the government for retaliation in violation of the First Amendment. *AAP v. HHS*, Case No. 25-cv-4505 (D.D.C.), Dkt. 23, at 45 (concluding the AAP demonstrated a likelihood of prevailing on a First Amendment retaliation claim).

6

To state RICO claims, Plaintiffs must allege that they were "injured in [their] business or property by reason of" a RICO violation, which requires actual causation, proximate causation, and cognizable injury.  18 U.S.C. ¶ 1964(c).  Plaintiffs here include parents and physicians who allege they were injured in various ways by the alleged racketeering activity.  Three are parents alleging that they suffered cognizable RICO injuries when their children were injured following vaccinations (the "Parent Plaintiffs")—in two instances based on the medical guidance provided by independent practitioners and in a third because a school medical consultant, acting without "statutory" or "legal" authority, revoked a vaccine exemption.  The other individual Plaintiffs are pediatricians who have faced disciplinary action from independent state medical boards.

Finally, CHD sues "in its associational capacity on behalf of its community members for declaratory and injunctive relief only."  Cplt. ¶ 48.  It alleges that the "AAP's actions . . . harm the financial well-being of CHD community members, limiting the resources they would otherwise choose to devote to CHD."  *Id.*  The Complaint contains no further allegations about which members were harmed or what financial injury they have suffered.

## LEGAL STANDARDS

Under Rule 12(b)(1), the party seeking to invoke a federal court's jurisdiction bears the burden of establishing subject-matter jurisdiction.  *U.S. Ecology, Inc. v. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000).  "Because Article III limits the constitutional role of the federal judiciary to resolving cases and controversies, a showing of standing 'is an essential and unchanging' predicate to any exercise of [federal] jurisdiction."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)) (internal citation omitted).

7

A Rule 12(b)(6) motion to dismiss "tests whether a plaintiff has properly stated a claim." *James v. District of Columbia*, 869 F. Supp. 2d 119, 120 (D.D.C. 2012). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not sufficient, and a court is not required to accept the plaintiff's legal conclusions as true. *Id.* at 121 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" above the speculative level. *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)). A court "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). "Nor must the court accept legal conclusions cast in the form of factual allegations." *Id.* And in evaluating Plaintiffs' allegations, the Court may also consider the documents Plaintiffs rely upon. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) ("It is also clear that these documents— which were appended to Myers' motion to dismiss and whose authenticity is not disputed—may be considered here because they are referred to in the complaint and are integral to Kaempe's conversion claim."). The court "may also consider documents in the public record of which the court may take judicial notice." *Nicholson v. Mabus*, 257 F. Supp. 3d 6, 8 (D.D.C. 2017).

Any claims regarding fraud, including RICO claims based on wire and mail fraud, are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), discussed in greater detail below. *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 108 (D.D.C. 2015).

## ARGUMENT

### I. PLAINTIFFS' RICO CLAIMS FAIL FOR MULTIPLE, INDEPENDENT REASONS

To plead a Section 1962(c) RICO claim, Plaintiffs must plead, among other things, that the AAP "conduct[ed] or participat[ed]" in the "conduct of [a RICO] enterprise's affairs through a

pattern of racketeering activity." And to establish a right to relief as private plaintiffs under 18 U.S.C. § 1964(c), they must also plead that they were "injured in [their] business or property by reason of [such] violation"—i.e., allege actual causation, proximate causation, and cognizable injury. Plaintiffs fail to plead any of these elements, which are each independent grounds to dismiss their complaint. And their conspiracy claim fails for similar reasons.

### A.    Plaintiffs Fail To Allege Any Predicate Acts

Plaintiffs must allege the commission of at least two predicate offenses (as outlined in the RICO statute) over a ten-year period to establish a pattern of racketeering. *W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001). Where, as here, the only alleged predicate acts are wire and mail fraud, Plaintiffs' RICO claims "must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Id.* at 637 (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)).

The mail and wire fraud statutes are essentially identical: Both require a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses," and the use of interstate mail or wire communications "for the purpose of executing such scheme or artifice." 18 U.S.C. § 1341. "Although the statute is phrased in the disjunctive," the "money or property" requirement "limit[s]" the "'scheme or artifice to defraud' element because the 'common understanding' of the words 'to defraud' when the statute was enacted referred 'to wronging one in his property rights.'" *Ciminelli v. United States*, 598 U.S. 306, 312 (2023) (quoting *Cleveland v. United States*, 531 U.S. 12, 19 (2000)). Plaintiffs must therefore allege "not only that" the AAP "engaged in deception, but also that money or property was an object of their fraud." *Id.* (internal quotation marks omitted). They must also therefore allege "specific intent to defraud—*e.g.*, that

9

a fraudster make statements he knows to be false or misleading." *MSP Recovery Claims v. Pfizer, Inc.*, 728 F. Supp. 3d 89, 110 (D.D.C. 2024) (internal quotation marks omitted).

But Plaintiffs do not identify any fraud. Their theory rests on disagreement with scientific conclusions, dissatisfaction with public health policy, and conclusory and speculative allegations about motive—none of which supplies a false statement, fraudulent intent, or a scheme to obtain money or property.

### 1.    Plaintiffs Have Not Adequately Alleged That The AAP Made False Statements

Plaintiffs claim that the AAP made (or caused to be made) false statements about vaccines, and those false statements supply the necessary predicate acts of fraud. But their complaint suffers from a fundamental flaw: The alleged "false statements" are mostly just statements of scientific opinion with which Plaintiffs disagree. Plaintiffs broadly point to various statements that vaccines are "safe" and "effective" that appear in the AAP's peer-reviewed journal, its website, and various other physician-facing or parent-facing public health resources. They then cite a handful of studies and public statements that they say contradict or qualify the AAP's statements regarding the childhood vaccine schedule and support Plaintiffs' own view of the schedule as untested, unproven, and unsafe. But that does not demonstrate that Plaintiffs' view is *true* and the AAP's statements are therefore *false*, let alone knowingly false. At most, even crediting Plaintiffs' allegations,[4] it demonstrates that there is scientific debate on this issue. But, as numerous district and circuit courts have held, a difference of opinion is not a sufficient basis for fraud.

---

[4] To be clear, we strongly disagree that Plaintiffs' allegations even come close to creating a debatable issue about the safety and efficacy of vaccines, as evidence-based research has continued to confirm; in fact, the "elimination of communicable diseases through vaccination [is] 'one of the greatest achievements' of public health in the 20th century." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 226 (2011). However, our brief is constrained to assume that the allegations are true for purposes of the motion to dismiss.

Courts are understandably and appropriately wary of wielding the blunt instrument of litigation in matters of scientific debates, particularly over public health. Indeed, the Supreme Court has warned courts about the "danger of content-based regulations in the fields of medicine and public health.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 756 (2018) (internal quotation marks omitted). And "both the First Amendment and commonsense observations about the nature of scientific debate" demonstrate why statements like the AAP's recommendations about childhood vaccines, even if they are as debatable as Plaintiffs allege, are not enough to make out a claim of fraud. *See Torrey v. Infectious Diseases Soc'y of Am.*, 86 F.4th 701, 704 (5th Cir. 2023); *see also ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir. 2013) ("Generally, statements of pure opinion—that is, statements incapable of being proven false—are protected under the First Amendment."); *Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 583 F. Supp. 3d 654, 659 (D.N.J. 2022), *aff'd*, 63 F.4th 240 (3d Cir. 2023) ("a scientific conclusion based on nonfraudulent data in an academic publication is not a 'fact' that can be proven false through litigation. To hold otherwise would chill robust and open debate about the efficacy of drugs within the medical community . . .").

Numerous courts have thus held, in a variety of contexts, that a debatable scientific or medical opinion is inadequate to support a claim of fraud or misrepresentation.[5] The Fifth Circuit's

---

[5] *See, e.g.*, *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 247 (3d Cir. 2023) (allegations that articles "disregarded studies" and "failed to consider a relevant procedure . . . cannot create an actionable falsehood because they do not bear on whether the statements are verifiable"); *U.S. ex rel. Geschrey v. Generations Healthcare, LLC*, 922 F. Supp. 2d 695, 703 (N.D. Ill. 2012) (assertion that others felt a patient was not appropriate for hospice "does not suffice to allege that the doctor's certification that A.W. was appropriate for hospice was fraudulent; it merely alleges that Relator Janus and others disagreed with the doctor's assessment"); *Padnes v. Scios Nova Inc.*, No. C 95-1693 MHP, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996) ("Medical researchers may well differ with respect to what constitutes acceptable testing procedures, as well as how best to interpret data garnered under various protocols.").

11

opinion in *Torrey* is especially instructive. The plaintiffs there, who alleged they suffered from chronic Lyme disease, brought claims for fraudulent and negligent misrepresentation against the Infections Diseases Society of America ("IDSA") based on IDSA's guidelines for treating Lyme disease. The plaintiffs had argued that IDSA's statements in its medical journal were false and fraudulent because they allegedly disregarded studies supportive of the plaintiffs' Lyme disease theories. *Torrey*, 86 F.4th at 705. The district court dismissed their claims, and the Fifth Circuit affirmed, on grounds "that the statements at issue were non-actionable medical opinions, not factual assertions that could support a claim for fraudulent or negligent misrepresentation." *Id.* at 702. The court joined the Second and Third Circuits in concluding that "merely publishing a medical opinion—even a hotly debated one—in a peer-reviewed journal cannot give rise to a misrepresentation claim." *Id.* at 704. "Contrary to Plaintiffs' view," the court stated, IDSA's guidelines "do not become actionable factual representations merely because they disapprove of studies Plaintiffs prefer. . . . [A]t best, Plaintiffs cite other studies or statements that have reached different conclusions or formed different opinions than those expressed in the IDSA Guidelines." *Id.* at 705 (internal quotation marks omitted).

Plaintiffs here fare no better. The AAP's statements (and the statements expressed by authors in its journals or other publications) are medical opinions. Plaintiffs may disagree with statements such as "vaccines are not associated with autism" or "vaccines are safe and effective," and they may believe that the AAP disregarded data or information that Plaintiffs say contradicts the AAP's conclusions. But all this amounts to is an allegation that there are "other studies or statements that have reached different conclusions or formed different opinions than those expressed" by the AAP. *Id.* at 705. That falls far short of what is necessary to allege that AAP's statements were knowingly false, and it dooms Plaintiffs' wire and mail fraud theory.

12

No doubt aware of this problem, Plaintiffs' strategy throughout the complaint is to try to draw comparisons to the RICO claims against various tobacco companies and related entities in *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006), *aff'd in part*, 566 F.3d 1095 (D.C. Cir. 2009).  But this is unavailing.  Although the *Philip Morris* court concluded that the tobacco defendants could not escape liability by describing their deceptive statements about the dangers of smoking as "opinions" (*id.* at 853), those statements are nothing like the ones here.

First, the court rejected the defendants' argument primarily because there was "overwhelming evidence" that they knew their statements were fraudulent, given that they were "inconsistent with the internal knowledge and practice of the corporation itself."  *Id.*  Plaintiffs here nowhere allege that, like the tobacco defendants, the AAP internally knew and acknowledged that the childhood vaccine schedule was untested or unsafe, or was anything other than what the AAP publicly professed; all they allege, at best, is that the AAP knew or should have known that certain types of vaccine studies had not been conducted.

Second, the court distinguished between statements of opinion and "statements [like those of the tobacco defendants] whose falsity can be proved through the orthodox evidentiary process" and "proved false by information that was available and known to the corporation at the time." *Philip Morris*, 449 F. Supp. 2d at 853-54 (internal quotation marks omitted).  But the supposed "falsity" of the AAP's statements that vaccines are safe and not associated with autism (*see, e.g.*, Cplt. ¶ 140) is at most, even fully crediting Plaintiffs' theory for purposes of this motion, a debatable opinion, not a statement whose falsity can be objectively proven in a court of law.  Thus, "[t]he statements at issue here do not come close to those in *Philip Morris* . . . [because] there is no basis upon which to establish whether they were known to be false when made." *Ctr. for*

13

*Immigr. Studies v. Cohen*, 410 F. Supp. 3d 183, 191 (D.D.C. 2019) (dismissing RICO claim based on opinions with which the plaintiff disagreed rather than on knowingly false statements).

Plaintiffs here allege that the AAP's description of vaccines as "safe" is false because, by their lights, existing studies have been insufficient to definitively prove the safety of the childhood vaccine schedule, and the issue cannot be settled because certain long-term observational studies have not been conducted. Even accepting that allegation as true for purposes of a motion to dismiss, all that Plaintiffs have alleged is that there is still scientific debate on this issue. But even if the AAP "advanced a conclusion that was debatable," *Cohen*, 410 F. Supp. 3d at 190, that does not suffice as a basis for a fraud claim.

### 2. Plaintiffs Have Not Pleaded Predicate Acts Of Mail And Wire Fraud

Regardless, Plaintiffs have not pleaded fraud with the required particularity. They attempt to allege "dozens of predicate acts" (Cplt. ¶ 162), but none of Plaintiffs' categories of "[m]isrepresentations/[o]missions of fact" (*id.* at 32) comes close to adequately pleading fraud.

The requirement to plead fraud claims with particularity under Federal Rule of Civil Procedure 9(b) "is designed, in part, to allow a District Court to distinguish valid from invalid claims[,] and to terminate needless litigation early in the proceedings." *Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d. 69, 89 (D.D.C. 2006) (internal quotation marks omitted). And as noted, "courts have been particularly sensitive to Rule 9(b)'s pleading requirements in RICO cases in which the predicate acts are mail fraud and wire fraud." *Id.* at 89 (quoting *Gotham Print, Inc. v. Am. Speedy Printing Ctrs., Inc.*, 863 F. Supp. 447, 458 (E.D. Mich. 1994)). "This caution stems from the fact that it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *W. Assocs.*, 235 F.3d at 637 (internal quotation marks omitted and alteration adopted). Thus, "[i]n accordance with Rule 9(b), plaintiffs alleging fraud must further state the time, place and content of the false misrepresentations, the fact misrepresented, and what was

14

retained or given up as a consequence of the fraud," and allege specifically "which defendant caused what to be mailed [or transmitted by wire] and when and how each mailing [or wire] furthered the fraudulent scheme." *Bates*, 466 F. Supp. 2d at 89 (internal quotation marks omitted and alterations adopted).

Plaintiffs fail to do so for all of the alleged misrepresentations.

i)    *"Paul Offit's claim that infants can safely receive 10,000 vaccines at once"*

Plaintiffs make much of a 2002 article published in *Pediatrics* (the AAP's peer-reviewed, editorially independent journal) by eight authors, including Dr. Paul Offit.[6]  *See* Cplt. ¶¶ 51-53; 105; 162.  But Plaintiffs nowhere allege "the fact misrepresented."  *See Bates*, 466 F. Supp. 2d at 89 (internal quotation marks omitted).  They point to the article's "claim[]" that infants "could 'theoretically' respond to 10,000 vaccines at once" (Cplt. ¶ 105), but allege only that "addressing B-cell capacity" instead of "cumulative toxicological effects" (*id.*) was "non-responsive" to parents' concerns (*id.* ¶ 53).  Plaintiffs ignore, however, that the article followed surveys that showed some parents "questioned the number of shots recommended for their children" or "were concerned that vaccines might weaken the immune system."  Ex. 1 at 1.  In response to those concerns, the authors explained that "vaccine-specific antibody responses and rates of vaccine-associated adverse reactions of children with mild or moderate illnesses are comparable to those of healthy children" *(id.* at 3), and that "[c]urrent studies do not support the hypothesis that multiple vaccines overwhelm, weaken, or 'use up' the immune system."  *Id.* at 4.  In fact, the article "us[es] this estimate" of infants' capacity to respond to 10,000 vaccines to "predict that if 11 vaccines were

---

[6] Throughout the complaint, Plaintiffs seek to frame Dr. Offit as an apparent architect of the alleged RICO scheme by misleadingly attributing authorship of various statements to him and him alone.  The 2002 *Pediatrics* article, for instance, has seven other authors (about whom Plaintiffs make no allegations).  *See* Ex. 1.  And Plaintiffs plead no facts to support the bald assertion that Offit is the AAP's "leading spokesperson."  Cplt. ¶ 25.

15

given to infants at one time" (the routine schedule), it would "use[] up" very little of the immune system. *Id.* at 3.

Plaintiffs thus do not allege that "10,000 vaccines" statement was false or misleading in the context of the article in which it appears. "[C]ontext is crucial," so Plaintiffs' selective presentation of statements without context should be rejected. *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 13 (D.D.C. 2019) (internal quotation marks omitted); *see also, e.g.*, *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 168 (3d Cir. 2014); *Emps.' Ret. Sys. of Rhode Island v. Williams Companies, Inc.*, 889 F.3d 1153, 1163 (10th Cir. 2018). At best, Plaintiffs have identified a scientific opinion with which they disagree, but that is insufficient for a fraud claim.

Without actually identifying a false statement, Plaintiffs have not pleaded that the article was an act of fraud. In any event, and as with every other alleged "false statement" in the complaint, Plaintiffs also fail to plead with particularity "what was retained or given up as a consequence of the fraud," *Bates*, 466 F. Supp. 2d at 88-89 (internal quotation marks omitted), or how the allegedly fraudulent statement was transmitted interstate via mail or wire. They make only the conclusory allegation that "[e]ach misrepresentation was transmitted interstate to AAP's 67,000 members and millions of parents, constituting predicate acts of mail and wire fraud" (Cplt. ¶ 163). That is insufficient. *See Gotham Print*, 863 F. Supp. at 458; *see also Bates*, 466 F. Supp. 2d at 90 (dismissing claims on failure to allege "which defendant caused what to be mailed or transmitted by wire in connection with the predicate acts of mail and wire fraud, as well as *specifically* when and how each mailing [or transmission] . . . furthered the fraudulent scheme" (internal quotation marks omitted)).

16

ii)       "*'The schedule is fully tested and safe'*"

The complaint repeatedly tries to create the appearance of fraudulent misrepresentations by misleadingly quoting statements out of context or even outright misstating them. Plaintiffs suggest that it is false to call the childhood vaccine schedule "fully tested" when, according to Plaintiffs, certain studies have not been conducted. But although the phrase "fully tested" appears in quotation marks throughout the complaint, Plaintiffs omit that this is not an actual statement by the AAP. It is not linked to any particular statement, and they do not attribute it to any particular source. Instead, it seems to be an attempt to manufacture falsity by attributing to the AAP a statement it never made and then declaring that statement false based on an observation in a report (from the Institute of Medicine) that, as explained below, Plaintiffs mischaracterize.

What Plaintiffs actually point to are statements by the AAP that vaccines are "safe and effective," that the childhood vaccine schedule "has been tested and approved by multiple authoritative experts for safety and efficacy," and that the IOM "strongly affirmed" the safety of the current schedule in 2013. Cplt. ¶¶ 106-08. But again, Plaintiffs do not and cannot plead the fact that was allegedly misrepresented. That childhood vaccines are "safe," "effective," and "tested" is clearly a scientific opinion, and Plaintiffs' disagreement with that opinion based on their reading of IOM's papers in 2002 and 2013 (*see id.* ¶ 106) does not suffice to allege that it is fraudulent. Nor do Plaintiffs explain *how* it is false or misleading to describe IOM as having "strongly affirmed" the safety of the vaccine schedule, given that IOM stated in that same paper that "[v]accines are among the most effective and safe public health interventions available to prevent serious disease and death" and that, notwithstanding the possibility of additional studies, "the available evidence is reassuring." *See* Ex. 2 (IOM 2013) at 1, 6. Such statements "do not become actionable factual representations merely because they disapprove of studies Plaintiffs

17

prefer." *Torrey*, 86 F.4th at 705. And the allegation that it was fraudulent to "omit[]" the IOM's finding about certain long-term studies of vaccines (Cplt. ¶ 108) is similarly inadequate. Even accepting Plaintiffs' description of the IOM paper as true,[7] an alleged "fail[ure] to disclose . . . . every piece of data" does not render a statement fraudulent. *See Pacira*, 583 F. Supp. 3d at 659 (internal quotation marks omitted).

Moreover, the complaint wrongly implies that the medical judgment that vaccines are "safe" and "effective" is an absolute guarantee of zero risk. That is not a reasonable interpretation of such statements, and ignores what the AAP and others have actually said. Indeed, vaccine manufacturers (as the Complaint alleges, ¶¶ 24, 32 & 81) as well as medical groups like the AAP have always acknowledged that, on rare occasion, adverse events may occur.[8] For example, the Red Book states that "[a]lthough vaccines are extremely safe products, serious adverse events, such as allergic reactions, are rare but can result from vaccine administration." Ex. 3 (Red Book Excerpts) at 36 & Appendix IV. None of that renders the statement that vaccines are "safe" and

_____

[7] Regardless, there are reasons to doubt Plaintiffs' interpretation. The 2013 IOM Report in fact states that "[t]he committee's efforts to identify priorities for recommended research studies did not reveal a base of evidence suggesting that the childhood immunization schedule is linked to autoimmune diseases, asthma, hypersensitivity, seizures or epilepsy, child developmental disorders, learning disorders or developmental disorders, or attention deficit or disruptive behavior disorders"; thus, "there is no scientific evidence to justify the majority of safety concerns" and "no significant evidence to imply that the recommended immunization schedule is not safe." However, because "perceptions dictate parental support and actions" it said that "further study of the full immunization schedule as well as further study to understand stakeholder perceptions and how they are formed may help improve awareness and education efforts." Ex. 2 at 135.

[8] Congress has long recognized this, as well, and so has established a no-fault scheme to address those instances. *See* 42 U.S.C. §§ 300aa-10 et seq. Designed to "stabilize the vaccine market and facilitate compensation," the National Childhood Vaccine Injury Act provides that "[c]laimants who show that a listed injury first manifested itself at the appropriate time [as described in a vaccine injury table] are prima facie entitled to compensation" under an expedited process in the Court of Federal Claims. *Bruesewitz*, 562 U.S. at 228. In return, vaccine manufacturers received "significant tort-liability protections"—protections Plaintiffs seek to bypass by redirecting blame to the AAP.

"effective" false or misleading, much less suggests those statements form the basis of an actionable fraud.

### iii)    *"AAP's fraudulent alarmism"*

Plaintiffs next complain about statements by past AAP President Dr. Susan Kressly and AAP committee member Dr. Jose Romero about the potential effects of changing the recommendation for hepatitis B vaccinations. Cplt. ¶ 112. But again, Plaintiffs never specify what facts were allegedly misrepresented. Plaintiffs contend that these statements are based on modeled projections (*id.* ¶ 113), which they presumably believe makes the assertions less persuasive, but Plaintiffs do not allege that anyone misrepresented those projections or used fraudulent data. Moreover, nothing in Plaintiffs' complaint links any alleged injures to the hepatitis B vaccine, let alone to comments about it by AAP members—nor could they, as the individual plaintiffs' injuries occurred *before* these statements were made. And the allegations about Dr. Sean O'Leary's comments about the revised childhood vaccine schedule (*id.* ¶ 116) are even more bare-bones— Plaintiffs do not even hint at what they think is false about those statements, nor do they plead any details about how or where any of these statements were made. And Plaintiffs' conclusory allegation that these statements were "designed to maintain revenue streams by preventing even minimal schedule modifications" (*id.* ¶ 114) gets them nowhere. Such a "'naked assertion[] devoid of further factual enhancement'" is insufficient under even Rule 8's pleading standard, let alone Rule 9(b)'s heightened standard. *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 406 F. Supp. 3d 72, 77 (D.D.C. 2019), *aff'd*, 2020 WL 873574 (D.C. Cir. Feb. 14, 2020) (internal quotation marks omitted).

Plaintiffs also suggest, in a generic and conclusory fashion, that a lawsuit the AAP filed in the District of Massachusetts regarding the childhood vaccine schedule represents one or more

19

"predicate acts of racketeering" (Cplt. ¶ 123). There is not a single allegation of what fact is misrepresented by the AAP's filings or when, where, or by whom any false statement was made. And in any event, even if Plaintiffs did offer more detailed allegations, litigation activity is not a predicate act for a RICO claim (even if the Court accepts as true Plaintiffs' allegation that the AAP filed suit with improper motives). *See E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 13 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015).

iv)    *"AAP's false attribution of mortality declines to vaccines"*

Plaintiffs next point to a statement on the AAP's website that its vaccine recommendations "have saved millions of lives." Cplt. ¶ 124. Again, Plaintiffs allege that this is "false" based on their reading of several reports discussing other factors that have contributed to mortality reductions from infectious diseases—and again, this scientific disagreement is insufficient to plead that the AAP's statement was fraudulent. Furthermore, Plaintiffs say nothing about how this single description of the AAP's recommendations contributed to any alleged fraud, nor do they link it to any of the injuries alleged in the complaint.

v)    *"Pointing to VAERS/VSD as 'proof of safety'"*

Plaintiffs take issue with a statement on the AAP's website that describes "post-licensure monitoring" of vaccines through systems "includes the Vaccine Adverse Events Reporting System (VAERS), the [VSD]," and other systems. Cplt. ¶ 129. Plaintiffs do not allege that statement is false—nor could they, because it is self-evidently true that vaccine monitoring *is* conducted through such systems. They merely argue that it "impl[ies] these mechanisms validate vaccine safety." *Id.* The same is true of statements about VAERS monitoring that the AAP allegedly made in a 2008 handout (about which the allegations are especially sparse—lacking any details about when it was made, by whom, or how it was transmitted). *Id.* ¶ 132. Plaintiffs may be unsatisfied

20

with the quality or efficacy of vaccine monitoring through VAERS and VSD because they allegedly do not "assess causality" (*id.* (emphasis omitted)), but it is not false or misleading to state that these systems monitor vaccine safety simply because (as Plaintiffs allege) they do not (and cannot) do so in precisely the manner they might in Plaintiffs' ideal world.  Plaintiffs' disagreement is insufficient to allege that these statements are fraudulent.

> vi)      "*'Vaccines do not cause autism – this has been proven.'*"

Plaintiffs misleadingly suggest that the quoted language "[v]accines do not cause autism – this has been proven" is a statement by the AAP.  But there is no such statement, and Plaintiffs do not allege that the AAP actually said this.  The same is true of the purported quotation "[m]ultiple studies have proven this" (Cplt. ¶ 104), which does not appear on the website Plaintiffs cite.

Their actual allegation is about the AAP's statements that "[v]accines are not associated with autism or developmental delay," and that "[d]ecades of rigorous research have shown vaccines do not cause autism," made on a website that listed and described certain studies that supported that conclusion.  *Id.* ¶¶ 138-39.  Plaintiffs point to a recent CDC statement and a single case of federal compensation, and on that basis argue that the AAP's statements are false.  But, as above, even crediting those allegations—and they do nothing to contradict the AAP's evidenced-based conclusions—fraud law does not punish choosing a different side of a scientific question.

Again, Plaintiffs have failed to allege that any fact was misrepresented.  Regardless, their own pleading makes clear that, from Plaintiffs' point of view, "evidence [is] 'inadequate to accept or reject a causal relationship'" between vaccines and autism.  *Id.* ¶ 140 (citing 2012 IOM).  Accepting Plaintiffs' allegation as true for purposes of a motion to dismiss, if there is not enough evidence to accept a causal relationship between vaccines and autism, then the AAP's scientific opinions on the matter are not capable of being proven false or fraudulent.  Nor have Plaintiffs

21

alleged any injury related to autism or developmental delay, let alone an injury linked to these statements by the AAP.

  vii)    *"AAP's fraudulent marketing of the Red Book as 'authoritative'"*

Lastly, Plaintiffs allege that the AAP fraudulently markets its Red Book as "authoritative" and its recommendations as "evidence-based."  Cplt. ¶ 143.  As described above, the Red Book provides clinical guidance on a wide range of pediatric medical treatment, only a fraction of which concerns vaccines.  Plaintiffs' entire theory as to why the AAP's descriptions of the Red Book are "false" is that it describes vaccines as "safe and effective" without acknowledging the IOM's 2013 finding that long-term observational studies of the cumulative vaccine schedule have not been conducted.  *Id.* ¶ 144.  But, as above, Plaintiffs do not state a fraud claim simply by showing a party failed to identify a piece of evidence that they think should been considered before reaching a scientific conclusion. Mere allegations that the Red Book "disregarded studies . . . cannot create an actionable falsehood."  *Pacira*, 63 F.4th at 247.  What's more, and as above, the 2013 IOM report opens by stating that: "Vaccines are among the most effective and safe public health interventions available to prevent serious disease and death." Ex. 2 at 1.  Thus, it in fact *supports* the statements in the Red Book.

Also fatal to Plaintiffs' claim is that they do not allege that the omission of this observation from the text of the Red Book renders the AAP's description of it false.  Nor could they—the representation that the Red Book is "authoritative" and "evidence-based" is plainly a matter of scientific opinion, one that Plaintiffs disagree with based solely on the IOM's 2013 statements. Plaintiffs have thus failed to allege that any fact was misrepresented.  Furthermore, they have not alleged a single consequence (let alone an injury) resulting from the AAP's description of the Red Book as "authoritative" and "evidence-based."

22

Plaintiffs have come nowhere close to the specific and particular allegations required when pleading wire and mail fraud, and their RICO claim should be dismissed on that ground.

### 3.    Plaintiffs Have Not Pleaded The Requisite Intent

Even if Plaintiffs had somehow pleaded that the AAP's statements were false or misleading, they have not met their burden to plead that the statements were made with the requisite intent.  To do so, they must plead that the AAP made statements it "kn[ew] to be false or misleading."  *MSP Recovery Claims*, 728 F. Supp. 3d at 110.  They must also plead "that money or property was an object of [the] fraud."  *Ciminelli*, 598 U.S. at 312 (internal quotation marks omitted); *see also Kelly v. United States*, 590 U.S. 391, 398 (2020).  In short, Plaintiffs must plead not only that the AAP knew its statements were false or misleading, but that it made those statements in order to defraud its victims of money or property through their supposed RICO scheme.

Despite the length of the complaint, Plaintiffs have not alleged the AAP's specific intent to defraud and make false statements.  Most of their complaint is based on the AAP's assertions, in one fashion or another, that the childhood vaccine schedule is safe and effective.  But *nowhere* do they allege that the AAP knew this was false (in other words, that it knew the vaccine schedule was unsafe or ineffective).  Plaintiffs "must offer some facts to support their claim" that the AAP "intended to deceive" its audience, but they have not done so.  *See Ambellu*, 406 F. Supp. 3d at 80.

At best, Plaintiffs allege that the AAP (i) "knew" of IOM's 2002 and 2013 reports discussing the possibility of additional testing of the cumulative vaccine schedule (Cplt. ¶¶ 110; 144), and (ii) "knew or should have known" about the supposed "limitations" of evidence related to any link between vaccines and autism (*id.* ¶¶ 141-42).  Even accepting those allegations as true, all they demonstrate is that the AAP allegedly was aware of scientific debate over studying long-term effects of the cumulative vaccine schedule and over the claim that vaccines can cause autism,

23

and that AAP issued statements setting out its best, evidence-based understanding of the status of the relevant science. They do not and cannot allege that the AAP was aware of evidence that vaccines were not safe and effective; indeed, Plaintiffs point to no such evidence themselves. None of this is enough to plead that the AAP "knew those representations were false when [it] made them" *MSP Recovery*, 728 F. Supp. 3d at 111. And, in any event, an entity's intent depends not on some abstract and general state of mind but instead "on the wrongful intent of specific employees" who "made, ordered, or approved the statement[s]," *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009) (per curiam)—and Plaintiffs allege nothing of the sort.

Nor have Plaintiffs alleged that the AAP intentionally engaged in a scheme to deprive anyone of money or property, a critical element of a mail or wire fraud claim. *See Ciminelli*, 598 U.S. at 312. They offer only conclusory allegations that the AAP's "true motive" was "[m]oney" and "selling more vaccines." Cplt. ¶ 122. They do not allege—nor could they, since it is patently untrue—that the AAP sells vaccines, or indeed makes any money at all from the provision of vaccines. Nor do they allege that the AAP's intent in stating that vaccines are safe and effective was to "deprive" any victim of "money or property." *Kelly*, 590 U.S. at 398 (internal quotation marks omitted). Again, bare bones allegations that the AAP's "true motive" was "[m]oney" (Cplt. ¶ 122) are not enough to plead the AAP's intent. Plaintiffs' claim thus cannot survive.

### B.    Plaintiffs Fail To Allege That The AAP "Conduct[ed] Or Participate[d]" In The Alleged Enterprise's Affairs

Plaintiffs must also plead (1) the existence of a RICO enterprise and (2) that the AAP conducted or participated in the conduct of such enterprise's affairs. *See* 18 U.S.C. § 1962(c). Plaintiffs fail to sufficiently allege either.

24

1.    **Plaintiffs Fail To Allege The Existence Of An Association-In-Fact Enterprise Because They Fail To Allege A Decisionmaking Structure**

Plaintiffs cannot satisfy RICO's "enterprise" requirement by alleging a supposed association-in-fact enterprise that includes the AAP, "vaccine manufacturers (including Pfizer, Merck, GlaxoSmithKline, and Sanofi Pasteur), aligned entities such as the American Board of Pediatrics, and key spokespersons including members of the AAP's Committee on Infectious Diseases." Cplt. ¶ 6.

To plead an association-in-fact enterprise, a plaintiff must allege facts demonstrating that the alleged enterprise had three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). While a plaintiff need not show that there is a "hierarchical structure or a 'chain of command,'" *id.* at 948, a plaintiff must nevertheless plead facts identifying the alleged enterprise's "decisionmaking structure," *Stankevich v. Kaplan*, 156 F. Supp. 3d 86, 94 (D.D.C. 2016), *aff'd*, 707 F. App'x 717 (D.C. Cir. 2017) (internal quotation marks omitted). *See also United States v. Philip Morris Inc.*, 116 F. Supp. 2d 131, 152 (D.D.C. 2000) (an enterprise "need not have a formal hierarchy or framework, so long as it involves some structure, to distinguish an enterprise from a mere conspiracy" (internal quotation marks omitted)).

Plaintiffs do not plead any facts about how decisions were made among enterprise participants. That failure is itself fatal to Plaintiffs' RICO claims. Instead, Plaintiffs allege that the "AAP and its enterprise associates have controlled federal vaccine policy through membership on the CDC's Advisory Committee on Immunization Practices [ACIP]." Cplt. ¶ 156. But they don't allege how the AAP or other enterprise participants were controlling vaccine policy while they served on a committee that the *government* controlled. And Plaintiffs do not allege the

government was part of the enterprise. *See id.* ¶¶ 156-58 (explaining that the CDC sets vaccine policy and that the CDC and HHS have control over who is a member of ACIP, not the AAP); ¶ 6 (no mention of government as enterprise participant). Indeed, the very fact that the AAP and other alleged enterprise participants were cut off from ACIP by HHS in 2025 shows that none of the alleged enterprise participants were controlling decisions about vaccine policy. *Id.* ¶ 157.

### 2. In Any Event, Plaintiffs Fail To Allege That The AAP "Conduct[ed] Or Participate[d]" In The Alleged Enterprise's Affairs

A RICO plaintiff must also allege that the members of the enterprise "conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (quoting 18 U.S.C. § 1962(c); emphasis omitted). That means that "the participants' actions must be 'undertaken on behalf of the *enterprise* as opposed to on behalf of [the participants] in their individual capacities, to advance their individual self-interests.'" *Cent. Am. Bank for Econ. Integration v. Mossi*, No. 24-CV-2544 (CRC), 2025 WL 2732731, at *14 (D.D.C. Sept. 25, 2025) (quoting *United Food & Com. Workers Union & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013)). Because Plaintiffs plead only that the AAP took actions in furtherance of its *own* interests, their RICO claims fail.

Indeed, all of Plaintiffs' allegations about the AAP show only that it undertook actions to advance its own interest in promoting pediatric health, not to advance any supposed RICO enterprise. The AAP is an organization dedicated to improving the health and well-being of children. Consistent with that interest, it publishes its peer-reviewed *Pediatrics* journal and the Red Book to disseminate information and clinical guidance to pediatricians about how to improve children's health. Also consistent with that interest, the AAP makes public statements about various topics related to improving children's health, including vaccinations. These are the same

26

actions that Plaintiffs allege are the AAP's actions in furtherance of the RICO enterprise. *See* Cplt. ¶¶ 160-64. Merely relabeling these ordinary, mission-driven activities does not plausibly allege that the AAP conducted or participated in the enterprise's affairs. *See, e.g.*, *Walgreen*, 719 F.3d at 856 (affirming dismissal of RICO claim where allegations in complaint did not "indicate how the cooperation in this case exceeded that inherent in every commercial transaction between a drug manufacturer and pharmacy"). And absent such allegations about enterprise-related conduct, Plaintiffs' claims must be dismissed. *See Mossi*, 2025 WL 2732731, at \*14 (dismissal based on failure to allege *Reves* standard).

### C.     Plaintiffs Do Not Adequately Allege Either But-For Or Proximate Causation

Plaintiffs must also show they were "injured in [their] business or property by reason of" a RICO violation. 18 U.S.C. § 1964(c). Each plaintiff must therefore plead but-for and proximate cause. *See Holmes v. SIPC*, 503 U.S. 258, 268 (1992). These requirements prevent RICO from being used to "open the door to massive and complex damages litigation" that could otherwise burden the courts. *Id.* at 274 (internal quotation marks omitted); *see also Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 612 (2025) (noting "constraints" on RICO claims). Plaintiffs' claims fail both causation requirements because their injuries are not directly caused by any alleged predicate act (proximate cause) and because they do not plausibly allege that any predicate act was outcome determinative (but-for cause).

#### 1.     Plaintiffs Fail To Allege Proximate Causation

RICO's proximate cause requirement demands a "direct" relationship between predicate acts and the injury asserted, *Holmes*, 503 U.S. at 269. A link that is "too remote," "purely contingent," or indirect is insufficient. *Id.* at 268, 271. RICO thus generally limits compensable harm to those at the "first step" of causation—not those several steps removed through independent

27

actors or attenuated factual contingencies. *Id.* at 271-72 (internal quotation marks omitted); *Med. Marijuana*, 604 U.S. at 612. None of the Plaintiffs' claimed injuries meets this requirement.

### a.    Parents' "Derivative" Injuries Are Insufficiently Direct

The Parent Plaintiffs' purported injuries are not "direct" because they rely on a causal theory that goes well beyond the first step of the causal chain. And their injuries arise only through harm to their children—classic derivative injuries (i.e., those flowing from harms "visited upon a third person") that the Supreme Court has said do not generally satisfy RICO's proximate cause requirement. *Holmes*, 503 U.S. at 268.

At their most direct, the causal chain alleged runs as follows: the AAP publishes statements to physicians; who in turn transmit those statements and make recommendations to parents; parents in turn consent to vaccination; children are then vaccinated by health professionals using vaccines made by independent manufacturers (approved by the FDA); which in turn results in injuries to those children; which in turn causes harm to Parent Plaintiffs. Cplt. ¶ 167. Even accepting Plaintiffs' allegations as true, and ignoring the myriad other issues with their causal theories (*see infra*)—many of which are even more indirect than that pattern—this attenuated, contingent, and derivative chain is precisely what both the Supreme Court and D.C. Circuit have rejected. *See, e.g.*, *Holmes*, 503 U.S. at 273; *Serv. Emps. Int'l Union Health & Welfare Fund v. Phillip Morris, Inc.*, 249 F.3d 1068, 1074 (D.C. Cir. 2001) (no proximate cause where "alleged harm arising from payment of medical expenses by the funds and the nations is itself derivative of alleged injuries to individual smokers").

The lack of directness implicates the very concerns that animate RICO's proximate-cause requirement. As *Holmes* explains, the lack of direct injury makes it "more difficult . . . to ascertain the amount of [plaintiffs'] damages attributable to the violation, as distinct from other, independent, factors." 503 U.S. at 269; *see also Serv. Emps.*, 249 F.3d at 1074 ("remote, derivative

28

nature of the alleged injuries . . . makes more difficult the determination of the amount of damages that is attributable to the alleged wrongdoing, as distinct from other independent factors"). Here, independent factors abound: health-care providers' individualized judgments and advice (whose independent decisionmaking is another factor severing proximate cause); guidance from other entities, such as the CDC[9]; and the vaccines themselves, which would introduce complex causation questions—including as to whether they caused the injuries and, even if so, whether any such injuries were sufficiently related to the challenged statements as opposed to some other factor. (Not to mention how to allocate fault between the AAP's statements and the vaccines themselves.) In other words, Plaintiffs' theory depends on treating generalized pediatric guidance about childhood vaccines as the direct cause of individualized medical outcomes—a premise that defies common sense and ignores confounding variables.

Additional policy considerations further undercut Plaintiffs' theory. *Holmes* also explains that "quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Holmes*, 503 U.S. at 269. The D.C. Circuit has further explained that this "need for complex rules apportioning damages arises because other indirectly injured parties might also sue." *Serv. Emps.*, 249 F.3d at 1075. Such indirect-injury cases require courts to disentangle multiple layers of harm across numerous actors, which is why they must be dismissed.[10]

---

[9] Even crediting the allegation that the "AAP and its enterprise associates have controlled federal vaccines policy," Cplt. ¶ 156, it would only compound the proximate causation issues by adding additional steps to the causal chain.

[10] Courts sometimes ask whether a more directly injured party would be better situated to sue, but that factor "cannot outweigh important policies underlying the first two *Holmes* factors." *Servs. Emps.*, 249 F.3d at 1073-74. Proximate cause under RICO is not a "quest for the 'best' (or, realistically, 'least bad') plaintiff. *Id.* at 1072. "Rather, the Supreme Court has insisted on an

No doubt aware of these issues, Plaintiffs insist that their injuries were "foreseeable" (Cplt. ¶ 21) and that the "causation chain operates exactly as [AAP] intended" (*id*. ¶ 165). But neither suffices for the "directness" that RICO demands. *See Servs. Emps.*, 249 F.3d at 1073, 1076 (plaintiffs' "reliance on the purportedly foreseeable nature of their injuries and the allegedly intentional nature of defendants' wrongdoing is misplaced"). As the Supreme Court recently emphasized, foreseeability alone "does not cut it." *Med. Marijuana*, 604 U.S. at 612. Nor may a plaintiff evade RICO's directness requirement by pointing to a party's supposed motive or intent. *See Anza v. Ideal Steal Supply Co.*, 547 U.S. 451, 460 (2006); *see also Gen. Motors, LLC v. FCA US, LLC*, 44 F.4th 548, 560 (6th Cir. 2022); *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 145 (2d Cir. 2018).

Plaintiffs' reliance on *Kaiser Foundation* likewise fails. The First Circuit's focus on foreseeability and intent cannot be reconciled with the Supreme Court's rejection of such proximate-cause theories. *See Kaiser Found. Health Plan, Inc. v. Pfizer (In re Neurontin Mktg. and Sales Prac. Litig.*), 712 F.3d 21, 34, 37-38 (1st Cir. 2013). It is also distinguishable: The plaintiffs there were third-party payors alleging damages in paying for prescriptions they claimed would not have been written absent the defendants' conduct—a harm not derivative of injury to a third person. That stands in sharp contrast to the derivative and remote injuries alleged here.

**b.    Physicians' Injuries Are Indirect Because They Depend On Separate Actions Of Separate Actors**

The Physician Plaintiffs fare no better: Their claims are insufficiently direct because they sit several steps down a causal chain and hinge on the discretionary decisions of independent actors, i.e., the medical boards that govern physician licensure and discipline in their respective

---

appropriate plaintiff, namely, a plaintiff whose alleged injury possess a sufficiently direct causal relationship to the alleged wrongdoing." *Id.*

states.  *See, e.g.*, *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 11 (2010) (plurality); *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 107 (4th Cir. 2025) (RICO proximate cause lacking when there is an "intervening factor from which . . . the plaintiff's injuries derive" (internal quotation marks omitted)); *Gen. Motors*, 44 F.4th at 563 (no causation where harm rests on separate actions carried out by separate parties).

An intermediate and independent decisionmaker generally severs proximate cause unless no other factors could account for the injury other than the alleged predicate acts—something Physician Plaintiffs do not (and cannot) allege here, given the numerous other considerations that could have informed the board's decisions, including vaccine-related statements from the AAP and other entities (such as the CDC) that are *not* challenged as racketeering acts.  *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) (proximate cause based on reliance of third party where "there are no independent factors that account for respondents' injury"); *Solomon v. Dechert LLP*, No. 22-3137 (JEB), 2023 WL 6065025, at *11 (D.D.C. Sept. 18, 2023) ("[W]eight of the cases suggests that when a RICO predicate act—here, wire fraud—was not decisive in influencing a third party's injurious action, that predicate act did not proximately cause the injury").  This is in stark contrast to *Bridge*, where the independent actor (the county government) exercised limited discretion, and so the injury mechanically flowed from the fraud.  *Bridge*, 553 U.S. at 643 (observing parcels allocated by county on "rotational basis"); *Hemi*, 559 U.S. at 14-15 (plurality) (distinguishing *Bridge*).  Permitting their claims would thus pose exactly the risk the proximate cause requirement is intended to prevent: requiring the Court to disentangle how much of the alleged harm is attributable to the supposed predicate acts as opposed to independent, intervening

31

factors and decisions. *See, e.g.*, *Anza*, 547 U.S. at 460 (proximate cause intended to "prevent these types of intricate, uncertain inquiries from overrunning RICO litigation").[11]

### 2.  Plaintiffs Fail To Allege That Predicate Acts Actually Caused Their Purported Injuries

Plaintiffs also fail to allege but-for causation.  Plaintiffs do not plausibly allege that their injuries would not have occurred had the challenged statements not been made (or had they been phrased the way plaintiffs prefer)—indeed, they do not specifically link them directly to the *challenged statements* at all.  *See Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015) ("[I]f the person who was allegedly deceived by the misrepresentation (plaintiff or not) would have acted in the same way regardless of the misrepresentation, then the misrepresentation cannot be a but-for, much less proximate, cause of the plaintiffs' injury.").

Those defects become clear when examining each Plaintiff's allegations:

***Shaw and Doe***: Both trace their purported injuries to physicians dismissing their concerns and acting "consistent with" or "based on" the AAP's purported "contraindication framework." Cplt. ¶¶ 17; 33.  But they do not (and cannot) allege that the AAP's guidance on contraindications is itself false or misleading and thus offer no basis to conclude that their injuries would not have occurred absent the challenged predicate acts—indeed, their alleged injuries have no connection to the alleged predicate acts (i.e., the challenged statements) whatsoever.  They never even describe what precisely the "AAP's contraindications framework" is (and at times cite guidance from the

---

[11] Plaintiff CHD independently lacks Article III associational standing for the reasons discussed *infra*. Regardless, any causal theory it could allege is far too speculative, threadbare, and vague to state a claim.  It alleges only that "AAP's actions, as described herein, harm the financial well-being of CHD community members, limiting the resources they would otherwise choose to devote to CHD."  Cplt. ¶ 48.

CDC and ACIP) or how it relates to the statements they charge as fraudulent.  Cplt. ¶¶ 12; 17 & 17 n.6.

*Nelson*:  Nelson claims she relied on comments from "clinic staff relying on AAP guidelines and Red Book recommendations that [the vaccine schedule] was 'completely safe.'" *Id.* ¶ 22. She does not identify which specific guidelines or statements purportedly caused her injury, or what factual basis she has to plead that the clinic staff relied on a particular challenged statement, leaving no plausible basis to link any alleged predicate act to the outcome—particularly given the presence of intermediate actors who may have miscommunicated guidance or relied on other sources.  Indeed, the Red Book itself acknowledges that "[a]lthough vaccines are extremely safe products, serious adverse events, such as allergic reactions, are rare but can result from vaccine administration" and that "moderate or severe acute illness" (which Nelson alleges) is a precaution that "might increase the risk or seriousness of an adverse reaction, might interfere with vaccine effectiveness, or might complicate making another diagnosis because of a possible vaccine-related reaction."  Ex. 3 (Red Book Excerpts) at 36 & Appendix IV.  Moreover, the vaccine injury Nelson identifies (seizure) is one that the complaint even acknowledges is a known and disclosed risk.

*Thomas and Stoller*:  Likewise, neither Physician Plaintiff identifies any particular AAP statement that caused his alleged harm, nor explains why he would not have suffered the same injuries even in the absence of the alleged predicate acts—rather than for independent reasons, including based on guidance from the AAP and other entities (including federal and state agencies) that Plaintiffs do not challenge.

Indeed—and notwithstanding Plaintiffs' generalized attacks on the AAP's guidance—the statement that Plaintiffs actually challenge as predicate acts (the only things relevant to causation) generally bear no connection to Plaintiffs' alleged injuries.  For example, Plaintiffs cite certain

33

statements regarding Hepatitis B and the CDC's new vaccine schedule—all of which were made *after* Plaintiffs suffered their purported injuries. Their references to other statements, such as those concerning vaccines and autism, likewise are unrelated to the alleged injuries. Nor is there any plausible allegation that even the few statements with tangential relevance would have altered any outcome had they been phrased in the Plaintiffs' preferred form—e.g., to acknowledge certain studies had not been conducted—given the many other aspects of vaccine science and guidance that Plaintiffs do not challenge, and the fact that they do not even specifically allege which of the challenged statements anyone in these causal chains relied on.

Independent third-party decisionmakers—such as health-care professionals, medical examiners, and state medical boards—also sever the causal chain. Plaintiffs do not plausibly allege that such parties would have acted differently if the AAP had made different statements. Again, the Plaintiffs' purported injuries are not specifically and directly linked to the challenged statements and, in any event, these actors may have been influenced by other factors, such as the mountains of other evidence supporting the safety and efficacy of vaccines as well as guidance from other entities on the same topics. *See Sergeants Benevolent*, 806 F.3d at 90 ("[B]ecause the decision could have been made for any number of a multitude of reasons, we could not reasonably infer that Lilly's misrepresentations were, in fact, a but-for cause (much less proximate cause) of the excess prescriptions paid for by the plaintiffs."). While Plaintiffs need not necessarily rule out every conceivable intervening cause, they must at least plead some plausible causal theory—which they have not done.[12] And even if they have adequately pleaded such theories it would only compound the proximate-cause problems: The court would be required to speculate about the

---

[12] Indeed, Plaintiffs' own allegations undermine their causal theory. As they would have it, physicians acted not based on these particular challenged statements, but rather based on "board certification, insurance participation requirements, and economic compulsion." Cplt. ¶ 170.

extent to which these independent actors (and Plaintiffs themselves) were influenced by these challenged statements as opposed to their own judgment, discretion, or other authoritative sources.

### 3. Other Causation And Injury Issues Abound

Even apart from the failures discussed above, each Plaintiff's causation and injury allegations suffer from additional, plaintiff-specific defects that independently foreclose their RICO claims:

*Shaw:* The Complaint asserts that Shaw was "induced . . . to consent to vaccination" by unidentified "categorical safety claims" attributed to the AAP. Cplt. ¶ 21. But the Complaint does not specify which AAP statements supposedly had that effect, or how and when Shaw heard those statements, leaving the allegation too vague to support a plausible causal theory. Shaw also does not offer any specific allegation regarding how she was "injured in [her] business or property," and thus her claim fails for that reason alone.

*Nelson:* Nelson claims injury based on an adverse event that, by her own account, is listed on the DTaP package insert, which further complicates any causal inquiry regarding the effects of the challenged statements, Cplt. ¶ 24; the AAP's Red Book itself directs pediatricians to package inserts for additional information about vaccines, Ex. 3 (Red Book Excerpts) at 21 & Appendix IV. Moreover, she seeks as damages "funeral expenses, unreimbursed medical costs, lost income, and diversion of family resources to public advocacy and legal efforts." Cplt. ¶ 26. But the Supreme Court recently declined to say whether such harms are cognizable RICO injuries. *See Med. Marijuana*, 604 U.S. at 946 ("As we noted at the outset, 'business' may not encompass every aspect of employment, and 'property' may not include every penny in the plaintiff's pocketbook. Accordingly, not every monetary harm—be it lost wages, medical expenses, or otherwise—necessarily implicates RICO.").

*Doe:* Doe blames her injury on a medical examiner who by her own telling lacked "legal" and "statutory authority" (Cplt. ¶¶ 29; 33), making any connection to the alleged racketeering acts even more remote and contingent. And she too claims injuries based on what she acknowledges are disclosed side effects (complicating the causal chain) and alleges harms (medical expenses and costs) that may not be cognizable under RICO.

*Thomas:* The Order of Emergency Suspension against Thomas does not even mention the AAP—much less any of the statements challenged here—and identifies additional, independent bases for his suspension, including problems in patient care and documentation, such as failing to refer a febrile infant to an emergency room hospital for definitive testing and observation (Ex. 4 (Thomas Emergency Suspension) at 3.3.3). Thomas also chose to *voluntarily* surrender his medical license (Cplt. ¶ 38), so he cannot claim that the AAP (or anyone else other than him) caused his loss of license. And because his initial suspension occurred in 2020, at least some of his injuries fall outside RICO's four-year statute of limitations, which begins to run from the date the alleged injury is or should have been discovered. *See Chalabi v. Hashemite Kingdom of Jordan*, 503 F. Supp. 2d 267, 273 (D.D.C. 2007).

*Stoller:* The order revoking Stoller's license likewise makes apparent there were multiple bases for the revocation of his license, including relying on "unverified and medically irrelevant personal and family health histories." Ex. 5 (Stoller Revocation) at 29. Moreover, his California medical license was revoked in 2020, outside the four-year statute of limitations, and the subsequent revocation of his New Mexico license by a second independent medical board adds yet another layer of attenuation to his causation theory.

***

36

Plaintiffs obviously disagree with the AAP's medical guidance, and they have tried to shoehorn that disagreement into a RICO scheme. But they have utterly failed to allege facts that, even if accepted as true, are sufficient to support a wire or mail fraud-based RICO claim.

### D.    Plaintiffs' RICO Conspiracy Claims Should Also Be Dismissed

Plaintiffs' RICO conspiracy claim should also be dismissed.

*First*, for the reasons discussed above, Plaintiffs' RICO allegations are insufficient and so "their allegations of conspiracy to engage in that conduct also fail to state a claim of conspiracy to violate RICO." *Byrne v. Brock*, No. 19-7120, 2020 WL 1487757, at *2 (D.C. Cir. Feb. 27, 2020).

*Second*, Plaintiffs' conspiracy claim independently fails to state a claim. "To state a § 1962(d) conspiracy, the complaint must allege that (1) two or more people agreed to commit a subsection (c) offense, and (2) a defendant agreed to further that endeavor." *Byrne*, 2020 WL 1487757, at *2 (internal quotation marks omitted). Plaintiffs do neither.

Plaintiffs do not allege that the AAP entered into an agreement with anyone to commit a RICO violation but instead seem to rely on *inferring* an agreement through conduct. *See* Cplt. ¶¶ 176-80. None of these allegations suffices either. First, Plaintiffs point to a 2026 lawsuit as "an agreement reduced to a filed complaint." *Id.* ¶ 178. A 2026 complaint cannot be an agreement to commit RICO violations that Plaintiffs allege began in 2002, and Plaintiffs do not allege that anything about this complaint shows that the enterprise participants have had a decades-long agreement to racketeer. And Plaintiffs' allegations that the AAP and its supposed conspirators are engaged in joint litigation because they have agreed to be in cahoots to further their RICO enterprise are conclusory at best.

Plaintiffs next point to a kitchen sink of other supposed conspiratorial conduct, including the AAP's participation in ACIP and funding it received from pharmaceutical companies. *Id.* ¶ 179. But none of these allegations sufficiently alleges that the AAP or its supposed co-

37

conspirators entered into any of these actions *in order* to further their RICO misconduct. The AAP and others could have just as easily taken these actions to further their legitimate interests: in the AAP's case, promoting children's welfare. And the D.C. Circuit has emphasized that RICO "allegations that a defendant acted in ways consistent with a conspiratorial agreement, but also equally well explained by legitimate economic incentives, do not suffice to show illegality." *RSM Prods. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051-52 (D.C. Cir. 2012) (internal quotation marks omitted). Accordingly, dismissal of RICO conspiracy claims is "proper when a conspiracy allegation does not plausibly suggest an illicit accord because it is not only compatible with, but indeed is more likely explained by, lawful, unchoreographed free-market behavior." *Id.* at 1052 (internal quotation marks omitted). Because the AAP's actions are at least as equally well explained by its organizational mandate and goal to promote children's health, which is furthered by its participation in ACIP and receipt of funding from pharmaceutical companies, the conspiracy claim should be dismissed. *Id.* (affirming dismissal of RICO conspiracy claims); *Walgreen*, 719 F.3d at 856.

## II.    PLAINTIFFS LACK ARTICLE III STANDING

While Plaintiffs' claims fail on multiple, independent merits grounds, the Court need not even entertain this Complaint for a more fundamental reason: Plaintiffs lack Article III standing. First, all Plaintiffs fail to satisfy Article III's causation requirements, for the same reasons their allegations regarding RICO causation fail. Second, and regardless, the claims of Plaintiff CHD should be dismissed because it has not alleged associational standing.

### A.    Plaintiffs Cannot Satisfy Article III's Causation Requirement

Article III standing requires showing that an "injury is fairly traceable to the challenged action of the defendant." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 180 (2000). If the injury is "the result of the independent action of some third party not before the

38

court," there is no standing.  *Bennett v. Spear*, 520 U.S. 154, 167 (1997); *see also California v. Texas*, 593 U.S. 659, 675 (2021) (when a causal relation between injury and challenged action relies on independent third parties, standing is "substantially more difficult to establish" (internal quotation marks omitted)).  At a bare minimum, a "plaintiff must show at the least that third parties will likely react in predictable ways."  *California*, 593 U.S. at 675 (internal quotation marks omitted).  In making that showing, plaintiffs "cannot rely on speculation about the unfettered choices made by independent actors."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (internal quotation marks omitted).

Additionally, "to show that the alleged injury is fairly traceable to the challenged action, the plaintiffs must make a reasonable showing that 'but for' defendants' action the alleged injury will not occur."  *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 104 F. Supp. 2d 58, 63 (D.D.C. 2000) (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975)).  "If the injury would occur regardless of the challenged action—say, because some separate action would independently cause it in full—then the fair-traceability test is not met."  *E.Q. v. DHS*, No. 25-CV-791 (CRC), 2025 WL 1768208, at *6 (D.D.C. June 26, 2025) (internal quotation marks omitted); *see also* 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3531.5 (3d ed. 2025) ("Rather than a break in one causal chain, standing may be defeated by finding a different cause.").

Plaintiffs have not adequately alleged that AAP's actions were the but-for cause of their injuries.  As discussed above, each of the individual Plaintiffs allege their injuries were caused by a speculative and highly attenuated chain of events involving decisions by multiple intervening and independent third parties that independently would have caused Plaintiffs' purported injuries even if the AAP had never taken the actions that Plaintiffs challenge.  Indeed, as above, Plaintiffs

fail to link any injury to any specific statements alleged to be false, instead gesturing toward the AAP's general guidance and advocacy regarding vaccines not alleged to be predicate acts. None of Plaintiffs' injuries are therefore "fairly traceable" to the challenged actions. Thus, the Court lacks jurisdiction to hear this dispute, independent of the Complaint's myriad merits failures.

### B.    Plaintiff CHD Lacks Standing For An Additional And Independent Reason

Plaintiff CHD, which seeks only injunctive and declaratory relief, lacks Article III standing for an additional, independent reason.

Specifically, it fails to properly allege associational standing. An organization can have organizational standing to sue on its own behalf, or associational standing to sue on behalf of its members. *See, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, No. CV 25-0946 (CKK), 2026 WL 252420, at *20 (D.D.C. Jan. 30, 2026). CHD alleges only the latter. Cplt. ¶ 48 ("CHD sues in its associational capacity on behalf of its community members"). And its allegations are deficient.

Associational standing requires "showing that (a) its members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *League*, 2026 WL 252420, at *21 (internal quotation marks omitted). CHD does not allege that any of its members have standing to sue in their own right. The only allegation that its members are harmed is a conclusory statement that the "AAP's actions, as described herein, harm the financial well-being of CHD community members, limiting the resources they would otherwise choose to devote to CHD." Cplt. ¶ 48.

That threadbare allegation is insufficient. CHD was required to "show that at least one specifically-identified member has suffered an injury-in-fact." *Am. Chemistry Council v. DOT*, 468 F.3d 810, 820 (D.C. Cir. 2006). It does not specifically identify any injured member.

40

Moreover, the complaint does not allege how CHD members are financially hurt nor how any financial injury is fairly traceable to the AAP's actions. *See Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 135 (D.C. Cir. 2006) ("For standing to be proper, it must be that the injury fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." (internal quotation marks omitted)).

Nor does CHD allege that the interests it seeks to protect are germane to its purpose. CHD's "mission is to end the epidemic of childhood chronic disease caused by toxic environmental exposures." Cplt. ¶ 45. How that mission is linked to the complaint's allegations that the AAP's vaccination-related efforts have hurt children's health is not alleged.

## III. REGARDLESS, PLAINTIFFS CANNOT SEEK DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs seek, in part, declaratory and injunctive relief. Even if Plaintiffs had standing (they don't), and even if they had adequately alleged a RICO claim (they haven't), none of the Plaintiffs would be entitled to declaratory and injunctive relief.

As an initial matter, they are not entitled to this relief because, for the reasons discussed above, their RICO claims are deficient. *See Wilson v. On the Rise Enters., LLC*, 305 F. Supp. 3d 5, 19 (D.D.C. 2018) (plaintiffs may only obtain declaratory and injunctive relief "upon prevailing on some independent claim"). In any event, neither the injunctive nor declaratory relief they seek is permitted under RICO, and, regardless, Plaintiffs do not show they are entitled to either.

*First*, RICO does not authorize private parties to seek injunctive or declaratory relief. The Supreme Court declined to address whether private plaintiffs in a civil RICO action are entitled to equitable relief, *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 411 (2003), and the DC Circuit has not expressly addressed the question either. However, the D.C. Circuit has indicated

41

in dicta that private plaintiffs may not themselves seek equitable relief.  *Philip Morris*, 566 F.3d

at 1145.[13]  And of the circuits that *have* addressed the issue, the majority have held that the civil

RICO statute does *not* authorize private plaintiffs to seek injunctive relief based on the statutory

text and legislative history, and the Fourth Circuit has additionally held that private plaintiffs are

not permitted to seek declaratory relief under RICO either.  *See Hengle v. Treppa*, 19 F.4th 324,

356 (4th Cir. 2021); *In re Fredeman Litig.*, 843 F.2d 821, 830 (5th Cir. 1988); *Religious Tech. Ctr.*

*v. Wollersheim*, 796 F.2d 1076, 1084 (9th Cir. 1986).

As those courts have explained, Section 1964(c), which creates a cause of action for private

parties, does *not* refer to the remedial powers laid out in subsection (a), which includes equitable

and declaratory relief.  *See, e.g.*, *Hengle*, 19 F.4th at 354; *see also Wollersheim*, 796 F.2d at 1083

("the inclusion of a single statutory reference to private plaintiffs, and the identification of a

damages and fees remedy for such plaintiffs in part (c), logically carries the negative implication

that *no other remedy* was intended to be conferred on private plaintiffs").  That Congress only

intended for private plaintiffs to sue for damages is further supported by the fact that Congress

*rejected* an amendment that would explicitly allow for injunctive relief in subsection (c).

*Wollersheim*, 796 F.2d at 1085; *see also Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*,

586 U.S. 296, 307 (2019) (considering rejected Congressional proposals).  Accordingly, Congress

did not intend to allow private litigants to obtain injunctive or declaratory relief under RICO.

*Hengle*, 19 F.4th at 354 (noting that subsection (c) "makes no mention of injunctive or declaratory

---

[13] While nevertheless allowing a plaintiff to *intervene* in a lawsuit where the government was seeking equitable relief, the court noted that because subsection (b) allows the government to seek equitable remedies and subsection (c) allows suits for damages, "[t]he statutory scheme does not directly provide private parties with a cause of action for equitable remedies."  *Philip Morris*, 566 F.3d at 1145; *see also id.* ("Section 1964(b) reserves for the government the ability to 'institute' a cause of action for equitable remedies . . . .").

relief" and so "private plaintiffs may sue only for treble damages and costs" (internal quotation marks omitted)).  This Court should therefore dismiss Plaintiffs' requests for injunctive and declaratory relief.

*Second*, even if declaratory and injunctive relief are available under RICO (or Plaintiffs can seek that relief under any other authority), they have not sufficiently alleged necessary facts to obtain that relief.  Plaintiffs seeking injunctive or declaratory relief must "establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue and that the threatened injury is certainly impending." *Friends of the Earth*, 528 U.S. at 170.  In other words, a plaintiff seeking "prospective declaratory and injunctive relief . . . must establish an ongoing or future injury that is 'certainly impending'; he may not rest on past injury." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2015).  "Any threatened harm that is not both 'real and immediate' is 'too speculative' to support standing." *Michigan Welfare Rights Org. v. Trump*, 600 F. Supp. 3d 85, 108 (D.D.C. 2022) (quoting *Lyons*, 461 U.S. at 103; *Laidlaw*, 528 U.S. at 190).  Additionally, "a plaintiff must demonstrate standing separately for each form of relief sought." *Laidlaw*, 528 U.S. at 185.

Plaintiffs do not allege that the AAP's allegedly wrongful behavior will cause "certainly impending" injuries, which is enough to dismiss their claims for injunctive and declaratory relief.  Each of the individual Plaintiffs' injuries occurred in the past, and, though Plaintiffs make conclusory claims that their injuries are "continuing" (*see* Cplt. ¶¶ 21; 27; 44), they do not explain how these injuries are continuing or likely to occur again.  Any injuries or deaths or losses of professional licenses that Plaintiffs suffered have already occurred, and Plaintiffs do not allege that

any future actions by the AAP will cause Plaintiffs to suffer those or other injuries again, let alone plead allegations that any threat of future harm from the AAP's actions is "certainly impending."

As for CHD, even if it has sufficiently alleged standing (and it has not), it has not alleged that there is any "certainly impending" threat of injury to CHD because of the AAP's actions. Again, the complaint only vaguely alleges that there is some nebulous financial harm to CHD members, which is far too little to show any certainly impending threat.

*Finally*, even if Plaintiffs had alleged sufficient facts to show they have standing to seek injunctive or declaratory relief, they would still fall short of showing that such relief is warranted. *See Williams v. Veneman*, No. CV 03-2245 (CKK), 2005 WL 8177882, at *6 (D.D.C. July 5, 2005) (dismissing injunctive relief claim for failing to sufficiently plead a request for that relief).  There is a four-part test for granting a permanent injunction: The plaintiff must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  Plaintiffs do not allege facts that the damages they seek would be inadequate compensation for any injuries suffered, that a remedy in equity is warranted, or that the public interest is served by an injunction.

Likewise, Plaintiffs have not alleged sufficient facts to show that declaratory relief is warranted.  To grant declaratory relief, the Court must consider "(1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue and (2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the

proceeding." *League,* 2026 WL 252420, at \*19 (internal quotation marks omitted).  Plaintiffs do not allege any facts about how the declaratory relief they seek will serve any useful purpose in clarifying legal relations or provide relief from any uncertainty, insecurity, or controversy giving rise to this proceeding.

Regardless, the request for declaratory relief is improper because "even where a legal controversy exists, a party may not carve out a particular question within that controversy and present it to the Court for adjudication via declaratory relief." *Harford Mut. Ins. Co. v. New Ledroit Park Building Co.*, 313 F. Supp. 3d 40, 46 (D.D.C. 2018) (Kelly, J.) (internal quotation marks omitted).  And here Plaintiffs' request for declaratory relief seeks only piecemeal declarations about whether certain statements are false or misleading and qualify as predicate acts.

**CONCLUSION**

Defendant respectfully requests that the Court dismiss the Complaint.

Dated: April 3, 2026

Respectfully submitted,

*/s/ Richard Sauber*
Richard Sauber (Bar No. 385070)
Jack A. Herman (Bar No. 1033370)
Lauren Cassady Andrews (Bar No. 888314680)
Shikha Garg (Bar No. 90002307)
Herbert Smith Freehills Kramer (US) LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

*Counsel for American Academy of Pediatrics*