**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ANDREA SHAW, et al.,

*Plaintiffs,*

v.                                                  Civil Action No. 1:26-cv-00171 (TJK)

AMERICAN ACADEMY OF PEDIATRICS,

*Defendant.*

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

i

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT .................................................................1

FACTUAL BACKGROUND .......................................................................................................2

    A. The American Academy of Pediatrics ...............................................................................2

    B. The Enterprise, Its Participants, and Its Structure .............................................................2

    C. The IOM Reports: What the Evidence Actually Shows ....................................................4

    D. The Enforcement Infrastructure: Discipline and Suppression .........................................4

ARGUMENT ...............................................................................................................................5

    I. The Complaint States a Claim for Relief Under RICO .....................................................5

    A. The Challenged Statements Are Verifiable Factual Misrepresentations, Not Protected

       Scientific Opinions ...........................................................................................................5

          1. The Foundational Misdirection: The 10,000 Vaccines Claim (Compl. ¶¶ 51-57,

             105) ................................................................................................................................7

          2. "The Schedule Is Fully Tested and Safe" (Compl. ¶¶ 106–110) .........................8

          3. The AAP's Fraudulent Alarmism (Compl. ¶¶ 111–123) ....................................9

          4. False Attribution of Mortality Declines to Vaccines (Compl. ¶¶ 124–128) ........9

          5. Pointing to VAERS/VSD as "Proof of Safety" (Compl. ¶¶ 129–137) ..............10

          6. "Vaccines Do Not Cause Autism" (Compl. ¶¶ 138–142) ..................................10

7. Fraudulent Marketing of the Red Book as "Authoritative" (Compl. ¶¶ 143–144) ....................................................................................................11

8. The Omitted Fact Is Material as a Matter of Law...............................................11

9. Defendant's Reliance on *Torrey* and *Pacira* Is Misplaced...............................12

10. The AAP's Knowledge of Falsity Satisfies the Philip Morris Standard..........14

B. The Complaint Satisfies Rule 9(b).................................................................................15

C. The Complaint Adequately Pleads Knowledge and Intent ...........................................17

D. The Complaint Adequately Pleads Enterprise and Participation ..................................21

1. The Complaint Alleges an Association-in-Fact Enterprise with a Decisionmaking Structure.................................................................................21

2. The AAP Conducted or Participated in the Enterprise's Affairs.......................23

E. The Complaint Adequately Pleads Proximate and But-For Causation ..........................25

1. The Parent Plaintiffs' Injuries Are Directly Caused by the Predicate Acts.......27

2. The Physician Plaintiffs' Injuries Are Directly Caused by the Predicate Acts..30

3. The Contraindication Framework Is a Product of the Fraudulent Standard of Care .................................................................................................................31

4. The Existence of Other Contributing Factors Does Not Defeat Causation .......31

5. Plaintiffs Adequately Plead But-For Causation.................................................33

6. The Temporal Sequence of Predicate Acts Does Not Defeat Causation ...........34

7. Defendant's Plaintiff-Specific Arguments Do Not Defeat Causation ...............34

8. The Statute of Limitations Does Not Bar Plaintiffs' Claims ............................36

F. The RICO Conspiracy Claim Should Not Be Dismissed .................................................37

II. Plaintiffs Have Article III Standing ...................................................................39

A. Each Plaintiff's Injury Is Fairly Traceable to the AAP's Conduct ...............................39

B. CHD Has Associational Standing ..................................................................................40

C. A Favorable Decision Would Redress Plaintiffs' Injuries ...........................................42

III. Plaintiffs May Seek Declaratory and Injunctive Relief ................................................43

CONCLUSION.................................................................................................................45

## TABLE OF AUTHORITIES

<u>Cases</u>

*American Legal Foundation v. FCC*, 808 F.2d 84 (D.C. Cir. 1987) ..............................................41

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ...................................................................28

*Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69 (D.D.C. 2006) ...............................................15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................................................38

*Boyle v. United States*, 556 U.S. 938 (2009) ...................................................................................21

**Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)............................................... *passim*

*Byrne v. Brock*, No. 19-7120, 2020 WL 1487757 (D.C. Cir. Feb. 27, 2020)................................38

*Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016)................................................................44

*Ciminelli v. United States*, 598 U.S. 306 (2023)..............................................................17, 20, 21

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019) ..................................................................39

*Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025) ..................................................43

*E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1 (D.D.C. 2014), aff'd, 629 F. App'x 1 (D.C.
Cir. 2015) ........................................................................................................................24

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)..............................................................45

*Emery v. Am. Gen. Fin., Inc.*, 71 F.3d 1343 (7th Cir. 1995)............................................................6

*Flyers Rts. Educ. Fund, Inc. v. U.S. DOT*, 957 F.3d 1359 (D.C. Cir. 2020) .................................40

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000) .....................................39

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989)......................................................................17

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ....................................................................37

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010) ..............................................................30

*Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021) ............................................................................44

*Holmes v. SIPC*, 503 U.S. 258 (1992) .........................................................................25, 27, 28

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977).........................................40, 42

*In re Fredeman Litig.*, 843 F.2d 821 (5th Cir. 1988)......................................................................44

*In re Stoller*, Cal. Med. Bd. Case No. 800-2017-034218 (adopted Feb. 16, 2021) .........................2

*In re Stoller*, N.M. Med. Bd. Case No. 2021-025.........................................................................36

*Kaiser Found. Health Plan, Inc. v. Pfizer, Inc.*, 712 F.3d 21 (1st Cir. 2013)....................26, 27, 28

*Kelly v. United States*, 590 U.S. 391 (2020) .................................................................................20

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) .........................................................................37

*Larson v. Valente*, 456 U.S. 228 (1982) .......................................................................................43

*Med. Marijuana, Inc. v. Horn*, 604 U.S. 593 (2025) ........................................................28, 32, 35

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990).......................................................................5

*Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001).........................................44

*Neder v. United States*, 527 U.S. 1 (1999).....................................................................................11

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013).....................................5

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240 (3d Cir. 2023)....5, 12,13

*Pub. Emps. for Env't Resp. v. Zeldin, 2026 U.S. App. LEXIS 12620 (D.C. Cir. May 1, 2026).40, 41, 42

Religious Tech. Ctr. v. Wollersheim, 796 F.2d 1076 (9th Cir. 1986) .............................................44

Reves v. Ernst & Young, 507 U.S. 170 (1993).............................................................................23

Rotella v. Wood, 528 U.S. 549 (2000) ........................................................................................36

RSM Prods. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP, 682 F.3d 1043 (D.C. Cir. 2012) ....................................................................................................................................................38

Rumsfeld v. Forum for Acad. & Institutional Rts., Inc., 547 U.S. 47 (2006) ...............................39

Salinas v. United States, 522 U.S. 52 (1997)...............................................................................37

Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393 (2003)................................................43, 44

Sergeants Benevolent Ass'n v. Sanofi-Aventis U.S. LLP, 806 F.3d 71 (2d Cir. 2015)..................29

Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc., 249 F.3d 1068 (D.C. Cir. 2001) ....................................................................................................................................27, 28

Stankevich v. Kaplan, 156 F. Supp. 3d 86 (D.D.C. 2016) ...........................................................21

*Torrey v. Infectious Diseases Soc'y of Am., 86 F.4th 701 (5th Cir. 2023)...................................12

TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438 (1976) ..............................................................12

U.S. ex rel. Totten v. Bombardier Corp., 286 F.3d 542 (D.C. Cir. 2002).....................................18

U.S. ex rel. Williams v. Martin-Baker Aircraft Co., 389 F.3d 1251 (D.C. Cir. 2004)...................15

United Food & Com. Workers Union v. Walgreen Co., 719 F.3d 849 (7th Cir. 2013)...........24, 25

*United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006), aff'd in part, 566

    F.3d 1095 (D.C. Cir. 2009) ...................................................................... *passim*

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) .......................................5

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) ...............................5

### Statutes

18 U.S.C. § 1962.............................................................................................37, 44

18 U.S.C. § 1964(c) ...............................................................................28, 34, 43, 44

18 U.S.C. §§ 1341, 1343.......................................................................................17

42 U.S.C. § 300gg-13(a)(2) ..................................................................................22

### Rules

Fed. R. Civ. P. 9(b) ..................................................................................... passim

Fed. R. Civ. P. 12(b)(6)........................................................................................14

### Other Authorities

Jaffe Decl. Ex. A (IOM, *Multiple Immunizations and Immune Dysfunction (2002)*) .................4, 7

Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 26 (2010) ...............32

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Contrary to Defendant's argument, this case is not about a scientific disagreement. It is about the systematic creation of a knowingly false narrative that the childhood vaccine schedule has been fully tested, that is, that administering all the vaccines in the schedule together has been proven safe. However, it is indisputable that the studies designed to examine the long-term effects of the cumulative schedule as administered have never been conducted. See Compl. ¶¶ 58–59 (citing the two Institute of Medicine reports, the latter of which is attached to Defendant's motion as Exhibit 2; the earlier is attached to the Jaffe Declaration filed with this Opposition).

That narrative was implemented through a series of false statements of fact and material omissions published by Defendant and its officers and spokespersons over the past twenty-plus years, as detailed in the Complaint and discussed below. The importance of these indisputable facts and Defendant's false statements lies in their context: as the number of recommended vaccines increased, so did parents' concerns about their cumulative effect.

The AAP met those concerns with two moves. First, it published a paper in its own journal calculating that an infant could theoretically respond to 10,000 vaccines at once, answering an immunological question about the capacity to respond while the parents' question was toxicological, about cumulative harm. Def. Ex. 1. Second, its spokespersons insisted the cumulative schedule could not ethically be studied, when the same IOM report Defendant filed as Exhibit 2 identifies a feasible, ethical, and cost-effective way to conduct exactly those studies. Def. Ex. 2 at 9, 13. Both moves deflected the question rather than answering it, and the case is provable from Defendant's own exhibits. And these two moves are at the heart of the illegal scheme alleged in the Complaint.

This is the mirror image of the tobacco RICO case wherein the enterprise manufactured false uncertainty, generating doubt about a danger its members knew was real. Here Defendant was at the center of manufacturing false certainty through deflection, generating false certainty in the safety of the childhood vaccination schedule, despite the absence of the studies the IOM recommended. Compl. ¶¶ 62–63. Both are fraudulent. Both deploy the apparatus of science to foreclose the very inquiry that would expose the false representations. Defendant did not need to know the schedule was unsafe; it knew it had no basis to call the schedule tested and safe, and said so anyway.

## FACTUAL BACKGROUND

### A. The American Academy of Pediatrics

The AAP describes itself as a non-profit dedicated to children's health. Def. Mem. at 3. It is also a nine-figure enterprise: it generates $115–125 million in annual revenue, employs 475 staff, represents approximately 67,000 pediatricians, and receives funding from the manufacturers of the vaccines on the schedule it promotes. Compl. ¶¶ 49, 154, 179. More importantly for this motion, the AAP's publications function as the legally enforceable standard of care for pediatric immunization. The Medical Board of California found that "the standard of care for pediatricians in giving advice and making decisions about immunization is to follow the recommendations in the ACIP Guidelines and the AAP Red Book." *In re Stoller*, Cal. Med. Bd. Case No. 800-2017-034218, Finding 83 (adopted Feb. 16, 2021) (Def. Ex. 5). Nearly 600 statutes and regulations across 49 states reference ACIP, and Oregon incorporates it by definitional reference. OAR 333-050-0210(8).

### B. The Enterprise, Its Participants, and Its Structure

2

The AAP does not act alone. The Complaint alleges an association-in-fact enterprise whose members include the major vaccine manufacturers (Pfizer, Merck, GlaxoSmithKline, and Sanofi Pasteur), aligned entities such as the American Board of *Pediatrics*, and the AAP's Committee on Infectious Diseases spokespersons, united by a single purpose: to maintain and expand vaccine uptake by representing the schedule as categorically safe while concealing the absence of cumulative-safety testing. Compl. ¶ 6.

The money and the message run in opposite directions through the AAP. Manufacturers fund it through the "Friends of Children Fund" and other channels, with Pfizer, Merck, and Sanofi as "President's Circle" donors and GlaxoSmithKline as a "Patron." Compl. ¶ 154. The AAP in turn distributes the enterprise's safety message through its 67,000 members, virtually every pediatrician in America, who deliver it to families as their medical advice. Compl. ¶ 8.

The enterprise's decisionmaking ran through ACIP, on which the AAP held a liaison seat from 1964 until mid-2025 and through which it and the CDC harmonized the schedule, during an era when conflicts of interest on the committee were endemic and the AAP's Paul Offit served while holding Merck-funded rotavirus patents. Compl. ¶¶ 156, 158. The relationships span six decades, satisfying any longevity requirement, and they track the template the court found sufficient in *Philip Morris*: a trade organization that conducts the industry's joint public relations and manufactures doubt about an inconvenient body of evidence. Compl. ¶ 155. The enterprise has also identified itself. When HHS moved to reform vaccine policy in 2025, the AAP and a roster of aligned organizations jointly sued in the District of Massachusetts to restore the recommendations the enterprise depends upon. Compl. ¶ 157. In that suit the AAP asserts to a federal court that the schedule has been "rigorously tested," a factual characterization it disclaims

here as mere "scientific opinion." The significance of that admission is addressed in Argument I.A and I.D.

### C. The IOM Reports: What the Evidence Actually Shows

As the schedule grew from 11 doses against four diseases in 1983 to more than 72 doses today, roughly a quarter of parents questioned the number of shots or worried the schedule was harming their children. Compl. ¶ 50. In January 2002 the AAP published in *Pediatrics* an article by Paul Offit and seven coauthors calculating that an infant could "theoretically" respond to about 10,000 vaccines at once, a statement about immunologic capacity, not the safety of the schedule. Compl. ¶¶ 51, 53–55. The Institute of Medicine, in 2002 and again in 2013, identified the studies needed to answer the safety question and found they had not been conducted; the 2013 report so stating is the AAP's own Exhibit 2. Jaffe Decl. Ex. A; Def. Ex. 2 at 6. The documentary contradiction, and the passages Defendant selectively quotes, are set out in Argument I.A.

### D. The Enforcement Infrastructure: Discipline and Suppression

The enterprise enforces these representations through the standard of care. The AAP's guidance is not advisory in practice; it is the benchmark medical boards apply. Defendant's own Exhibit 5 establishes the mechanism: the board's expert testified that the standard of care is to follow the ACIP Guidelines and the AAP Red Book, the ALJ credited that testimony, and every sustained cause of discipline traced back to it. Def. Ex. 5, Findings 83, 88. The Physician Plaintiffs are what enforcement looks like. Dr. Paul Thomas published the vaccinated-versus-unvaccinated comparison the IOM had twice recommended and the AAP called unethical; eleven days later Oregon emergency-suspended his license, and after a two-year proceeding he surrendered it and the AAP revoked his membership. Compl. ¶¶ 34–39. Dr. Kenneth *Stoller*, who

issued individualized exemptions after clinical evaluation, lost his California and then his New Mexico license and remains unable to practice. Compl. ¶¶ 41–44. In each case the discipline enforced conformity to the schedule the AAP represents as tested and safe. The enterprise also brands dissenting research "misinformation" and has urged technology platforms to suppress vaccine-safety content, Compl. ¶¶ 101–103; the discipline and the suppression are one mechanism, and the course of conduct, not any single act, is the fraud.

ARGUMENT

## I. THE COMPLAINT STATES A CLAIM FOR RELIEF UNDER RICO

### A. The Challenged Statements Are Verifiable Factual Misrepresentations, Not Protected Scientific Opinions

A statement is actionable if it is verifiable, "provable as false." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 21 (1990). On a motion to dismiss, the Court "must accept a well-pleaded allegation that a verifiable statement is false," and a verifiable statement is sufficient to survive dismissal. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 620, 627 (D.C. Cir. 2001). A court may treat a statement as non-actionable opinion as a matter of law only when it is "not reasonably capable" of a verifiable factual meaning. *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990). The verifiability principle is not confined to defamation; it governs scientific and commercial falsity alike. *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013); *Pacira BioSciences, Inc. v. American Society of Anesthesiologists, Inc.*, 63 F.4th 240 (3d Cir. 2023).

Defendant's argument that the challenged statements must be read "in context" as protected scientific opinion does not contend that they are unverifiable; it asks the Court to adopt Defendant's reading over Plaintiffs'. That is not a question resolved on a motion to dismiss. Each

5

of the representations addressed below is a verifiable statement of fact alleged to be false; its falsity is therefore assumed here.

Furthermore, this case closely parallels *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006), *aff'd in part*, 566 F.3d 1095 (D.C. Cir. 2009). In that case the courts found that trade organizations operated as part of a RICO enterprise by publishing "independent" scientific guidance that misrepresented the state of the evidence about the enterprise's products, telling the public that research had not established a causal link between smoking and disease when it knew otherwise. Both the district court and the D.C. Circuit held the conduct actionable. The AAP occupies the same position in the vaccine enterprise: a trade organization that publishes guidance on behalf of the enterprise's participants, tells pediatricians and parents the childhood vaccine schedule has been tested and proven safe, and cites IOM reports to support its schedule safety claims. The modus operandi is the same; the product is different.

A defendant cannot escape liability by labeling intentionally misleading factual statements "opinion." "[E]ven partially true statements can be actionable fraud … if intentionally misleading as to facts. A half-truth, or what is usually the same thing a misleading omission, is actionable as fraud … if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled." *Philip Morris*, 566 F.3d at 1124 (quoting *Emery v. Am. Gen. Fin., Inc.*, 71 F.3d 1343, 1348 (7th Cir. 1995)). [1]

---

[1] Both courts also specifically rejected the First Amendment defense Defendant raises here, that RICO liability would "chill" scientific discourse. Both courts held otherwise. "The First Amendment does not shield fraud," and neither the Noerr-Pennington doctrine nor the First Amendment protects communications "predicated on fraud or deliberate misrepresentation." 566 F.3d at 1123–24. The AAP's publications to practitioners and parents are not petitions to

6

The Complaint identifies each misrepresentation by publication, speaker, date, and URL across seven categories, Compl. ¶¶ 105–148. A statement about what a cited authority concluded, or whether specified testing exists is a factual representation even in a scientific context. Misrepresenting what a cited authority found, misrepresenting whether scientific evidence exists, and claiming testing was done when it was not are each verifiable factual claims, not protected opinion. Each category below falls within these principles, and the facts underlying each are set out in the Factual Background and detailed in the cited paragraphs of the Complaint.

**1. The Foundational Misdirection: The 10,000 Vaccines Claim (Compl. ¶¶ 51-57, 105)**

The AAP's 2002 *Pediatrics* article by Offit and seven coauthors calculated that an infant could "theoretically… respond to about 10,000 vaccines at any one time." Compl. ¶ 105; and Def. Ex. 1. Defendant says the statement is not false because, read in context, the article addressed a concern about the immune system being "overwhelmed." Def. Mem. at 15-16. However, parents' concern was about safety: whether administering this many vaccines (with their adjuvants) could harm their children. Compl. ¶¶ 50, 53. That was the question the Institute of Medicine said had to be answered by studies, one month after this article was published. Compl. at ¶ 58.

The IOM specifically asked whether the schedule could "adversely affect the developing immune system," and to answer the question, it recommended using existing surveillance systems, including the Vaccine Safety Datalink, "to study safety questions related to asthma and

---

government; they are communications designed to influence behavior, the category both courts held unprotected when predicated on fraud.

other important allergic disorders, as well as to study type 1 diabetes and other important autoimmune diseases." Jaffe Decl. Ex. A at 14.

The Offit et al. article said nothing about any autoimmune diseases or allergic conditions that the vaccines might cause. The article's falsity is not in the calculation; it was answering a different question from the one that was asked, and then misrepresenting that the article answered the parents' safety concerns. For more than two decades the AAP has deployed this theoretical calculation as a public-relations device, equipping its 67,000 member pediatricians, the Red Book, and its public channels to reassure parents and to represent that the schedule has been "fully tested and proven safe." Compl. ¶¶ 3–4, 7, 52, 60–62, 64, 144, 184.

### 2. "The Schedule Is Fully Tested and Safe" (Compl. ¶¶ 106–110)

The AAP represents that the schedule "has been tested and approved by multiple authoritative experts for safety and efficacy," that a vaccine "must be tested, found safe and closely monitored," and that "immunizations are safe and effective for children." Compl. ¶¶ 106–109. Most pointedly, its 2016 clinical report claims the IOM "strongly affirmed" the schedule's safety in 2013. Compl. ¶ 108.[2]

Each representation conveys a verifiable factual claim, that the cumulative schedule was tested and that a named authority affirmed its safety. All are false based on AAP's cited source. As set out in the Factual Background, the 2013 IOM report the AAP filed as Exhibit 2 states that "studies designed to examine the long-term effects of the cumulative number of vaccines … have

---

[2] Defendant argues the 2013 report "supports" the Red Book because it calls vaccines "most effective and safe" and the "available evidence is reassuring." Def. Mem. at 24; Def. Ex. 2 at 1, 6. That reads half of a sentence: the committee found that "although the available evidence is reassuring, studies designed to examine the long-term effects of the cumulative number of vaccines . . . have not been conducted." Def. Ex. 2 at 6. Both IOM reports called for those studies, and the 2013 report found they still had not been done. Compl. ¶¶ 58–59, 135–136.

not been conducted," Def. Ex. 2 at 6, and the 2002 report found no study comparing vaccinated and unvaccinated children, IOM 2002 at 36. A representation that the IOM "strongly affirmed" as attesting to the schedule's safety that the IOM said was never studied is not scientific opinion; it is a false statement about what a cited authority found, provable by laying the AAP's words beside its own Exhibit 2.

Defendant's objection that the phrase "fully tested" appears in no single AAP publication, Def. Mem. at 17, misses the point: the quoted representations are the AAP's own words, and whether the cumulative schedule was "tested" is a verifiable question the IOM reports answer in the negative.

### 3. The AAP's Fraudulent Alarmism (Compl. ¶¶ 111–123)

When ACIP moved the hepatitis B birth dose to individual decisionmaking in December 2025, AAP officers called it "irresponsible and purposely misleading" and projected "99,000 preventable hepatitis B infections" and deaths; in January 2026 the chair of its infectious-diseases committee called an eleven-vaccine schedule "a very dark day for children." Compl. ¶¶ 111–116.

These projections rest on unpublished models, not observed outcomes; the United Kingdom, Canada, and seventeen EU states delay the birth dose without surges. Compl. ¶ 113. And the falsity is shown by a comparison the AAP cannot explain: if eleven recommended vaccines are "a very dark day," California's ten-vaccine school mandate is worse, yet the AAP has never called it dangerous or sued California, and never sued Massachusetts, where it filed suit, over that state's nine-vaccine requirement. Compl. ¶¶ 119–121. The alarmism appears only when change threatens the enterprise's revenue, and the December 2025 and January 2026 statements are fresh predicate acts of wire fraud. Compl. ¶¶ 114–118.

9

### 4. False Attribution of Mortality Declines to Vaccines (Compl. ¶¶ 124–128)

The AAP claims its recommendations "have saved millions of lives," Compl. ¶ 124, but a study in its own journal found nearly 90% of the decline in infectious-disease mortality occurred before 1940, before almost any current vaccine existed, and the CDC attributes the decline to sanitation, nutrition, housing, and antibiotics. Compl. ¶¶ 125–126. Attributing those historical declines to the schedule misstates verifiable historical fact. Compl. ¶¶ 127–128.

### 5. Pointing to VAERS/VSD as "Proof of Safety" (Compl. ¶¶ 129–137)

The AAP tells parents that post-licensure systems, VAERS and the VSD, demonstrate vaccine safety and that VAERS monitoring ensures vaccines "remain safe." Compl. ¶¶ 129, 132.

Its own 2024 clinical report concedes that VAERS "cannot generally assess causality" and "serves as a hypothesis-generating system." Compl. ¶ 131. A system that cannot assess causality cannot prove safety, yet the AAP invokes it as proof when reassuring parents and dismisses it as unreliable when confronted with adverse-event reports. That is a knowing misrepresentation about a surveillance system's evidentiary value, not opinion.

Contrary to AAP's representation that the VSD is "post-licensure monitoring" implying the safety of vaccines is continually monitored (*Id.* at ¶ 129), it does no such thing. It is an unexamined database which IOM twice recommended be studied to determine the cumulative safety of the vaccine schedule, which studies have never been done. *Id.* at ¶¶ 134-136, Def. Ex. 2 at 9, 13. AAP recasts the IOM's rejection of a prospective vaccinated-versus-unvaccinated trial as proof the question could not be studied at all, and continues to cite the unexamined database as proof of the schedule's safety. Compl. ¶¶ 58, 129, 134–136.

### 6. "Vaccines Do Not Cause Autism" (Compl. ¶¶ 138–142)

On November 20, 2025, one day after the CDC withdrew "vaccines do not cause autism" as "not an evidence-based claim," the AAP reaffirmed that "decades of rigorous research have shown vaccines do not cause autism." Compl. ¶¶ 138–139.

The IOM the AAP invokes declined to reach that conclusion, finding the evidence "inadequate to accept or reject a causal relationship," and for several infant vaccines no autism studies existed to review. Compl. ¶¶ 140–141. A categorical assertion of settled science, maintained the day after the responsible federal agency withdrew the identical claim, is a false statement of fact about the state of the evidence.

**7. Fraudulent Marketing of the Red Book as "Authoritative" (Compl. ¶¶ 143–144)**

The AAP markets its Red Book, sold at $175 a copy, as "the most authoritative and comprehensive" resource for pediatric infectious diseases. Compl. ¶ 143. On the face of Defendant's Exhibit 3, the Red Book commits the same half-truth shown above in category 2: it states the schedule's safety "has been affirmed by multiple independent reviews, including from the National Academy of Medicine," Def. Ex. 3 at 29, invoking the 2013 report as proof of safety while omitting that report's finding that the cumulative studies "have not been conducted," Def. Ex. 2 at 6. Its falsity is provable by laying Exhibit 3 beside Exhibit 2. This matters because the Red Book defines the standard of care, Def. Ex. 5, Finding 83, so the half-truth sits in the very text that compels physicians to tell parents the schedule is safe. Compl. ¶¶ 143–144.

**8. The Omitted Fact Is Material as a Matter of Law**

The affirmative misrepresentations, that the schedule was "tested" and "strongly affirmed," are false on their face and their falsity does not depend on materiality. The omission, the AAP's failure to disclose that the IOM's recommended cumulative-safety studies were never conducted, is actionable as a half-truth only if the omitted fact is material. *Neder v. United*

11

*States*, 527 U.S. 1, 23, 25 (1999). It is, as a matter of law, and the proof comes from the AAP itself.

The AAP admitted the cumulative-safety question was material to parents in the document Defendant filed as Exhibit 1. The Offit article was written, by its own terms, to answer the question parents were asking, "Do Multiple Vaccines Overwhelm or Weaken the Infant's Immune System?", reciting that 23% of parents questioned the number of shots and 25% feared the schedule weakened the immune system. Def. Ex. 1 at 124. The AAP then distributed it through its 67,000 members as the standard answer. Compl. ¶¶ 57, 68.

An organization does not write a national journal article and deploy it via pediatricians throughout the country to answer a question it considers immaterial to the audience's decision. By addressing the concern, the AAP conceded its materiality, and cannot now contend that the truth, that the recommended studies were never conducted, was immaterial to the same parents. No reasonable mind could conclude otherwise. See *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449–50 (1976) (materiality resolved as a matter of law where the fact is so obviously important that reasonable minds cannot differ).

### 9. Defendant's Reliance on *Torrey* and *Pacira* Is Misplaced

Defendant invokes *Torrey v. Infectious Diseases Society of America,* 86 F.4th 701 (5th Cir. 2023), and *Pacira,* for the principle that publishing a medical opinion cannot be a misrepresentation. But *Torrey* did not decide the issue because the Fifth Circuit held that Torrey forfeited it by not arguing it in the district court. *Torrey*, 86 F.4th at 705 n.6. In any event, a close reading of the case shows the material differences between the medical judgments about treatment guidelines, versus the false statements demonstrated in this case.

12

*Pacira* draws the dividing line between the non-actionable tentative scientific judgments expressly disclosed and verifiable factual representations. It also distinguishes verifiability from reliability: attacks on a study's methodology are not actionable, but only because they do not bear on whether a statement can be proven true or false. *Pacira*, 63 F.4th at 247. (The court reserved the question as to which side an allegation that a defendant fabricated or falsified the data falls, noting that *Pacira* had not. *Id.*)

The AAP's representations sit on the actionable side of that line: whether the IOM found that cumulative-safety studies had been conducted is verifiable, and the AAP's statement that the schedule was "tested" and its safety "strongly affirmed" is provably false against the AAP's own cited report. *ONY,* 720 F.3d at 496, which Defendant also cites, draws the same distinction. It protects conclusions drawn from accurately described, non-fraudulent data on subjects of genuine scientific disagreement, but it holds that falsifiable statements of fact remain actionable "if known to be false when made," *id.,* and treats a claim that the defendant misrepresented a source's findings as the easier case for the plaintiff, *id.* at 497. That is this case. The dispute here is not over interpretation.

This case is categorically different. The AAP made factual misrepresentations about what the IOM found, contradicted by the IOM report the AAP itself cites; the falsity is internal to the AAP's own sources, not a competing study it chose to disregard. The same is true of the other categories, mortality, VAERS, and autism, each a verifiable factual claim provable without resolving any scientific debate. Defendant would extend *Pacira* from protecting debatable conclusions to immunizing false statements about the contents of cited sources. No circuit has gone that far, and *Philip Morris* holds the opposite. Defendant's anticipated answer, that its synthesis of the IOM report is "reasonable," does not rescue the statements: a reasonable reading

13

of a report finding that the cumulative studies have not been conducted does not yield the representation that the schedule's safety has been "strongly affirmed." 449 F. Supp. 2d at 853–54.

### 10. The AAP's Knowledge of Falsity Satisfies the *Philip Morris* Standard

Defendant distinguishes *Philip Morris* on the ground that the tobacco defendants "internally knew" their statements were false while the AAP merely "knew or should have known" the studies were not done. Def. Mem. at 13. The Complaint alleges actual knowledge: the AAP cited the IOM reports, and its committee members participated in IOM reviews. Compl. ¶¶ 108, 110, 142, 144. Here the contradictory evidence is the public reports the AAP itself cited, so knowledge of falsity appears on the face of the record, making the pleading stronger than *Philip Morris* was when it survived dismissal.

Defendant's further argument, that the AAP never "knew" the schedule was unsafe, misframes the claim. The Complaint alleges the AAP knew the IOM's recommended safety studies had not been conducted and represented that the schedule was tested. Representing that evidence of safety exists when it does not is actionable under *Philip Morris*. The distinction Defendant draws cuts the other way. The mechanism is identical, the apparatus of science deployed to foreclose the very inquiry that would expose the misrepresentation, and *Philip Morris* holds that a defendant cannot escape liability by dressing such a representation as scientific opinion. The AAP did not need to know the schedule was unsafe; it knew it had no basis to call the schedule tested and safe, and said so anyway.[3]

---

[3] Defendant's falsity argument ultimately asks the Court to decide on the pleadings whether these statements are fact or opinion, whether they are false, and whether the AAP made them knowingly, each a disputed question of fact that *Philip Morris* resolved only after trial. The Complaint alleges verifiable factual misrepresentations facially contradicted by the AAP's own cited sources, which certainly satisfies Rule 12 (b)(6).

One feature ties the categories of false statements together and marks this as fraud rather than disagreement: a closed, self-enforcing sequence pleaded in the Complaint. All of these statements point in the same direction. The AAP told parents not to worry because an infant could respond to 10,000 vaccines (a capacity claim, not a safety answer); said the cumulative schedule could not ethically be studied, even though the IOM called for observational VSD analysis that would withhold nothing; the studies were never done; then cited the resulting absence of evidence as proof of safety. Compl. ¶¶ 60, 64–68, 131, 136. The absence of a finding of harm was preordained by the refusal to look, and the report establishing all of this is Defendant's own Exhibit 2. Each step protects the next, and the whole is what distinguishes this scheme to mislead parents from a legitimate scientific opinion or disagreement.

**B. The Complaint Satisfies Rule 9(b)**

Defendant devotes many pages to the contention that the Complaint fails to plead fraud with the particularity Rule 9(b) requires. Def. Mem. at 14–23. Most of what appears under that heading is not a particularity argument at all. It is a restatement of Defendant's opinion defense, that the challenged statements cannot be false, and of its causation defense, that the statements did not cause Plaintiffs' injuries. Those arguments are answered in Sections I.A and I.E. The particularity question is narrow: whether the Complaint identifies the who, what, when, where, and how of each alleged misrepresentation. It does.

Rule 9(b) requires a complaint to "state the time, place and content of the false misrepresentations, the fact misrepresented, and what was retained or given up as a consequence of the fraud." *Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 89 (D.D.C. 2006) (citing *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.,* 389 F.3d at 1256). The Rule's purpose is to give the defendant notice of the precise misconduct charged. The Complaint here gives notice in

15

detail. It does not gesture at a general course of conduct; it identifies each misrepresentation by publication, speaker, date, and quoted language, and it states the specific fact that each misrepresentation concealed or distorted.

The specifics are pleaded category by category. The 2002 foundational misrepresentation is identified by publication (*Pediatrics*), authorship (Offit and seven coauthors), date (January 2002), and content (the claim that an infant could theoretically respond to 10,000 vaccines). The fact misrepresented is that the calculation addressed B-cell immunogenicity rather than the cumulative toxicological safety parents were asking about. Compl. ¶¶ 51–62. The "tested and safe" misrepresentations are identified by source, including the 2016 clinical report "Countering Vaccine Hesitancy" in *Pediatrics*, the AAP's policy position, and the HealthyChildren.org article "Vaccine Safety: Examine the Evidence," each with quoted language and URL. The fact misrepresented is that no study has tested the cumulative safety of the schedule, which the AAP knew because it cited the very reports that say so. Compl. ¶¶ 106–110. The autism misrepresentation is identified by speaker (AAP President Susan Kressly), date (November 20, 2025), and quoted language ("decades of rigorous research have shown vaccines do not cause autism"). The fact misrepresented is that the claim was made one day after the CDC withdrew the identical statement as not evidence-based. Compl. ¶¶ 138–139.

The hepatitis B alarmism is identified by speaker (Kressly and committee member José Romero), date (December 5, 2025), and content (the projection of "99,000 preventable hepatitis B infections"), with the fact misrepresented: that the projection derived from unpublished models contradicted by the experience of the United Kingdom, Canada, and seventeen EU member states. Compl. ¶¶ 112–113. The mortality, VAERS, and Red Book misrepresentations are

16

pleaded with the same specificity. Compl. ¶¶ 124–137, 143–144. This is the "time, place and content" that *Bates* requires.[4]

The Complaint further pleads the pattern element. The predicate acts span twenty-four years, from the 2002 Offit article to the December 2025 hepatitis B statements and the January 2026 conduct, and they are related through a common purpose, common methods, and common victims. Compl. ¶ 164. That satisfies the continuity-plus-relatedness standard for a RICO pattern.[5]

Finally, to the extent Defendant's 9(b) argument incorporates its contention that Plaintiffs have not alleged "what was retained or given up as a consequence of the fraud," that is the money-or-property element, and it is pleaded as set forth in Section I.C, including the administration fees and visit revenue that the AAP's member pediatricians collect for each vaccination, the manufacturers' vaccine revenues, and the AAP's own Red Book and related income. Compl. ¶¶ 94–96, 143, 154. Rule 9(b) requires particularity, not proof, and the Complaint supplies it.

### C. The Complaint Adequately Pleads Knowledge and Intent

To plead wire or mail fraud, Plaintiffs must allege that the AAP made statements it "knew to be false or misleading," *Philip Morris,* 566 F.3d at 1118, and that money or property was an object of the fraud, *Ciminelli v. United States,* 598 U.S. 306, 312 (2023). Knowledge and

---

[4] The Complaint also pleads the interstate-transmission element. The AAP is a national organization with approximately 67,000 members across all fifty states; its journal *Pediatrics* is distributed by mail and electronically to members nationwide; its website HealthyChildren.org is accessible by wire to parents across state lines; and the Red Book is sold commercially through interstate channels. Compl. ¶¶ 143, 163. Each transmission across state lines is a use of the mails or wires within 18 U.S.C. §§ 1341 and 1343. Compl. ¶ 163.

[5] *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). As in *Philip Morris*, the enterprise's fraud has continued into the present, with predicate acts in late 2025 and early 2026. *Philip Morris,* 566 F.3d at 1108–09.

intent, however, need not be pleaded with particularity. Rule 9(b) requires particularity only as to "the circumstances constituting fraud", the time, place, and content of the false representations, while providing by its terms that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551–52 (D.C. Cir. 2002). Defendant's demand that Plaintiffs plead the AAP's knowledge of falsity with time-place-content specificity asks for more than the Rule requires. The Complaint satisfies the Rule standard, and then some.

**Knowledge of falsity.** Defendant frames the intent question as whether the AAP "knew the vaccine schedule was unsafe." Def. Mem. at 23. That is not the fraud alleged. The fraud is that the AAP represented the cumulative schedule as tested and its safety "strongly affirmed" when it had no evidence of cumulative safety, knew it had none, and acted to prevent the studies that could supply it.

The required knowledge is knowledge that the representation was false, not knowledge that vaccines are dangerous. The Complaint pleads the knowledge directly. The AAP cited the 2002 and 2013 IOM reports, which state that studies of the cumulative schedule's long-term safety had not been conducted, and then represented in the same publications that the schedule was "tested" and its safety "strongly affirmed." An organization that cites a report establishing that the studies do not exist, and simultaneously tells parents the testing has been done, knows its representation is false.

The suppression confirms it: the AAP, through Offit, recast the IOM's call for observational study as a demand for an unethical withholding trial and declared the research impossible, and the enterprise punished Dr. Thomas when he performed it. Compl. ¶¶ 35–40, 60, 64–65. A party that believed its safety claim was supported would not work to prevent the claim

18

from being tested. In the Massachusetts litigation the AAP presents the same safety representations as factual assertions to obtain emergency relief while calling them non-actionable opinion here. The same organization, citing the same reports across the same channels, knows what the evidence shows and has chosen to say otherwise.

**Specific intent of identified actors.** Defendant invokes the rule that a corporate entity's fraudulent intent depends on the "wrongful intent of specific employees" who "made, ordered, or approved" the statements, and contends the Complaint names no such individuals. Def. Mem. at 24; *Philip Morris,* 566 F.3d at 1119. The Complaint names them. The 2002 article was authored by Dr. Paul Offit, a member of the AAP's Committee on Infectious Diseases and the organization's leading public spokesperson on childhood vaccination, and published in the AAP's own journal. Compl. ¶¶ 25, 51–52. The autism reaffirmation was made by AAP President Susan Kressly. Compl. ¶¶ 138–139. The mortality and schedule-revision statements were made by Sean O'Leary, chair of the AAP's Committee on Infectious Diseases. Compl. ¶¶ 116, 124. Each spoke in an official AAP capacity on the subject of his or her office. The AAP approved each statement in the manner an organization approves institutional speech: by publishing it in its peer-reviewed journal, by issuing it under the name of its president and committee chair, and by disseminating it to its members and the public as the AAP's position. *Philip Morris* requires no more.

**Money or property.** Defendant argues that the AAP "does not sell vaccines, or indeed make any money at all from the provision of vaccines." Def. Mem. at 24. The Complaint does not allege that the AAP sells vaccines. It alleges that the AAP participates in an enterprise whose participants include vaccine manufacturers (Pfizer, Merck, GlaxoSmithKline, Sanofi Pasteur) that do sell vaccines, in a global market estimated at $15.08 billion. Compl. ¶¶ 2, 6. The enterprise's common purpose is to maintain and expand vaccine uptake. The AAP's role is to

19

translate ACIP recommendations into enforceable clinical standards and to ensure physician compliance through the Red Book and medical board discipline. The money that funds the scheme originates with the families and insurers who pay for vaccinations, and it is distributed across the enterprise's participants: the manufacturers that sell the vaccines, the pediatricians who administer them, and the AAP itself. The mail and wire fraud statutes require that "money or property was an object of the fraud," not that each enterprise participant personally received the proceeds. *Ciminelli*, 598 U.S. at 312.

*Kelly v. United States*, 590 U.S. 391, 402–03 (2020), does not aid the Defendant. There the object of the scheme was an exercise of regulatory power over bridge lanes, and the only financial loss, the cost of the employees' labor, was an incidental byproduct of that non-property goal. Here money is not a byproduct of some other objective. It is the objective: the enterprise exists to maintain the vaccine uptake that generates the families' and insurers' payments, the administration fees, and the manufacturers' sales. *Kelly* bars a claim where money is the collateral cost of a different aim; it does not reach a scheme whose aim is the money.

The object of the fraud includes the money parents pay for the vaccinations the AAP's representations induce. The AAP's approximately 67,000 members, "virtually every pediatrician in America," deliver the enterprise's safety claims to families as medical advice and collect administration fees for each injection, performance bonuses tied to vaccination rates, and the revenue from the well-child visits into which vaccinations are bundled. Compl. ¶¶ 8, 94–96. That is money obtained through the scheme, paid by the deceived parties to the enterprise's own members. The AAP's assertion that pediatricians "do not profit off vaccines" and "either break even or even lose money" does not defeat the allegation and cannot at the pleading stage: the administration fees, bonuses, and bundled-visit revenue are received for the vaccination

20

regardless of the margin on the vial. Compl. ¶ 96. The object-of-the-fraud requirement asks whether money was an object of the scheme, not whether any participant's margin was positive. *Ciminelli*, 598 U.S. at 312.[6]

### D. The Complaint Adequately Pleads Enterprise and Participation

Defendant argues that Plaintiffs fail to allege a RICO enterprise because the Complaint does not identify a "common decisionmaking structure, hierarchy, or mechanism for directing conduct," and that the AAP's conduct served only its own mission rather than an enterprise's affairs. Def. Mem. at 25–27. The enterprise, its participants, its structure, and its decisionmaking mechanism are set out in the Factual Background, Part B, and pleaded in detail in the Complaint. Those allegations defeat both arguments.

### 1. The Complaint Alleges an Association-in-Fact Enterprise with a decisionmaking Structure

An association-in-fact enterprise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). A plaintiff need not allege a "hierarchical structure or a 'chain of command,'" *id*. at 948, but must identify the enterprise's "decisionmaking structure," *Stankevich v. Kaplan*, 156 F. Supp. 3d 86, 94 (D.D.C. 2016). The Complaint alleges each element.

---

[6] The AAP's own enrichment is alleged the same way. It grew into a nine-figure organization over the same quarter-century in which the schedule expanded sixfold: as doses rose from 11 in 1983 to more than 72 today, AAP membership more than tripled and annual revenue rose to between $115 and $125 million. Compl. ¶¶ 49, 92. That revenue is tied to the schedule: the Red Book sold at $175 a copy, continuing medical education and conferences that exist because the schedule exists, and direct manufacturer funding. Compl. ¶¶ 97, 143, 154. These are traditional property interests and an object of the scheme.

**Purpose and participants**. The Complaint identifies the members, the AAP, the vaccine manufacturers (Pfizer, Merck, GlaxoSmithKline, and Sanofi Pasteur), the American Board of Pediatrics, and the AAP's Committee on Infectious Diseases spokespersons, and the common purpose that unites them: maintaining and expanding vaccine uptake by representing the schedule as categorically safe while concealing the absence of cumulative-safety testing. Compl. ¶ 6. The relationships are concrete and financial. The manufacturers fund the AAP through the "Friends of Children Fund" and other channels, with Pfizer, Merck, and Sanofi as "President's Circle" donors and GlaxoSmithKline as a "Patron," and the AAP in turn distributes the enterprise's safety message through its 67,000 members. Compl. ¶¶ 8, 154. The AAP is the hub: it takes in manufacturer support and puts out the categorical safety message that sustains the manufacturers' market. See Factual Background, Part B.

**Decisionmaking structure**. The Complaint identifies the mechanism through which the enterprise set the schedule it then promoted and enforced: the CDC's Advisory Committee on Immunization Practices. The AAP has held a liaison seat on ACIP since 1964, and from 1995 until mid-2025 the AAP and the CDC harmonized their schedules and operated as a unified voice. Compl. ¶ 156. ACIP itself is a government committee and is not alleged to be a member of the enterprise. The private enterprise participants used ACIP as a decision node: an ACIP recommendation, once adopted, triggered mandatory insurance coverage under 42 U.S.C. § 300gg-13(a)(2), was incorporated into the laws of 49 states, was written into the AAP's Red Book as the standard of care, and was enforced through medical-board discipline. Compl. ¶¶ 156–158. That ACIP's formal procedures were run by the government does not defeat the allegation; it describes how the enterprise operated, through influence over a governmental decision point during a period when, as the Complaint alleges, conflicts of interest on ACIP were

22

endemic and the AAP's own representative sat on the committee while holding manufacturer-funded vaccine patents. Compl. ¶ 158.

**Longevity.** The relationships span more than six decades, which satisfies *Boyle's* longevity requirement, and they track a recognized template. The Complaint alleges that the AAP functions as the Tobacco Institute and the Center for Tobacco Research did for the cigarette manufacturers: the trade organization that conducts the industry's joint public relations and conveys a unified message manufacturing doubt about an inconvenient body of evidence. Compl. ¶ 155. That is the structure the court found sufficient in *Philip Morris*.

Defendant argues that the AAP's removal from ACIP in 2025 proves it never controlled vaccine policy. Def. Mem. at 26. The opposite inference is at least as plausible, and at the pleading stage it is the one the Court must draw: the enterprise operated through ACIP for decades until HHS disrupted it. Compl. ¶ 157. The disruption does not negate the enterprise's existence during the relevant period, and the AAP's response to it, jointly suing in Massachusetts to restore the schedule, is further evidence that the enterprise is intact and operating. Compl. ¶¶ 157, 178.

### 2. The AAP Conducted or Participated in the Enterprise's Affairs

Under *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993), a plaintiff must allege that the defendant participated in "the conduct of the enterprise's affairs, not just … [its] own affairs." Defendant argues that the AAP's publications and advocacy advanced only its own mission of promoting children's health. Def. Mem. at 26–27. The Complaint alleges otherwise, and the distinction Defendant draws collapses on the facts pleaded.

The AAP operationalizes the enterprise's decisions. Its Red Book defines the standard of care that governs every pediatrician in the country, a fact Defendant's own Exhibit 5 confirms.

23

Def. Ex. 5, Finding 83; see Factual Background, Part D. That standard dictates which vaccines physicians administer, what they tell parents, and what befalls physicians who deviate, who lose their licenses, as Plaintiffs Thomas and Stoller did. Compl. ¶¶ 34–44, 100. Translating the enterprise's schedule into binding clinical doctrine for 67,000 physicians, and enforcing it through professional discipline, is direction of the enterprise's affairs, not the pursuit of an independent charitable mission. Compl. ¶ 160.

The conduct that most belongs to the enterprise rather than to the AAP alone is the joint defense of the schedule. When HHS moved to reform vaccine policy, the AAP did not act by itself. It joined with other members of the enterprise to sue HHS in the District of Massachusetts to restore the recommendations the enterprise depends upon. Compl. ¶ 157. The plaintiffs in that suit include the American Academy of Pediatrics, the American Public Health Association, the American College of Physicians, the Infectious Diseases Society of America, the Society for Maternal-Fetal Medicine, and the Massachusetts Chapter of the American Academy of Pediatrics. See Factual Background, Part B. An organization acting only in its own interest does not coordinate with a roster of aligned professional organizations to litigate the preservation of the very schedule whose safety it has misrepresented. That coordination is the conduct of an enterprise's affairs. Compl. ¶ 178.

Defendant's contention that the lawsuit cannot be a predicate act, Def. Mem. at 20, attacks an argument the Complaint does not make. The predicate acts are the AAP's false statements. The lawsuit is pleaded as evidence of concerted enterprise action: members who "aligned their interests in a single legal action" to preserve the schedule. Compl. ¶ 178. *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 13 (D.D.C. 2014), aff'd, 629 F. App'x 1 (D.C. Cir.

24

2015) holds only that filing suit is not itself a predicate act; it does not bar pleading a lawsuit as evidence that an enterprise exists.

Defendant's reliance on *United Food & Commercial Workers Union v. Walgreen Co.*, 719 F.3d 849, 856 (7th Cir. 2013), is misplaced. *Walgreen* involved a pharmacy filling a manufacturer's prescriptions, an ordinary commercial transaction that revealed nothing beyond the relationship "inherent in every commercial transaction between a drug manufacturer and pharmacy." The Complaint here alleges far more: an organization that defines the standard of care, converts ACIP recommendations into binding clinical doctrine, blocks the studies the IOM recommended, ensures that dissenting physicians lose their licenses, and coordinates joint litigation to defend the schedule. Compl. ¶¶ 64–68, 97–98, 100, 156–158, 160, 178; see Factual Background, Parts B and D. *Walgreen* itself confirms the point: the court recognized that when participants "band together to commit [violations] they cannot accomplish alone . . . then they cumulatively are conducting the association-in-fact enterprise's affairs, and not [simply] their own affairs," and affirmed dismissal only because the plaintiff there alleged nothing beyond the cooperation inherent in an ordinary manufacturer-pharmacy relationship. *Id.* at 856.

The AAP and the manufacturers are alleged to have done together what none could do alone: represent as tested a schedule none had tested, block the studies that would expose the gap, and maintain the uptake that funds them all. That is conduct of the enterprise's affairs, not the AAP's own. At the pleading stage, where all inferences run in Plaintiffs' favor, those allegations are more than sufficient to plead both the enterprise and the AAP's conduct of its affairs.

### E. The Complaint Adequately Pleads Proximate and But-For Causation

25

RICO requires each plaintiff to plead but-for and proximate cause. *Holmes v. SIPC*, 503 U.S. 258, 268 (1992). Proximate cause demands a "direct" relationship between the predicate acts and the injury, *id*. at 269, and the Supreme Court has held that requirement is satisfied where a fraud operates on a third party whose response causes the plaintiff's injury, so long as that response is mechanical and predictable rather than the product of independent discretion. *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 656–58 (2008). First-party reliance is not an element of a civil RICO mail- or wire-fraud claim; what matters is whether the fraud was "directed at and received by the party whose actions the schemer sought to influence." *Id*. at 657, 661.

This is a compelled-intermediary case. The AAP publishes its safety claims, Compl. ¶¶ 3, 105–109, instructing pediatricians that "the clear message parents should hear is that vaccines are safe and effective," Compl. ¶ 107, knowing that physicians who deviate face medical-board discipline, loss of hospital privileges, and exclusion from insurance networks, Compl. ¶¶ 99–100, 160. The standard of care, in the medical board's own words, is to follow the ACIP Guidelines and the AAP Red Book. Def. Ex. 5, Finding 83. Pediatricians transmit the AAP's representations to parents because that standard compels them to do so, parents consent, and their children are vaccinated and injured. Compl. ¶¶ 27, 165–170. That is the *Bridge* pattern: the fraud is aimed at physicians, who respond not as independent actors exercising discretion about cumulative-schedule safety but as compelled conduits, and the injury falls on the parents the scheme targeted. The chain is not speculative; it is the mechanism the Complaint alleges and the board's findings confirm.

A 2025 survey found 85% of parents trust their child's pediatrician for vaccine information, above the CDC and FDA. Compl. ¶ 166. The theory is stronger than the one the

First Circuit sustained in *Kaiser Found. Health Plan, Inc. v. Pfizer, Inc.*, 712 F.3d 21 (1st Cir. 2013), where the manufacturer merely influenced independent physicians through marketing; here the AAP controls pediatricians through certification, reimbursement, and the threat of discipline. Compl. ¶ 170. If influence sufficed in *Kaiser*, control suffices here.[7] *See* Factual Background, Part D.

### 1. The Parent Plaintiffs' Injuries Are Directly Caused by the Predicate Acts

Defendant calls the chain "attenuated" because it runs through physicians, parents, manufacturers, and the FDA. Def. Mem. at 28–30. The number of actors is irrelevant under *Bridge*; what matters is whether the intermediary's response was mechanical or discretionary. 553 U.S. at 656–58. Here the physician follows the AAP standard because he must. All of this was not only foreseeable; it was, and Plaintiffs allege remains, the plan set out throughout the Complaint.

Defendant separately contends the Parent Plaintiffs' injuries are "derivative" of their children's and therefore too indirect. Def. Mem. at 28. The derivative-injury bar of *Holmes* denies recovery to a plaintiff who stands downstream of a wrong aimed at someone else and absorbs a consequential cost, as the health funds did in *Service Employees*. The Parent Plaintiffs are not downstream of the fraud; they are its target. A misrepresentation about vaccine safety is directed at the adult who decides whether to vaccinate; the child decides nothing. Under *Bridge*, the intended target of a fraud is directly injured even when the scheme operates through intermediaries and without any showing of reliance. 553 U.S. at 657, 661. That the parents' loss

---

[7] See *Kaiser,* 712 F.3d at 36–39 (proximate cause satisfied where the defendant's fraud operated on prescribing physicians who were the "targets and instruments of the fraud").

was realized through harm to their children does not make it derivative, because the children were not the object of any fraud; the parents were.

The losses the Parent Plaintiffs allege are their own. Ms. Nelson alleges funeral expenses, unreimbursed medical costs, lost income, and diversion of family resources; Ms. Doe alleges medical expenses she has borne. Compl. ¶¶ 26, 33. Unreimbursed medical costs are by definition money the parents paid from their own funds. A loss suffered by the target of a scheme, in the target's own property, is a direct injury redressable under 18 U.S.C. § 1964(c). For the same reason the parents' consent does not break the chain: an act the defendant fraudulently induced and foresaw is not a superseding cause, and the burden of establishing an intervening cause rests on the defendant, not on Plaintiffs. *Kaiser*, 712 F.3d at 38. That burden cannot be carried on a motion to dismiss.

Defendant's reliance on *Holmes* and *Service Employees* is misplaced. Those cases involved derivative injuries: the health funds paid medical costs because smokers, the direct victims, developed disease. *Serv. Emps.*, 249 F.3d at 1074. The Parent Plaintiffs are the direct victims, not payors absorbing the downstream cost of a stranger's injury.

Defendant's reliance on *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 612 (2025), for the proposition that foreseeability "does not cut it" misses the theory. Plaintiffs do not rely on foreseeability. They rely on *Bridge*: a third party received the fraud and responded mechanically by following a standard of care the AAP itself constructed.

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460–61 (2006), does not bar this claim. There the RICO violation was defrauding the State of tax revenue, while the plaintiff's lost-sales injury flowed from a separate set of actions, the competitor's price-cutting, that the fraud did not require and that the competitor might have taken for any reason. The fraud and the injury ran

28

through different channels. Here they run through one: the misrepresentations the AAP transmits through pediatricians are the same statements that induce the parents' consent, so there is no distinct, intervening course of conduct for a court to disentangle. *Anza* withholds RICO standing where a plaintiff invokes the defendant's motive to bridge a gap between the predicate act and a separately caused harm. The Parent Plaintiffs point to no such gap.

Nor does the parent's decision to consent sit outside the scheme as an independent cause. Securing that consent is the object of the fraud, and a decision the defendant's own manual instructs its members to engineer cannot be the intervening act that breaks the chain. *Bridge*, 553 U.S. at 658–59. The Red Book does not tell pediatricians to present the cumulative-safety question neutrally. It instructs them to open with a "presumptive format," a closed-ended assertion such as "Sara is due for several vaccines today," rather than the participatory question "How do you feel about vaccines today?", because the presumptive format is associated with increased vaccine uptake. Def. Ex. 3 at 34. When a parent voices reluctance, the manual directs the pediatrician to pursue adherence to the recommended vaccines, and reports that parental acceptance is "significantly higher when clinicians pursued their vaccine recommendations (versus acquiesced) after initial parent reluctance." *Id.* at 35. The parent's consent is not an independent intervening cause; it is the outcome the AAP's safety message is designed to produce, and the AAP instructs its members across repeated visits to produce it.

Defendant's but-for authority does not fit this case. Defendant relies on *Sergeants Benevolent Ass'n v. Sanofi-Aventis U.S. LLP,* 806 F.3d 71 (2d Cir. 2015), which held that class-wide causation could not be shown through generalized proof and which expressly declined to foreclose "individual claims." *Id.* at 96–97. This motion tests the plausibility of the named Plaintiffs' allegations, not the adequacy of class-wide proof.

29

Moreover, as the court explained, a physician's choice to prescribe a drug turns on "an individual patient's diagnosis, past and current medications, the physician's own experience… and the physician's knowledge regarding the side effects." *Id.* at 89–90. The childhood vaccine schedule is not an individualized decision, by definition. A scheduled vaccine is not prescribed for a particular patient on an individualized assessment; it is a recommendation for every child. The grounds on which a physician may decline to administer a scheduled dose are confined to a short, fixed list of recognized contraindications and precautions, anaphylaxis following a prior dose and unexplained encephalopathy. Compl. ¶ 56. Deviation from the schedule is "generally discouraged" and entertained only "if it is the only way to move forward to vaccinate a child." Def. Ex. 3 at 29.

### 2. The Physician Plaintiffs' Injuries Are Directly Caused by the Predicate Acts

The causal chain for the Physician Plaintiffs is even more direct. The AAP published safety representations that became the legally enforceable standard of care. Medical boards applied that standard. Physicians who deviated lost their licenses. As established in the Factual Background, Part D (The Enforcement Infrastructure), the Stoller order (Def. Ex. 5) confirms that the standard of care requires adherence to the ACIP Guidelines and AAP Red Book (Finding 83), and every sustained cause of discipline traces back to that standard. There is no independent discretion in this chain.

Defendant argues that the medical boards' disciplinary decisions were "separate actions of separate actors" that sever the causal chain, citing *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 11 (2010). Def. Mem. at 30–32. *Hemi Group* is distinguishable. There, the City alleged that a company's failure to file tax reports caused the City to lose tax revenue, but the causal chain required the City to identify the non-filers, determine their tax liability, and successfully

collect. 559 U.S. at 10–11. The intermediate steps involved significant discretion. Here, the medical boards did not exercise independent discretion about whether the AAP's safety claims were accurate. They accepted the AAP standard as given and measured physician conduct against it. Under *Bridge*, an intermediate decisionmaker whose response is mechanical rather than discretionary does not sever proximate cause. 553 U.S. at 656–58. The boards were applying the AAP's framework, not exercising independent scientific judgment.

The regulatory incorporation of ACIP reinforces proximate cause. As the Factual Background details, ACIP recommendations trigger mandatory insurance coverage, are written into 49 states' laws and the AAP's Red Book as the standard of care, and are enforced through medical-board discipline. Recommendations carrying those consequences are direct causal links, not the attenuated speculation that defeats proximate cause.

### 3. The Contraindication Framework Is a Product of the Fraudulent Standard of Care

Defendant argues that Plaintiffs Shaw and Doe trace their injuries to the "AAP's contraindication framework" without alleging the framework itself is false. Def. Mem. at 32–33. That misapprehends the theory. The framework is the enforcement mechanism through which the fraud operates: it confines a physician's grounds to decline a scheduled dose to the same short, fixed list described above, Compl. ¶ 56, and that narrowness rests on, and is a direct consequence of, the representation that the schedule is tested and safe. Were the schedule acknowledged as untested, the framework would expand to permit individualized judgment about cumulative risk. Compl. ¶¶ 55–56.

### 4. The Existence of Other Contributing Factors Does Not Defeat Causation

Defendant identifies what it characterizes as "independent bases" for the Physician Plaintiffs' discipline: Dr. Stoller's unverified records, his use of genetic testing, and his blanket

31

exemptions; Dr. Thomas's failure to refer a febrile infant to the emergency room. Def. Mem. at 36–37. Defendant's implicit argument is that because other factors contributed, the AAP standard was not the cause.

RICO proximate cause does not require the predicate acts to be the sole cause of injury. Where tortious conduct is a substantial factor in producing harm, the existence of other contributing factors does not sever the causal link.[8] The Supreme Court in *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 612–13 (2025), described RICO's proximate cause requirement as demanding a "direct relationship," not an exclusive one.

The "independent bases" Defendant identifies are not independent of the AAP standard. Dr. Stoller's patient histories were "medically irrelevant" only because the AAP Red Book does not recognize them as contraindications. His genetic testing was an "extreme departure from the standard of care" only because the AAP Red Book does not endorse it. His blanket exemptions violated the standard only because ACIP recognizes no basis for universal exemption. Def. Ex. 5, Findings 91–92, 95–96, 97–98. Each "independent" basis loops back to the AAP standard. Remove the AAP's framework and the disciplinary grounds collapse. The only charge against Dr. Thomas that is genuinely independent of the AAP standard is the failure to refer a febrile infant to the emergency room. One ancillary charge in a multi-count proceeding does not sever causation as to the charges that are traceable to the AAP's fraudulent standard.

Defendant also seizes on the Complaint's allegation that physicians acted based on "board certification, insurance participation requirements, and economic compulsion," Def. Mem. at 34 n.12; Compl. ¶ 170, arguing this shows physicians were driven by factors other than the AAP's

---

[8] *Restatement (Third) of Torts: Liability for Physical and Emotional Harm* § 26 (2010) ("An actor's tortious conduct need only be a factual cause of the other's harm.").

32

statements. The argument is self-defeating. Those compulsion mechanisms, board certification, insurance participation, and pay-for-performance metrics, are the enforcement infrastructure that converts AAP guidance into mandates, and each traces back to the AAP's safety representations. They do not sever the causal chain. They are the causal chain.

### 5. Plaintiffs Adequately Plead But-For Causation

Defendant argues that Plaintiffs have not plausibly alleged their injuries would not have occurred absent the challenged statements. Def. Mem. at 32–35. The Complaint alleges otherwise for each Plaintiff.

For the Parent Plaintiffs, the but-for analysis follows directly from *Bridge*. Because first-party reliance is not an element of a RICO mail- or wire-fraud claim, Plaintiffs need not show that any parent relied on a particular AAP statement. *Bridge*, 553 U.S. at 659–661. The question is whether the injury would have occurred had the fraud not been committed, and the Complaint alleges it would not: the AAP's misrepresentations defined the standard of care that compelled physicians to tell parents the schedule was safe, parents consented on that basis, and the vaccinations followed. Compl. ¶¶ 165–170.[9] Defendant's demand that each parent identify the specific statement she relied on (Def. Mem. at 33–34) asks for a showing *Bridge* forecloses. Plaintiffs prevail whether or not reliance is required.

The Physician Plaintiffs allege they lost their licenses for deviating from the AAP standard of care. If the AAP had accurately represented the IOM's findings, the standard of care would be different. Instead of a rigid framework treating the schedule as definitively safe, the

---

[9] The Complaint supplies the connection even on a reliance theory: had the parents' physicians disclosed what the IOM actually found, that "studies designed to examine the long-term effects of the cumulative number of vaccines or other aspects of the immunization schedule have not been conducted" (IOM 2013 at 6), they would not have consented to the full schedule as administered. Compl. ¶¶ 21, 26–27, 31, 33.

standard would require shared clinical decisionmaking and individualized assessment, exactly the approach Dr. Thomas and Dr. Stoller practiced. Their deviation from the standard would not have been a deviation at all if the standard had been honestly constructed. The but-for connection between the AAP's misrepresentations and the Physician Plaintiffs' injuries is direct: change the representations, change the standard, eliminate the basis for discipline.

### 6. The Temporal Sequence of Predicate Acts Does Not Defeat Causation

Defendant argues that certain challenged statements, particularly those regarding hepatitis B and the CDC's January 2026 schedule revision, were made after the Parent Plaintiffs suffered their injuries. Def. Mem. at 34. This argument confuses individual predicate acts with the pattern of racketeering activity the Complaint alleges.[10]

### 7. Defendant's Plaintiff-Specific Arguments Do Not Defeat Causation

Shaw. Defendant argues Shaw's allegations are "too vague" because she does not specify which AAP statements she relied on or how she was "injured in her business or property." Def. Mem. at 35. As to reliance, *Bridge* does not require personal reliance on specific statements. 553 U.S. at 661. Shaw alleges she was "induced to consent to vaccination" by safety claims transmitted through her physician. Compl. ¶ 21. As to business or property injury, Shaw's loss is of the same kind the Complaint itemizes for Nelson. The deaths of Shaw's two children eight days after vaccination, Compl. ¶¶ 17–19, necessarily entailed the funeral and medical expenses

---

[10] The Complaint alleges a scheme spanning more than two decades. Compl. ¶¶ 50–148. The predicate acts temporally connected to the parent Plaintiffs' injuries include the 10,000 vaccines claim (2002), the "safe and effective" representations on the AAP website and in the Red Book (ongoing), and the 2016 clinical report claiming the IOM "strongly affirmed" the schedule's safety. These predate the Parent Plaintiffs' injuries. The later predicate acts (December 2025 and January 2026) are alleged as evidence of the continuing pattern, demonstrating that the enterprise's fraudulent conduct is ongoing and that the standard of care that destroyed the Physician Plaintiffs' careers remains in force.

that constitute injury to property under Section 1964(c). A RICO plaintiff need not itemize damages at the pleading stage; a plausible allegation of economic loss suffices, and the deaths supply it.

**Nelson.** Defendant argues that Nelson's child suffered a known, disclosed adverse event (seizure) and questions whether her damages are cognizable RICO injuries. Def. Mem. at 35. The relevant question is whether Nelson would have consented to vaccination had she been told the truth: that the IOM's recommended cumulative-safety studies had not been conducted. Nelson alleges she relied on the AAP's safety assurance. Compl. ¶ 22. As to cognizability, *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 600–01 (2025), held that economic harms flowing from a personal injury are not categorically excluded from RICO and must be tested against the ordinary meaning of injury to "business or property." The losses Nelson pleads are injuries to property: out-of-pocket sums she paid and money she would otherwise have retained. Funeral expenses, unreimbursed medical costs, and lost income are economic losses to her own funds, not the personal injury itself, and money is the paradigm case of property. That those losses arose downstream of a physical injury does not convert them into a non-property harm; it is the depletion of Nelson's own funds, not her child's injury, that she asserts as her RICO injury. The allegation suffices at the pleading stage. Because *Horn* leaves the boundaries of "business or property" to be applied case by case, whether Nelson's specific losses qualify is not a question to be resolved against her on the pleadings; it should be determined on a developed record.

**Thomas.** Defendant argues Dr. Thomas voluntarily surrendered his license. Def. Mem. at 36. Dr. Thomas entered a stipulated order in which he "neither admits nor denies" the Board's allegations. The surrender resolved a contested proceeding; it did not concede the merits. Defendant's statute of limitations argument is addressed in subsection 8 below.

35

**Stoller.** Defendant raises a statute of limitations argument (Def. Mem. at 36), addressed in subsection 8 below. As to New Mexico, the New Mexico Medical Board applied the same AAP standard ("the standard of care is to follow the ACIP Guidelines and AAP Red Book," *In re Stoller*, N.M. Med. Bd. Case No. 2021-025), confirming the nationwide reach of the enforcement of the AAP standard.

**Doe.** Defendant argues that Doe's injury is traceable to a school medical official and that Doe's damages may not be cognizable. Def. Mem. at 36. The school medical consultant applied the AAP's contraindication framework in revoking Doe's child's vaccine exemption (Compl. ¶¶ 29, 33), demonstrating how pervasive the AAP's framework has become. As to cognizability, the same response applies as for Nelson.

### 8. The Statute of Limitations Does Not Bar Plaintiffs' Claims

Defendant argues that Dr. Thomas's 2020 suspension and Dr. Stoller's 2021 California revocation fall outside RICO's four-year limitations period. Def. Mem. at 36. Limitations is an affirmative defense, and dismissal on the pleadings is proper only where the complaint shows on its face that no timely injury is alleged. The Complaint alleges injuries within the period.

The civil RICO limitations clock is tied to the plaintiff's injury, not to the later discovery of the racketeering pattern. *Rotella v. Wood*, 528 U.S. 549, 554–55 (2000) (rejecting the injury-and-pattern discovery rule). Dr. Stoller's RICO injury is the loss of his ability to practice medicine, and that injury accrued in 2023. The 2021 California revocation did not end his practice: he held a second license, and the Complaint alleges he became "unable to practice medicine" only when New Mexico revoked his remaining license in 2023. Compl. ¶ 41. That is the injury, and it accrued within four years of the January 2026 filing.

36

Under the separate-accrual rule, a plaintiff recovers for damages "over and above" the harm earlier acts caused; the rule bars only the use of a later act to revive a stale injury already complete outside the period. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189–90 (1997). The loss of licensure in 2023 is harm over and above the single-state revocation in 2021, not the same injury at a later date. That the California action was the stated reason the New Mexico board acted goes to what precipitated the 2023 revocation, not to when Dr. Stoller's practice-ending injury accrued. *Klehr* itself involved a single, continuous injury complete years before suit; it does not bar recovery for a distinct, later injury that first occurred within the limitations period.

The Parent Plaintiffs' injuries arose in 2025, squarely within the period. Compl. ¶¶ 21, 26, 33. To the extent any damages flow solely from Dr. Thomas's 2020 suspension or the 2021 California revocation standing alone, the allocation of recoverable damages is a question for a later stage. It is not a basis for dismissal: the Complaint alleges injuries within the limitations period for the Parent Plaintiffs and for Dr. Stoller, and the existence of some older damages does not bar a claim that pleads timely injury.

### F. The RICO Conspiracy Claim Should Not Be Dismissed

Count Two alleges that the AAP conspired to violate Section 1962(c). The standard is settled: a RICO conspirator need not agree to commit the predicate acts personally, need not know the other conspirators or the details of the scheme, and need only knowingly agree to further the enterprise's objective. *Salinas v. United States*, 522 U.S. 52, 63–65 (1997). The agreement need not be express; it may be inferred from the defendant's conduct and from circumstantial evidence of a common design. *Halberstam v. Welch*, 705 F.2d 472, 477, 487 (D.C. Cir. 1983) (proof of a tacit understanding suffices to show agreement, which may be inferred from indirect evidence of symbiotic, long-running joint activity toward a shared object).

37

The Complaint pleads each element. It alleges the object of the conspiracy, maintaining and expanding vaccine uptake by disseminating false safety assurances while blocking the studies that would reveal the schedule's risks; the AAP's knowledge of the IOM's 2002 and 2013 findings; and the co-conspirators, the enterprise participants identified in the enterprise allegations, including the vaccine manufacturers and aligned professional organizations. Compl. ¶¶ 6, 152–159, 177. The agreement may be inferred from the same coordinated conduct that establishes the enterprise: six decades of joint participation in ACIP, sustained manufacturer funding of the AAP, and synchronized public advocacy. See Factual Background, Part B; Argument I.D. The AAP's present joint litigation against HHS, in which it and a roster of aligned organizations sued to restore the recommendations the enterprise depends upon, is concrete evidence of that agreement and a party admission of the participants' shared purpose. Compl. ¶¶ 118, 157, 178. This is the kind of evidence from which the court inferred agreement in *Philip Morris*: decades of parallel conduct, joint funding, and coordinated public statements. *Philip Morris,* 449 F. Supp. 2d at 851–906.

Defendant's two arguments do not survive these allegations. Defendant first argues that the conspiracy claim fails because the substantive RICO claim fails. Def. Mem. at 37. That argument falls with its premise. The substantive claim is adequately pleaded for the reasons stated in Sections I.A through I.E, and the conspiracy claim therefore stands. *Byrne v. Brock*, No. 19-7120, 2020 WL 1487757, at *2 (D.C. Cir. Feb. 27, 2020).

Defendant next argues the conduct is "equally well explained by legitimate economic incentives." Def. Mem. at 37–38 (citing *RSM Prods. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051–52 (D.C. Cir. 2012)). It is not. *RSM* draws its rule from *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and that rule bars an inference of agreement only

where the conduct is *equally* consistent with legitimate self-interest. The AAP's conduct is not, because the innocent explanation it offers, concern for children's safety, cannot account for what the AAP does. If eleven recommended vaccines are, in the AAP's words, "a very dark day for children," California's ten-vaccine school mandate is worse, yet the AAP has never objected to it. Compl. ¶¶ 119–122. The AAP reaffirmed its categorical autism denial one day after the CDC withdrew the identical claim as not evidence-based. Compl. ¶ 139. And it sued to restore the prior schedule in full, including doses that ACIP had moved to shared clinical decisionmaking. Compl. ¶¶ 118, 123. None of this is explained by a good-faith scientific mission; all of it is explained by an agreement to maintain uptake regardless of the evidence. At the pleading stage, where every inference runs in Plaintiffs' favor, that suffices.

## II. PLAINTIFFS HAVE ARTICLE III STANDING

Defendant argues that Plaintiffs lack Article III standing because their injuries are traceable to state medical boards and independent physicians rather than to the AAP, and that a favorable decision would not redress their harm. Def. Mem. at 38–41. Defendant is wrong on both counts, and its own exhibits prove it. As a threshold matter, the Court need only find standing for one Plaintiff per claim for the claim to survive a standing challenge. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

### A. Each Plaintiff's Injury Is Fairly Traceable to the AAP's Conduct

Article III traceability is less demanding than RICO proximate cause, requiring "no more than de facto causality." *Dep't of Commerce v. New York,* 588 U.S. 752, 768 (2019); see *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180 (2000). It does not require that the AAP's conduct be the sole cause or that the chain be free of third parties. Each Plaintiff's injury is traceable to the AAP's conduct under the more rigorous proximate and but-for causation as set

39

out in Section I.E. A fortiori, the less rigorous Article III causation requirement is satisfied.

Further, Defendant's contention that physicians and medical boards exercised independent

judgment is refuted by its own Exhibit 5, establishing that the standard of care is to follow the

ACIP Guidelines and the AAP Red Book. Def. Ex. 5, Finding 83.

### B. CHD Has Associational Standing

CHD sues "in its associational capacity on behalf of its community members for

declaratory and injunctive relief only." Compl. ¶ 48. An organization that is not a traditional

membership group may still assert associational standing if it is "the functional equivalent of a

traditional membership organization," that is, if it is "sufficiently identified with and subject to

the influence of those it seeks to represent." *Pub. Emps. for Env't Resp. v. Zeldin*, 2026 U.S.

App. LEXIS 12620, at *4 (D.C. Cir. May 1, 2026) (*quoting Flyers Rts. Educ. Fund, Inc. v. U.S.

DOT*, 957 F.3d 1359, 1362 (D.C. Cir. 2020)); *Hunt v. Washington State Apple Advertising

Comm'n*, 432 U.S. 333, 344–45 (1977). Under *Zeldin*, that functional equivalence turns on three

things: the organization's purpose is to advance the interests of the constituency, the constituency

is the primary beneficiary of its activities, and the organization is subject to the constituency's

influence. *Id.* at *5. The Complaint pleads each.

**Purpose and primary beneficiary.** CHD's purpose is to serve its community, and that

community is the primary beneficiary of its work. The Complaint alleges that CHD "exists solely

because of donations of its supporters" and that "[i]f CHD did not serve the interests of its

community, it would cease to exist." Compl. ¶ 48. That is the alignment *Zeldin* found missing

where the organizations never claimed their constituency was "the primary beneficiary of [their]

work." 2026 U.S. App. LEXIS 12620, at *18.

40

**A discrete, identifiable constituency.** CHD's constituency is not an open-ended public. It is organized into more than 20 state chapters, most incorporated within CHD, a military chapter, and international chapters, and into defined litigation and science committees through which the community acts. Compl. ¶¶ 45, 47. The shared interest is specific, not the diffuse "interest in seeing the law obeyed" that doomed the media-watchdog group in *American Legal Foundation v. FCC*, 808 F.2d 84, 90 (D.C. Cir. 1987), whose constituency "could . . . purport to serve all who read newspapers, watch television, or listen to the radio." The CHD community is bound by a single, defined objective: ending the childhood injuries the Complaint describes.

**Constituent control.** The community controls CHD's work. Attorneys in the community bring potential lawsuits to CHD's litigation committee, scientists bring studies to its science committee, and through these channels the community "directly shapes the organization's priorities, determines which cases CHD pursues, and guides its advocacy, educational, and publication initiatives." Compl. ¶ 47. The community also finances CHD. Compl. ¶ 48. That is the member-driven control *Zeldin* and *American Legal Foundation* require, and it is the precise feature both decisions found absent: a "definable membership body whose resources and wishes help steer the organization's course." *Zeldin*, 2026 U.S. App. LEXIS 12620, at *17 (quoting *ALF*, 808 F.2d at 90).

*Zeldin* confirms CHD's standing. The organizations there sought to represent their own "board members, supporters[,] and staff," principally their employees, and the court held that employees are "the means by which the organizations act, not the constituency whose interests define those actions." 2026 U.S. App. LEXIS 12620, at *6, *20. The court stressed that the organizations had "given us no insight" into their relationship with any constituency and had "not identified any distinct group of supporters." *Id.* at *4, *20. CHD does not sue on behalf of its

41

employees; it sues on behalf of a defined community that funds it, directs its litigation, and is the reason it exists. On the three points *Zeldin* found dispositive, CHD pleads what the *Zeldin* plaintiffs did not. And the standard is plausibility: at the pleading stage the court "accept[s] the well-pleaded factual allegations as true and draw[s] all reasonable inferences . . . in the plaintiff's favor." *Id.* at *11. CHD's allegations clear that bar.

Germaneness. The interest CHD asserts is germane to its purpose of ending childhood chronic disease "caused by toxic environmental exposures." Compl. ¶ 45. The Complaint frames the harm from vaccines in those terms. It describes the parents' concern as "a toxicological and clinical question," whether it is safe to inject an infant with "aluminum adjuvants, thimerosal, formaldehyde, polysorbate 80, [and] residual DNA fragments," Compl. ¶ 53, and alleges that the cumulative "toxicological effects" of the schedule are the unstudied danger at the center of this case, Compl. ¶ 105. Those substances, and the antigens administered with them, are introduced into the infant from outside the body. They are toxic exposures as the Complaint uses the term, and they cause the childhood chronic disease CHD exists to address. Compl. ¶ 10. Defendant's contrary reading, Def. Mem. at 41, isolates the mission clause from the toxicological theory the Complaint pleads throughout. Read as a whole, with the inferences a motion to dismiss requires, CHD's mission reaches the conduct this action challenges.

No individual participation is required. Because CHD seeks only declaratory and injunctive relief, neither the claim asserted nor the relief requested requires the participation of individual community members. *Hunt*, 432 U.S. at 343.

### C. A Favorable Decision Would Redress Plaintiffs' Injuries

A favorable decision would redress Plaintiffs' injuries. The primary relief the Complaint seeks is treble damages under 18 U.S.C. § 1964(c), and damages are inherently redressable.

Plaintiffs Nelson and Doe allege concrete economic harm, including funeral expenses, unreimbursed medical costs, lost income, and diversion of family resources; the Physician Plaintiffs allege the economic destruction of their practices on revocation of their licenses. Compl. ¶¶ 26, 33, 35–44. These are injuries to business and property under any reasonable construction of Section 1964(c), and an award of damages redresses them directly, regardless of any third party's response.

To the extent Plaintiffs also seek declaratory and injunctive relief, redressability requires only that a favorable decision redress the injury; it need not afford complete relief or restore the plaintiff's exact prior situation. *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 113–14 (2025) (even "one dollar" of redress suffices); *Larson v. Valente*, 456 U.S. 228, 242–43 (1982). A declaration that the AAP's safety representations are false, and that the standard of care they shaped rests on fraudulent premises, would remove the predicate on which the Physician Plaintiffs were disciplined and would assist their efforts to regain licensure.

And the individual Plaintiffs' damages claims require no third-party response at all. An award of treble damages under Section 1964(c) redresses their injuries regardless of what any state does.[11]

### III. PLAINTIFFS MAY SEEK DECLARATORY AND INJUNCTIVE RELIEF

Defendant argues that RICO does not permit private plaintiffs to obtain injunctive or declaratory relief. Def. Mem. at 41–45. This Circuit has not decided the question, and the Supreme Court expressly left it open. *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 411

---

[11] Defendant points to Dr. Thomas's agreement never to reapply in Oregon as proof that his injuries are not redressable. Def. Mem. at 36. Oregon is one state, and for the reasons stated in the text, redressability does not require that Dr. Thomas's exact prior situation be restored.

43

(2003). This Court therefore writes on a clean slate, and the better reading of the statute is that § 1964 authorizes the relief Plaintiffs seek.[12]

The text supplies the answer through a parity of reasoning adopted by the Second and Seventh Circuits. Section 1964(a) grants the district courts power to "prevent and restrain" RICO violations by entering injunctive relief. Section 1964(b) authorizes the Attorney General to "institute proceedings," and § 1964(c) authorizes "[a]ny person injured in his business or property" to sue. Subsections (b) and (c) are parallel: each confers a right of action, on the government and on private plaintiffs respectively, and neither specifies the remedy. The government's authority to obtain a permanent injunction does not come from § 1964(b), which mentions only interim relief; it comes from the general grant of remedial power in § 1964(a). It follows, by parity of reasoning, that private plaintiffs obtain injunctive relief through the same combination, the right of action in § 1964(c) together with the remedial power in § 1964(a). *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 696–700 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003). *See also Chevron Corp. v. Donziger,* 833 F.3d 74, 137 (2d Cir. 2016) ("[A] federal court is authorized to grant equitable relief to a private plaintiff who has proven injury to its business or property by reason of a violation of [18 U.S.C.] § 1962.").

The Ninth and Fourth Circuits read § 1964(c) to carry a negative implication barring such relief. *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1083–85 (9th Cir. 1986); *Hengle v. Treppa*, 19 F.4th 324, 354–56 (4th Cir. 2021).[13] The inference seems weak, and given the split

---

[12] Even if the Court were to conclude that private plaintiffs cannot obtain equitable relief under RICO, that conclusion would not support dismissal. The availability of a particular remedy is distinct from the sufficiency of the claim. Plaintiffs' RICO claims seek treble damages under § 1964(c), and those claims proceed regardless of how the equitable-relief question is resolved.

[13] The Fifth Circuit took neither side. *In re Fredeman Litig.*, 843 F.2d 821, 830 (5th Cir. 1988) vacated a preliminary order freezing assets, but the court declined to decide "whether all forms of injunctive or other equitable relief are foreclosed to private plaintiffs under RICO."

and RICO's command that it be 'liberally construed to effectuate its remedial purposes,' Pub. L. No. 91-452, § 904(a), 84 Stat. 947 (1970), dismissal of injunctive relief at the pleading stage is not warranted.

Defendant's argument that Plaintiffs allege only past injury and no "certainly impending" future harm, Def. Mem. at 43, does not defeat the relief sought. The treble-damages claim, pleaded for Plaintiffs Shaw, Nelson, Doe, Thomas, and Stoller, redresses completed injuries and requires no showing of impending future harm. And the declaratory and injunctive relief addresses ongoing conduct: the Complaint alleges that the AAP continues to disseminate the same safety representations through HealthyChildren.org and its other publications, Compl. ¶¶ 21, 27, and CHD, which sues for declaratory and injunctive relief alone, pleads an injury to its community that persists as long as those representations continue, Compl. ¶ 48. An injury that endures while the misrepresentations do is neither past nor speculative. Whether Plaintiffs ultimately satisfy the four-factor test for a permanent injunction under *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), is a merits question that turns on a record that has not yet been developed, not a pleading requirement. Def. Mem. at 44.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss in its entirety.

Dated: June 9, 2026

Respectfully submitted,

/s/ Richard Jaffe
RICHARD JAFFE, ESQ.
428 J Street, 4th Floor
Sacramento, California 95814
Tel: 916-492-6038
CA Bar No. 289362
DC District Court ID No. CA00224
*Attorney for Plaintiffs*