**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANDREA SHAW, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN ACADEMY OF PEDIATRICS,<br><br>Defendant. | Civil Action No. 1:26-cv-00171 (TJK) |

**REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................................ iv

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

I.    THE SUBSTANTIVE RICO CLAIMS SHOULD BE DISMISSED ................................. 2

      A.    Plaintiffs Fail To Adequately Allege Any Predicate Acts ...................................... 2

            1.    No Adequate Allegations That The AAP Made False Statements ............. 2

            2.    Plaintiffs Have Not Pleaded Predicate Acts Of Mail And Wire Fraud ....... 7

            3.    Plaintiffs Have Not Pleaded The Requisite Intent ..................................... 9

      B.    Plaintiffs Fail To Allege That The AAP "Conduct[ed] Or Participate[d]" In The
            Alleged Enterprise's Affairs ................................................................................. 11

            1.    Plaintiffs Fail To Allege Decisionmaking Structure ................................ 11

            2.    In Any Event, Plaintiffs Fail To Allege That The AAP "Conduct[ed] Or
                  Participate[d]" In The Alleged Enterprise's Affairs ................................. 12

      C.    Plaintiffs Do Not Adequately Allege Either But-For Or Proximate Causation .... 13

            1.    Plaintiffs Fail To Allege Proximate Causation ......................................... 13

                  a.    Parent Plaintiffs Do Not Allege A Direct Causal Relationship ..... 13

                  b.    Physicians' New Theory Also Conflicts With Fraud Theory ........ 16

            2.    Plaintiffs Fail To Plead But-For Causation .............................................. 17

                  a.    Individuals Do Not Allege But-For Causation ............................. 17

                  b.    Physicians' Theory Fails For The Same Reasons ........................ 18

            3.    Other Causation And Injury Issues Abound ............................................. 19

      D.    Plaintiffs Fail To Allege Conspiracy .................................................................... 20

II.   PLAINTIFFS LACK ARTICLE III STANDING ........................................................... 21

      A.    Plaintiffs Cannot Satisfy Article III's Causation Requirement ............................ 21

ii

**TABLE OF CONTENTS—Continued**

**Page**

B.      Plaintiff CHD Lacks Standing For An Additional And Independent Reason ....... 22

III.     PLAINTIFFS CANNOT SEEK DECLARATORY AND INJUNCTIVE RELIEF ......... 23

CONCLUSION ..................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Chemistry Council v. DOT*,
468 F.3d 810 (D.C. Cir. 2006) .......................................................................................22

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*,
406 F. Supp. 3d 72 (D.D.C. 2019) ................................................................................9, 10

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) ........................................................................................................14

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) .........................................................................................24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................................................9, 11

*Bates v. Nw. Hum. Servs., Inc.*,
466 F. Supp. 2d 69 (D.D.C. 2006) ...................................................................................9

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................................21

*Bontkowski v. Smith*,
305 F.3d 757 (7th Cir. 2002) ..........................................................................................25

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008) ................................................................................................. *passim*

*Byrne v. Brock*,
No. 19-7120, 2020 WL 1487757 (D.C. Cir. Feb. 27, 2020) ...........................................20

*Chevron Corp. v. Donziger*,
833 F.3d 74 (2d Cir. 2016) ..............................................................................................20

*Ciminelli v. United States*,
598 U.S. 306 (2023) ........................................................................................................11

*Ctr. for Immigr. Studies v. Cohen*,
410 F. Supp. 3d 183 (D.D.C. 2019) ..................................................................................6

*D. Penguin Bros. Ltd. v. City Nat'l Bank*,
587 F. App'x 663 (2d Cir. 2014) ....................................................................................12

iv

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Doe 1 v. Apple Inc.*,
96 F.4th 403 (D.C. Cir. 2024) ...................................................................................21

*Empire Merchs., LLC v. Reliable Churchill LLLP*,
902 F.3d 132 (2d Cir. 2018) ....................................................................................15

*Farah v. Esquire Magazine*,
736 F.3d 528 (D.C. Cir. 2013) ...................................................................................3

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .................................................................................................22

*Gen. Motors, LLC v. FCA US, LLC*,
44 F.4th 548 (6th Cir. 2022) ....................................................................................15

*Harford Mut. Ins. Co. v. New Ledroit Park Bldg. Co.*,
313 F. Supp. 3d 40 (D.D.C. 2018) ...........................................................................25

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010) .....................................................................................................14

*Hengle v. Treppa*,
19 F.4th 324 (4th Cir. 2021) ...............................................................................23, 24

*Holmes v. Sec. Inv. Prod. Corp.*,
503 U.S. 258 (1992) .......................................................................................13, 14, 16

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 .............................................................................................................22

*Kaiser Found. Health Plan, Inc. v. Pfizer, Inc.*,
712 F.3d 21 (1st Cir. 2013) ..................................................................................3, 16

*United States ex rel. Keaveney v. SRA Int'l, Inc.*,
219 F. Supp. 3d 129 (D.D.C. 2016) ...........................................................................7

*Kelly v. United States*,
590 U.S. 391 (2020) .................................................................................................11

*Libre By Nexus v. Buzzfeed, Inc.*,
311 F. Supp. 3d 149 (D.D.C. 2018) ...........................................................................3

*MSP Recovery Claims v. Pfizer, Inc.*,
728 F. Supp. 3d 89 (D.D.C. 2024) .......................................................................9, 10

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
   720 F.3d 490 (2d Cir. 2013)................................................................3, 5, 6, 8

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
   583 F. Supp. 3d 654 (D.N.J. 2022) .............................................................6, 8

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
   63 F.4th 240 (3d Cir. 2023) .........................................................................3

*Padnes v. Scios Nova Inc.*,
   1996 WL 539711 (N.D. Cal. Sept. 18, 1996) ............................................5

*PhantomALERT v. Apple Inc.*,
   762 F. Supp. 3d 8 (D.D.C. 2025) ...............................................................24

*Pub. Emps. for Env't Resp. v. Zeldin*,
   174 F.4th 183 (D.C. Cir. 2026)...................................................................22

*RSM Prods. Corp. v. Freshfields Bruckhaus Deringer U.S., LLP*,
   682 F.3d 1043 (D.C. Cir. 2012)...................................................................21

*SEC v. Musk*,
   826 F. Supp. 3d 35 (D.D.C. 2026)...............................................................25

*Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*,
   249 F.3d 1068 (D.C. Cir. 2001)...............................................................14, 16

*Stankevich v. Kaplan*,
   156 F. Supp. 3d 86 (D.D.C. 2016) ..............................................................11

*Torrey v. Infectious Diseases Society of America*,
   86 F.4th 701 (5th Cir. 2023) ...............................................................4, 5, 7

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v.
   Walgreen Co.*,
   719 F.3d 849 (7th Cir. 2013) ...............................................................12, 13

*United States v. Philip Morris USA, Inc.*,
   449 F. Supp. 2d 1 (D.D.C. 2006)................................................................6

*United States v. Philip Morris USA, Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009)...............................................................6, 9, 10, 23

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*West v. Lynch*,
  845 F.3d 1228 (D.C. Cir. 2017)......................................................................24

*Weyrich v. New Republic, Inc.*,
  235 F.3d 617 (D.C. Cir. 2001)..........................................................................3

*White v. Fraternal Order of Police*,
  909 F.2d 512 (D.C. Cir. 1990)..........................................................................3

*Wilson v. Noem*,
  No. 20-cv-100, 2025 WL 1000666 (D.D.C. Apr. 3, 2025)......................................22

*Yoder v. Architect of the Capitol*,
  No. 23-2214, 2025 WL 915611 (D.D.C. Mar. 26, 2025) (Kelly, J.) .......................19

**Statutes & Rules**

18 U.S.C. § 1964............................................................................................20, 23

Fed. R. Civ. P. 8...................................................................................................9

Fed. R. Civ. P. 9...........................................................................................2, 7, 9

Fed. R. Civ. P. 54..............................................................................................25

**Other Authorities**

Christina Jewett, *Plaintiff for Anti-Vaccine Group's Suit Is Charged With Murder
  of Her Twins*, The New York Times, July 7, 2026. https://perma.cc/Z296-
  6VHQ..............................................................................................................19

**INTRODUCTION**

Plaintiffs' opposition doubles down on their strategy for this whole case: They have invented phantom "false" statements attributed to the AAP, created an absurd narrative of a decades-long criminal conspiracy, and weaponized the RICO statute against a non-profit organization dedicated to promoting children's health—all because Plaintiffs disagree with the AAP's scientific and evidence-based recommendations about childhood vaccines.

All of Plaintiffs' efforts to portray the AAP as a criminal racketeering enterprise fail. They have concocted a Rube Goldberg array of outlandish and fantastical chains of causation. But the most egregious part of Plaintiffs' efforts relies on the outright manufacturing of false quotes: Plaintiffs frame their case around the assertion that the AAP said the "childhood vaccine schedule has been fully tested," but quietly concede that the phrase "fully tested" ***does not appear*** in any AAP statement they identify. Rather than demonstrating the complaint's sufficiency, the opposition only highlights Plaintiffs' desperation to shoehorn their disagreement with the AAP's science-backed guidance into a RICO claim.

For a number of independent reasons, the complaint should be dismissed. Plaintiffs plead no predicate acts because they identify no actionable misrepresentation, much less fraud. Furthermore, they fail to identify the enterprise's decisionmaking structure or plausibly allege that the AAP participated in or conducted the enterprise's affairs. Plaintiffs also seek to link a wide array of injuries directly to a handful of challenged AAP statements, notwithstanding layers of independent decisionmakers and intervening factors—a theory far too remote, speculative, and implausible to support either RICO or Article III standing. Finally, Plaintiffs' allegations of conspiracy and associational standing fail, and they have no basis to demand sweeping declaratory

and injunctive relief. Nothing in Plaintiffs' opposition rescues their complaint from those fundamental defects.

Unsatisfied with their campaign in the court of public opinion, Plaintiffs have instead launched an assault on the AAP in a court of law. But there is no basis in the law for Plaintiffs' targeted attack, and the Court should not permit it to continue.

## ARGUMENT

## I.    THE SUBSTANTIVE RICO CLAIMS SHOULD BE DISMISSED

### A.    Plaintiffs Fail To Adequately Allege Any Predicate Acts

Plaintiffs concede that statements of scientific opinion are generally not actionable, so they insist they are challenging factual representations. Opp. 5. But their own arguments reveal the opposite. Their explanations for why the challenged statements are supposedly false rest largely on Plaintiffs' view that the available evidence did not justify the AAP's conclusions. As to Rule 9(b), Plaintiffs continue to attribute to the AAP statements that Plaintiffs concede it never made, largely gloss over what the AAP actually said, and never meaningfully explain *why* the AAP's statements were supposedly false or misleading. As for scienter, Plaintiffs identify no plausible basis to infer that the AAP believed any challenged statement was false or misleading.

#### 1.    No Adequate Allegations That The AAP Made False Statements

The opposition is replete with unsupported assertions and misstatements of law. And it does not identify an objectively false or misleading factual misrepresentation.

To begin, Plaintiffs misquote the (defamation) cases on which they rely to derive a misleading standard for when scientific statements can support a fraud claim. Opp. 5. The quote

Plaintiffs attribute to *Weyrich v. New Republic, Inc.* appears nowhere in the opinion[1]; rather, the court said it must determine whether the challenged statement "expressed or implied a verifiably false fact," though it would—under a pre-*Twombly* regime[2]—"assume the falsity of any *verifiable* statement." 235 F.3d 617, 624, 627 (D.C. Cir. 2001) (emphasis added). And while *White v. Fraternal Order of Police* stated that defamation claims can only be resolved as a matter of law when "the publication is not reasonably capable of any defamatory meaning," it said nothing about *whether* a statement is verifiable. 909 F.2d 512, 518 (D.C. Cir. 1990) (internal quotation marks omitted).

Thus, the "critical threshold question" of verifiability (*Weyrich*, 235 F.3d at 624) is not as simple as Plaintiffs suggest. Where "a statement is made as part of an ongoing scientific discourse about which there is considerable disagreement, the traditional dividing line between fact and opinion is not entirely helpful." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497 (2d Cir. 2013). While statements "about contested and contestable scientific hypotheses" may "in principle" be "matters of verifiable 'fact,'" "courts are ill-equipped to undertake to referee such controversies" (*id.*), and so, as even Plaintiffs concede (at 12-13), courts (including the Second and Third Circuits) generally treat such statements as nonactionable. *See, e.g.*, *ONY*, 720 F.3d at 497; *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 247 (3d Cir. 2023).

---

[1] These are not the only misstated or nonexistent quotations in Plaintiffs' brief. *See, e.g.*, Opp. 27 n.7 (the quoted language does not appear in *Kaiser Found. Health Plan, Inc. v. Pfizer, Inc.*, 712 F.3d 21 (1st Cir. 2013)).

[2] Post-*Twombly* cases have recognized that the "court must determine not only whether a statement is capable of defamatory meaning but also whether the statement is plausibly false." *Libre By Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149, 155 & n.2 (D.D.C. 2018) (despite a "seemingly broad pronouncement" in post-*Twombly* decision of *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013), "courts in this District still grant motions to dismiss where the facts alleged do not make out a plausible defamation claim" (internal quotation marks omitted)).

In *Torrey v. Infectious Diseases Society of America*, the Fifth Circuit similarly distinguished between "medical opinions" and factual representations. 86 F.4th 701, 704 (5th Cir. 2023).[3]

Plaintiffs never meaningfully explain how the challenged statements differ from the scientific and medical opinions courts have deemed nonactionable. They dismiss *Torrey* by asserting, without elaboration, that there are "material differences between the medical judgments about treatment guidelines" in *Torrey* and the statements here. Opp. 12. But *Torrey* is just like this case. The plaintiffs there challenged statements that "there is no convincing biological evidence for the existence of" chronic Lyme disease, that "antibiotic therapy has not proven to be useful and is not recommended for patients" with persistent symptoms, and that long-term antibiotic therapy is not recommended "because of a lack of biological plausibility, lack of efficacy, absence of supporting data, or the potential for harm to the patient." *Torrey*, 86 F.4th at 706 & n.5 (citation modified). Here, Plaintiffs allege that the AAP falsely stated (for example) that vaccines are "safe and effective" (Cplt. ¶¶ 106-09), that changes to recommendations for hepatitis B vaccination would cause "preventable deaths" and "liver cancers" (*id.* ¶ 112), and that "[d]ecades of rigorous research have shown vaccines do not cause autism" (*id.* ¶ 139) (internal quotation marks omitted). To take a position on whether available evidence supports a scientific conclusion about vaccines, or to make a recommendation about their safety and efficacy, "is plainly to express a medical opinion. Just because Plaintiffs disagree with those opinions does not mean that [the AAP] is somehow liable." *Torrey*, 86 F.4th at 706.

---

[3] Plaintiffs incorrectly assert (at 12) that *Torrey* did not decide whether medical opinions are verifiable factual representations. The "key issue on which [the court] resolve[d] th[e] appeal" was "whether the Guidelines constitute non-actionable medical opinions or actionable factual representations." *Torrey*, 86 F.4th at 704. The argument that the *Torrey* plaintiffs forfeited, and which the court declined to address, was whether nonactionable medical opinions can give rise to a misrepresentation claim if the defendant "knew the opinions were false." *Id.* at 707 n.6.

Plaintiffs then attempt to evade *ONY* and *Pacira* by conclusorily asserting that "the AAP's statement that the schedule was 'tested' and its safety 'strongly affirmed' is provably false," and that "the other categories" in the complaint are also "verifiable factual claim[s] provable without resolving any scientific debate." Opp. 13. These vague and unexplained declarations get Plaintiffs nowhere. The gravamen of the complaint is that Plaintiffs do not believe there is sufficient evidence to conclude that the childhood vaccine schedule is tested, safe, and effective, and so therefore, in Plaintiffs' view, the AAP's statements drawing such conclusions are objectively false or misleading. But even if the IOM report on which Plaintiffs heavily rely had found that the evidence of vaccine safety or efficacy was inconclusive (and that is not what the IOM found, *see* Doc. No. 8-4, MTD Ex. 2), the existence of "other studies or statements that have reached different conclusions or formed different opinions than those expressed" by the AAP does not establish that its statements were false or misleading—much less fraudulent. *Torrey*, 86 F.4th at 705.

Plaintiffs also cannot save their complaint by characterizing it as alleging that the AAP's statements are "factual misrepresentations about what the IOM found." Opp. 13. Plaintiffs try to argue that it is false or misleading to describe the IOM as having "strongly affirmed" the safety of the vaccine schedule while omitting the IOM's finding that long-term studies of the cumulative schedule have not been conducted. But Plaintiffs cannot base a fraud claim on an allegation "that the inferences drawn from" the IOM report "were the wrong ones" or that "the way" the IOM report was "presented and the conclusions drawn from [it] were allegedly misleading." *ONY*, 720 F.3d at 497-98; *see also Padnes v. Scios Nova Inc.*, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996) (plaintiffs' disagreement "with defendants about the import of the Colorado data does not make defendants' summaries of the study false or misleading"). Although Plaintiffs try to recast the AAP's description of the IOM report as a "false statement[] about the contents of cited sources"

5

(Opp. 13), their "attempt to reframe these perceived flaws in methodology as 'false descriptions of data on which the studies rely'" is precisely the tactic the district court rejected in *Pacira*. *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 583 F. Supp. 3d 654, 659-60 (D.N.J. 2022) (where plaintiff "asserts that the authors relied on deficient studies" or "improperly disregarded [other] studies," this does not amount to an allegation of "false descriptions of data on which the studies rely" (internal quotation marks omitted)). The Court should reject that attempt here, too.

Finally, Plaintiffs fall back on their principal strategy: gesturing to *Philip Morris* and then insisting, without meaningful explanation, that this is the same kind of case. Opp. 14-15. But the parallels that Plaintiffs try to draw are superficial at best; what matters is whether the AAP's statements here are actionable frauds and not scientific judgments, and nothing in *Philip Morris* supports that. As explained (Mot. 13), *Philip Morris* held that the statements at issue were fraudulent because there was "overwhelming evidence" that defendants knew their statements were untrue and because "objective data is available to disprove [the] statement[s] or demonstrate that [they were] misleading at the time [they were] made." *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 853 (D.D.C. 2006). Here, by contrast, Plaintiffs offer no non-conclusory allegations to demonstrate this case involves, at best, anything other than statements "made as part of an ongoing scientific discourse about which there is considerable disagreement." *ONY*, 720 F.3d at 497. Thus, "[t]he statements at issue here do not come close to those in *Philip Morris* . . . . [because] there is no basis upon which to establish whether they were known to be false when made." *Ctr. for Immigr. Studies v. Cohen*, 410 F. Supp. 3d 183, 191 (D.D.C. 2019). Plaintiffs cite competing interpretations, not contradictory facts. If accepted, their theory would allow a plaintiff to turn any scientific disagreement into fraud simply by alleging a party drew the wrong conclusion from the available evidence.

### 2.    Plaintiffs Have Not Pleaded Predicate Acts Of Mail And Wire Fraud

Rule 9(b) requires Plaintiffs to plead each act of alleged fraud with particularity. Plaintiffs recite that standard but do not satisfy it. They substitute their own characterizations for what the AAP actually said, argue with the AAP's conclusions, and insist that allegations of falsity must be accepted at the pleading stage. That is wrong. Plaintiffs must *plausibly* allege that the challenged statements were false or misleading. *See, e.g.*, *United States ex rel. Keaveney v. SRA Int'l, Inc.*, 219 F. Supp. 3d 129, 144 (D.D.C. 2016) (plaintiffs "failed to adequately plead the misrepresentation component of a fraudulent inducement claim"). It is not sufficient to plead falsity to allege that "other studies or statements . . . have reached different conclusions or formed different opinions than those expressed" by the AAP. *Torrey*, 86 F.4th at 705.

Take Plaintiffs' reliance on the phrase "fully tested." Plaintiffs concede that, although they put quotation marks around that phrase, it in fact "appears in no single AAP publication." Opp. 9. They nonetheless say this "misses the point." *Id*. But a fraud claim must be based on what defendant actually said, not a fiction plaintiffs invent and attack as false. Nor do Plaintiffs respond to the other quotations attributed to the AAP that do not appear in the cited sources (Mot. 21).

Even setting aside Plaintiffs' invented quotations, their remaining allegations do not plausibly plead a false or misleading statement. Whether framed as a falsehood, a misleading statement, or an omission, Plaintiffs' theories essentially reduce to the same contention: The AAP should not have expressed the challenged conclusion because Plaintiffs have a different interpretation of the evidence or would prefer additional or different studies be conducted. Plaintiffs argue that the absence of one particular type of vaccine study means it is false to call vaccines tested and safe; they believe that the CDC's recent about-face regarding the link between vaccines and autism renders false any statement to the contrary; and they think the use of "unpublished models" to project hepatitis B infections makes those projections false. Opp. 16. But

7

"a scientific conclusion based on nonfraudulent data"—and Plaintiffs nowhere allege that any of the data the AAP relied on was fraudulent—does not plausibly allege a false or misleading statement. *Pacira*, 583 F. Supp. 3d at 659. Nor can Plaintiffs simply recast their case as one for half-truths or omissions; a statement need not discuss every study, criticism, or alternative interpretation Plaintiffs believe warranted mention. *See id.* at 660 ("a scientific conclusion need not account for every piece of data that was *not* relied on"). At bottom, all Plaintiffs allege is that "the inferences drawn" by the AAP "were the wrong ones," and that is insufficient to plead that the AAP's statements were false or misleading. *See ONY*, 720 F.3d at 497.

Plaintiffs fare even worse in trying to defend their allegations about the "10,000 vaccines" statement. Plaintiffs' theory is not that anything in the article was inaccurate but instead that it supposedly "answer[ed] a different question from the one that was asked." Opp. 8; *see also id.* at 16. First, Plaintiffs' theory is that the article did not address questions raised by the IOM in a report that Plaintiffs acknowledge was released "one month *after* this article was published." *Id.* at 7 (emphasis added). A scientific article cannot be misleading for failing to address questions raised in a report that did not yet exist. And second, even assuming Plaintiffs' criticisms of what questions the article did or didn't address were valid, all it would demonstrate is that the article did not respond to a particular question Plaintiffs would have preferred, not that it was misleading, because it described the concerns addressed. *See* Mot. 15.

The remainder of the alleged false statements are addressed in entirely conclusory fashion. Plaintiffs merely state (at 16-17) that "[t]he mortality, VAERS, and Red Book misrepresentations are pleaded with the same specificity." They are not, for the reasons explained in the AAP's opening brief (at 20-22). This is woefully inadequate to specify "what fraudulent statements were made and in what context, when they were made, who made them, and the manner in which the

statements were misleading." *Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 91 (D.D.C. 2006) (citation modified).

### 3.    Plaintiffs Have Not Pleaded The Requisite Intent

Finally, Plaintiffs fail to plausibly allege that the AAP knew its statements were false or misleading. Plaintiffs misunderstand their burden. Although Rule 9(b) does not require fraudulent intent to be pleaded with specificity, it does not give Plaintiffs "license to evade" Rule 8's plausibility requirement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 686-87 (2009). Plaintiffs must still "offer some facts to support their claim," not merely a "conclusory inference." *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 406 F. Supp. 3d 72, 80 (D.D.C. 2019).

Plaintiffs argue (at 18) that the AAP knew its statements that the vaccine schedule was "tested" and its safety "strongly affirmed" by the IOM were false. But the only supporting allegation is that the AAP was aware of IOM reports discussing a long-term study of the cumulative vaccine schedule. Even if true, it shows only that the AAP knew about the IOM reports—not that the AAP knew that its own statements were false or misleading. This "conclusory inference" is insufficient. *Ambellu*, 406 F. Supp. 3d at 80; *see also MSP Recovery Claims v. Pfizer, Inc.*, 728 F. Supp. 3d 89, 112 (D.D.C. 2024) (dismissing RICO claims where "the plaintiffs fail to explain why that knowledge rendered specific representations by [the defendant] false or fraudulent").

Yet again, Plaintiffs' invocation of *Philip Morris* fails. Plaintiffs argue (at 14) that the AAP's alleged knowledge of IOM reports is akin to the *Philip Morris* defendants' knowledge of studies directly contradicting their claims about cigarette safety. But this is nothing like *Philip Morris*, where the court found that research had established that smoking was dangerous and addictive, that those findings "were well known, acknowledged, and accepted" by defendants, and that they "crafted their corporate priorities and strategies in response to these findings." *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1119-20 (D.C. Cir. 2009) (per curiam). Here,

9

Plaintiffs expressly disclaim any allegation that the AAP knew the vaccine schedule was unsafe. *See* Opp. 18 ("whether the AAP knew the vaccine schedule was unsafe . . . is not the fraud alleged"). At most, Plaintiffs allege only that the AAP knew others believed that further study was warranted or that evidence should be interpreted differently. That is a far cry from *Philip Morris*'s knowing fraud.

Plaintiffs offer only two other arguments that they have alleged knowledge, neither of which helps them. First, they point (at 18) to their allegation that Dr. Thomas was "punished" for his views. But Plaintiffs do not allege that the AAP had any role in that decision, and even if the AAP did, that would say nothing about the AAP's knowledge of whether its statements were false. Plaintiffs merely speculate (at 18-19) that "[a] party that believed its safety claim was supported would not work to prevent the claim from being tested," but "[w]ithout some facts to support claims of knowledge" a complaint "stops short of the line between possibility and plausibility." *MSP Recovery Claims*, 728 F. Supp. 3d at 111 (citation modified). Second, Plaintiffs vaguely refer (at 19) to statements made by the AAP in another litigation. Plaintiffs do not identify those statements, much less explain how they demonstrate that the AAP made a challenged statement with knowledge it was false. Again, such "conclusory inference[s]" fall short. *Ambellu*, 406 F. Supp. 3d at 80.

Plaintiffs also fail to plead "the wrongful intent of specific employees . . . . who made, ordered, or approved the statement[s]." *Philip Morris*, 566 F.3d at 1118. Plaintiffs respond (at 19) that they have identified individuals who allegedly made the challenged statements. That is not enough. They may have named individuals, but they have not pleaded that any of those specific individuals "made a false or misleading statement *with specific intent to defraud*." *Philip Morris*, 566 F.3d at 1118 (emphasis added).

10

Finally, Plaintiffs offer only conclusory allegations that the AAP sought to deprive anyone of money or property. *See Ciminelli v. United States*, 598 U.S. 306, 312 (2023). Their opposition merely recites (at 19-20) the allegation that pediatricians receive money for vaccinating children. But for their RICO claims to survive, receipt of money is not enough; they must allege that the AAP intentionally engaged in a "deceptive scheme[] to deprive" victims of "money or property." *Kelly v. United States*, 590 U.S. 391, 398 (2020) (internal quotation marks omitted). Plaintiffs allege only that the AAP's "true motive" in making statements about the safety and efficacy of vaccines was "[m]oney." Cplt. ¶ 122. That bare allegation is nowhere near sufficient for "the court to draw the reasonable inference that" the AAP's statements were made with the goal of obtaining money or property. *See Iqbal*, 556 U.S. at 678.

**B.    Plaintiffs Fail To Allege That The AAP "Conduct[ed] Or Participate[d]" In The Alleged Enterprise's Affairs**

Because Plaintiffs fail to plead both the existence of an enterprise and that the AAP conducted the affairs of that enterprise—each an independent requirement—their claims must be dismissed.

**1.    Plaintiffs Fail To Allege Decisionmaking Structure**

As Plaintiffs concede, they must plead the alleged enterprise's "decisionmaking structure." *See Stankevich v. Kaplan*, 156 F. Supp. 3d 86, 94 (D.D.C. 2016) (internal quotation marks omitted); Opp. 21. They point to the CDC's Advisory Committee on Immunization Practices ("ACIP") as a purported "decision node" through which the AAP and the alleged enterprise supposedly ran the scheme and "controlled federal vaccine policy." Opp. 22; Cplt. ¶ 156. That does not suffice.

These vague allegations do not identify *how* decisions were made *among* the alleged enterprise. Plaintiffs concede that ACIP was a government committee, not a member of the alleged enterprise, and that the government controlled ACIP's formal procedures. Opp. 22; Mot. 25-26.

11

The AAP's former liaison seat on the ACIP thus says nothing about how the alleged enterprise itself made decisions. Plaintiffs now describe the AAP as exerting "influence" over a governmental decision point rather than "control[]" of vaccine policy (Opp. 22-23), but, regardless, neither characterization explains any mechanism for *enterprise* decisionmaking.

**2.    In Any Event, Plaintiffs Fail To Allege That The AAP "Conduct[ed] Or Participate[d]" In The Alleged Enterprise's Affairs**

Plaintiffs also acknowledge that, to survive a motion to dismiss, they must allege that the AAP participated in the conduct of the *enterprise's* affairs, not just its own. They do not.

Plaintiffs argue that the AAP "operationalizes the enterprise's decisions" because it joined a lawsuit with other alleged enterprise members challenging HHS's recommendations and engaged in other coordinated activities. Opp. 24. This theory is implausible: Interest groups routinely coordinate and file lawsuits together, often to advance shared legal or policy positions unrelated to any alleged enterprise. And in any event, mere allegations that entities acted together do not suffice to show conduct or participation in an enterprise, where (as here) such actions are consistent with each party's own interests. *See* Mot. 26-27; *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013); *see also D. Penguin Bros. Ltd. v. City Nat'l Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (allegations that defendants "worked together in some respects to steal plaintiffs' funds" were insufficient). At most, Plaintiffs allege that the AAP pursued its own mission alongside organizations with aligned views.

Plaintiffs misapply *Walgreen* in their attempt to distinguish it. They argue this element is satisfied because "AAP and the manufacturers are alleged to have done together what none could do alone." Opp. 25. But (as Plaintiffs acknowledge) *Walgreen* rejected that theory absent additional allegations that "defendants could not have achieved their goals . . . without cooperation *that fell outside the bounds of the parties' normal commercial relationships*," such as by "fixing a

12

competitive bidding process in order to win insurance contracts at inflated prices." *Walgreen*, 719 F.3d at 856 (emphasis added). Plaintiffs allege nothing of the sort here. They offer no non-conclusory facts showing that the coordination they identify—such as filing a lawsuit—"exceeded that inherent" in ordinary activity to advance the AAP's own interests. *Id.*

### C.      Plaintiffs Do Not Adequately Allege Either But-For Or Proximate Causation

Plaintiffs' opposition confirms that they cannot satisfy RICO's causation requirements. Instead, Plaintiffs cycle through shifting theories, each of which is either inconsistent with their own allegations (including their theory of fraud), legally deficient, or both.

#### 1.      Plaintiffs Fail To Allege Proximate Causation

RICO's proximate cause requirement demands a "direct" relationship between predicate acts and the injury asserted, *Holmes v. Sec. Inv. Prod. Corp.*, 503 U.S. 258, 269 (1992). None of the Plaintiffs' claimed injuries satisfies this standard; each rests on multi-step causal chains with numerous intervening factors.

##### a.      Parent Plaintiffs Do Not Allege A Direct Causal Relationship

*None of Plaintiffs' Shifting Theories Works:* None of Plaintiffs' shifting theories demonstrates a "direct" link between the alleged misrepresentations and their asserted injuries. Plaintiffs first assert that physicians were "compelled conduits" of the AAP's safety statements, which in turn induced parental consent (Opp. 26). Even accepting the premise that the physicians acted "mechanically" (*id.* at 28) in relaying safety statements, this theory fails for multiple independent reasons, apart from its reliance on an impermissible "derivative" injury (*infra*). First, the Parent Plaintiffs do not plausibly allege reliance on the challenged statements (Mot. 32-34) and effectively concede as much by disclaiming a first-party reliance requirement. Thus, even if this theory satisfied proximate cause (it does not), it would fail for lack of but-for causation (*supra*). Second, the theory rests on statements not challenged as fraudulent (*e.g.*, Opp. 29 (discussing

13

statements in Red Book)) and, in several instances, conflicts with, or is unsupported by, Plaintiffs' own allegations (*e.g.*, Doe, who allegedly consented in the face of school requirements). Finally, and as relates to proximate cause, the theory also ignores independent and confounding factors—including independent medical judgment, regulatory guidance and other information available to parents, and the vaccines themselves—that break any "direct" causal link (Mot. 28).

These defects implicate core concerns underlying RICO's proximate-cause requirement. Where liability depends on a multi-step causal chain involving independent actors and intervening factors, it becomes "more difficult . . . to ascertain the amount of [plaintiffs'] damages attributable to the violation, as distinct from other, independent, factors," *Holmes*, 503 U.S. at 269—a problem that Plaintiffs, tellingly, ignore.

Instead, Plaintiffs invoke *Bridge* to argue that the number of actors in the causal chain does not matter so long as *one step* is "mechanical." But *Bridge* itself emphasized that there were "*no independent factors that account[ed] for respondents' injury.*" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) (emphasis added). Not so here. And Plaintiffs' assertion that the alleged misrepresentations and injuries run through a single "channel" does not make their theory any more "direct," because the alleged injury still depends on intervening decisions and other independent factors. While predicate acts need not be the *sole* cause of injury (Opp. 32), the presence of those independent factors bears directly on whether the causal chain is sufficiently "direct," a consideration that courts—including the Supreme Court and D.C. Circuit—routinely cite when holding a case should be dismissed at the pleading stage.[4]

---

[4] *Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1074 (D.C. Cir. 2001) (dismissal where "[n]either the funds nor the nations have shown that their claimed economic harms were not caused by other independent factors"); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458-59 (2006) (noting independent factors; reversing denial of motion to dismiss); *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 15 (2010) (plurality) (distinguishing

14

Recognizing those issues, Plaintiffs pivot to a different theory: parents were injured because physicians followed the *standard of care*. *See* Opp. 27 ("physician follows the AAP standard because he must"); *id.* at 30 (vaccine schedule mandatory); *id.* at 31 (tracing injuries to contraindication framework). But that is incompatible with Plaintiffs' fraud theory, which identifies the safety and efficacy statements as the basis for the alleged predicate acts. Indeed, Plaintiffs (at 12) disavow any fraud challenge to "medical judgments about treatment guidelines."

That disconnect, in turn, sends Plaintiffs scrambling for a *third* causation theory: that the AAP's statements shaped the standard of care, which then drove physician conduct. Opp. 31 ("narrowness rests on, and is a direct consequence of, the representation that the schedule is tested and safe"). That theory fares no better. It is not what Plaintiffs pleaded (contrast with Cplt. ¶ 167). And, in any event, it only adds further layers of attenuation and speculation: that the alleged statements were responsible for standards of care (despite myriad other factors that could have influenced them, including government recommendations that Plaintiffs say were "written into the AAP's Red Book as the standard of care" (Opp. 22)), which guided discretionary physician conduct, which affected parental consent (but not directly via these AAP statements), which led to vaccination, which harmed children, which in turn led to parental injury. That multi-step causal chain is the antithesis of the "direct" relationship RICO requires.

*Plaintiffs' Injuries Are Impermissibly Derivative*: Regardless of which causal theory they invoke, Plaintiffs' claims independently fail because their alleged injuries were derivative of harm to third parties: namely, their children. (Mot. 28). This is precisely the type of "too remote," "purely

---

*Bridge*; reversing denial of motion to dismiss); *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 143 (2d Cir. 2018) (noting Supreme Court had engaged in "counterfactual reasoning" regarding proximate cause at pleading stage); *Gen. Motors, LLC v. FCA US, LLC*, 44 F.4th 548, 563 (6th Cir. 2022) (noting existence of independent factors; affirming dismissal).

15

contingent," and indirect injury *Holmes* rejects. 503 U.S. at 268, 271.

Plaintiffs' response misses the point. They argue (Opp. 28) that their losses are "their own." But *Services Employees* makes clear that derivative injury does not turn on whose money was spent: there, too, plaintiffs used their own funds, but could not recover because that loss was contingent on harm to others. *See* 249 F.3d at 1074 (no proximate cause where "alleged harm arising from payment of medical expenses by the funds and the nations is itself derivative of alleged injuries to individual smokers"). Here, Plaintiffs' alleged losses similarly arise only because of asserted injuries to their children; Plaintiffs themselves describe their injuries as "downstream." (Opp. 35). *Kaiser* is distinguishable: it involved insurers' paying for unnecessary prescriptions, not losses contingent on patient injury. *Kaiser*, 712 F.3d at 34, 37-38. In any event, Plaintiffs do not even attempt to reconcile *Kaiser* with Supreme Court precedent (Mot. 30).

Plaintiffs contend (at 27) that they were the "target" of fraud, but offer no response to the pre- and post-*Bridge* precedent explaining that intent alone cannot establish proximate cause. Mot. 30. The relevant question is whether the alleged injury flows *directly* from the alleged misrepresentations. Where, as here, the claimed losses depend on intervening harm to third parties, the causal chain is too removed and implicates precisely the concerns *Holmes* identified, including (as above) the difficulty of apportioning damages among independent causes. *Serv. Emps.*, 249 F.3d at 1074.

#### b.    Physicians' New Theory Also Conflicts With Fraud Theory

As for the physicians, Plaintiffs concede that proximate causation exists only if medical boards acted "mechanical[ly] and predictabl[y]," without exercising "independent discretion" (Opp. 26, 30). Yet they offer no plausible basis to "directly" connect the alleged misrepresentation to their injuries on that premise. To the contrary, they acknowledge disciplinary action most directly flows from the standard of care, which they do not challenge as a predicate act. *E.g.*, Opp.

30 ("every sustained cause of discipline traces back to that standard"); Opp. 31 (Boards "accepted the AAP standard as given and measured physician conduct against it").

Plaintiffs attempt to bridge that gap by asserting that the AAP "published safety representations that became the legally enforceable standard of care." Opp. 30. But whatever that means, it is not pleaded—and certainly not with the requisite factual support. In any event, it only adds another layer of attenuation, placing the alleged misrepresentations even one step further removed from the asserted injuries: the statements did not directly cause the harm, but at most influenced the standards that allegedly did. That flunks *Holmes*, regardless. The proximate-cause requirement exists to prevent recovery where injury depends on the independent judgments of third parties, involves intervening causes at each stage, and would require speculation about how those actors would have behaved absent the alleged misstatements.

### 2. Plaintiffs Fail To Plead But-For Causation

Plaintiffs acknowledge that each must independently plead but-for causation, i.e., that their alleged injuries would not have occurred absent the alleged fraud (Opp. 33). The opposition reinforces that they cannot meet that standard, either. Many of the challenged statements post-date the alleged injuries, or are entirely unrelated to them (*e.g.*, statements about autism), and therefore cannot have caused them. And as to any remaining allegations, Plaintiffs never plausibly connect the alleged misrepresentations to the conduct that purportedly produced their injuries—and their attempts to do so only underscore the problems with their proximate-cause theories.

### a. Individuals Do Not Allege But-For Causation

While RICO does not *always* require first-party reliance, that principle does not help Plaintiffs, because they still must allege *some* plausible but-for causal chain. *Bridge*, 553 U.S. at 658-59 (but-for cause still required). Here, their invocation of *Bridge* sits in direct tension with their (deficient) proximate-cause theory. If Plaintiffs' theory is that physicians were in fact

17

"compelled conduits" of the AAP's statements (Opp. 26), then Plaintiffs' theory of actual cause still necessarily requires the parents relied on those statements. By disclaiming any reliance requirement, Plaintiffs effectively concede the gap in their causal chain.

Recognizing that problem, Plaintiffs attempt to salvage causation by stitching together a different chain: not that the physicians were conduits of these statements, but that the "AAP's misrepresentations defined the standard of care that compelled physicians to tell parents the schedule was safe, parents consented on that basis, and the vaccinations followed." Opp. 33. But that theory is not what Plaintiffs pleaded—*e.g.*, Cplt. ¶ 167 (physicians "present AAP's claims to parents as medical fact")—and even as reframed still fails to plausibly connect these *particular* statements to the standard of care and alleged injury. *Bridge*, 553 U.S. at 658 ("[N]one of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations.").

In all events, these formulations merely exacerbate Plaintiffs' proximate-cause problems: by disclaiming direct reliance on the AAP's statements, the parents only highlight that their injury is indirect, because it depends on the representations filtering through the standard of care (*see supra*) or doctors' bespoke statements about vaccine safety.

As a fallback, Plaintiffs therefore invoke yet another theory (Opp. 33 n.9), asserting that they would not have consented had physicians disclosed the IOM findings. But that is not reliance on any alleged AAP misrepresentation.

### b.    Physicians' Theory Fails For The Same Reasons

The physicians' theory suffers from the same defect. Plaintiffs effectively concede that the disciplinary actions did not themselves depend on any of the alleged misrepresentations. Instead, Plaintiffs assert that the standard of care would have been different had such statements not been made. Opp. 34 ("change the representations, change the standard, eliminate the basis for

18

discipline"). But that chain is not adequately alleged in the complaint. Moreover, that theory is yet more attenuated: It requires the Court to infer that alleged safety statements shaped the standard of care, which in turn influenced how the medical board resolved these complaints, which in turn produced the alleged injury. That additional causal layer, which still involves independent decisionmakers, would defeat proximate cause for the reasons discussed above, regardless.

### 3.    Other Causation And Injury Issues Abound

Even setting these issues aside, Plaintiffs' claims also fail for additional, plaintiff-specific reasons, several of which Plaintiffs do not meaningfully answer in their opposition.

**Shaw:** Shaw[5] attempts to paper over the lack of any connection to the predicate acts by citing *Bridge*, but that theory fails for the reasons discussed above. Regardless, Shaw cannot remedy her failure to allege *any* injury by saying she suffered the "same kind" of injury as Nelson (Opp. 34); that is an impermissible amendment-by-opposition. *See Yoder v. Architect of the Capitol*, No. 23-2214, 2025 WL 915611, at *3 (D.D.C. Mar. 26, 2025) (Kelly, J.).

**Nelson:** Nelson offers no response to the various factors that undermine her causal chain, even setting aside the fact that her allegations (that she relied on statements by *clinic staff*) are untethered from the proximate and actual cause theories Plaintiffs advance elsewhere—and are even more deficient. Nor does she establish that the losses she identifies constitute a legally cognizable injury.

**Doe:** Doe's allegations are entirely divorced from Plaintiffs' own theories of actual and proximate cause—and her chain is especially remote, because she attributes the relevant decision to an official who allegedly lacked "legal" and "statutory authority." Cplt. ¶¶ 29, 33. She likewise

---

[5] Shaw was recently arrested on charges of first-degree murder in the death of her twins. Christina Jewett, *Plaintiff for Anti-Vaccine Group's Suit Is Charged With Murder of Her Twins*, The New York Times, July 7, 2026. https://perma.cc/Z296-6VHQ.

does not address the absence of a cognizable injury.

**Thomas:** In addition to the defects above, Thomas's causal theory is undermined by Plaintiffs' acknowledgment that his suspension rested on at least one factor independent of his views regarding vaccines and that he voluntarily surrendered his license. Plaintiffs further do not dispute that at least some of his alleged injuries are time-barred.

**Stoller:** Stoller advances inconsistent causation theories, and neither works: If his New Mexico suspension arose from the same standard of care (Opp. 36), that theory is not pleaded and suffers from the same causation defects described above. If it derives from his California suspension (Opp. 37), then it suffers from the same defects and is even more attenuated. Plaintiffs also do not meaningfully dispute that some of his alleged damages are time barred.

**CHD:** Plaintiffs do not respond at all to the argument that, even independent of other defects, any "causal theory [CHD] could allege is far too speculative, threadbare, and vague to state a claim." Mot. 32 n.11. Their reliance on equitable relief does not help. Even if Plaintiffs were correct that Section 1964(a) authorizes private plaintiffs to seek equitable relief (and they are not), Plaintiff CHD would still (under its own reasoning) be required to plausibly allege that at least one member was injured "by reason of" a RICO violation under Section 1964(c)—that is, plead causation—because that is the threshold provision that permits private plaintiffs to sue. Opp. 44 (claiming power to seek equitable relief through "combination" of Section 1964(c) and (a)); *Chevron Corp. v. Donziger*, 833 F.3d 74, 137 (2d Cir. 2016) (equitable relief available where plaintiff has proven injury "by reason of" defendant's RICO violation).

### D.    Plaintiffs Fail To Allege Conspiracy

Plaintiffs' conspiracy allegations fail for two independent reasons.

First, Plaintiffs effectively concede that the conspiracy count rises or fails with the substantive RICO claims. Opp. 38; *see also Byrne v. Brock*, No. 19-7120, 2020 WL 1487757, at

*2 (D.C. Cir. Feb. 27, 2020) (per curiam). Because those claims fail for the reasons set forth above, the conspiracy claim must be dismissed as well.

Second, Plaintiffs' conspiracy theory independently fails under *RSM Prods. Corp. v. Freshfields Bruckhaus Deringer U.S., LLP*, 682 F.3d 1043, 1051-52 (D.C. Cir. 2012). Plaintiffs concede (as they must) that a conspiracy claim cannot survive a motion to dismiss where alleged conduct is "*equally* consistent with legitimate self-interest." Opp. 39. That is all Plaintiffs offer here. They point to the AAP's scientific judgments and advocacy—consistent with its mission to promote children's health—and ask the Court to infer a conspiracy. But Plaintiffs' mere disagreement with those views and actions does not plausibly allege an agreement to further an unlawful scheme.

## II.   PLAINTIFFS LACK ARTICLE III STANDING

Independent of the merits defects, Plaintiffs face threshold standing failures.

### A.   Plaintiffs Cannot Satisfy Article III's Causation Requirement

Plaintiffs do not dispute that they must plead a non-speculative causal connection between the challenged conduct and their injuries. As explained above, they fail to do so.

Plaintiffs also do not dispute that they lack standing where their injury is "the result of the independent action of some third party not before the court." *Bennett v. Spear*, 520 U.S. 154, 167 (1997); Mot. 38-39. Instead, they assert that the physicians and medical boards did not exercise independent medical judgment because the "standard of care is to follow the ACIP Guidelines and the AAP Red Book." Opp. 40. That fails. It does not establish the requisite "causal connection between the *assertedly unlawful conduct*"—here, the alleged misrepresentations—"and the alleged injury." *Doe 1 v. Apple Inc.*, 96 F.4th 403, 409 (D.C. Cir. 2024) (emphasis added; internal quotation marks omitted). And to the extent Plaintiffs contend that the challenged statements *shaped* the standard of care, they still impermissibly rely on "speculation about the unfettered choices made

21

by independent actors," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024)—just at a different, and even more attenuated, step in the causal chain. Article III forbids that. Mot. 38-39 (collecting authorities).

### B. Plaintiff CHD Lacks Standing For An Additional And Independent Reason

CHD independently fails Article III because it cannot establish associational standing.

CHD does not even attempt to explain how it satisfies the first requirement of association standing: that "at least one specifically-identified member has suffered an injury-in-fact." *Am. Chemistry Council v. DOT*, 468 F.3d 810, 820 (D.C. Cir. 2006). CHD identifies no one—only the bare assertion that the AAP's conduct "harm[s] the financial well-being of CHD community members." Cplt. ¶ 48. That conclusory allegation is insufficient, (Mot. 40-41), and its failure to respond is fatal. *See Wilson v. Noem*, No. 20-cv-100, 2025 WL 1000666, at *1 n.7 (D.D.C. Apr. 3, 2025).

Plaintiffs invoke *Zeldin* as though it relieves CHD of the obligation to identify a constituent with standing. It does not. *Zeldin* recognizes that it is "[i]mplicit" in this requirement that an organization have members or (as CHD urges) their functional equivalents. *Pub. Emps. for Env't Resp. v. Zeldin*, 174 F.4th 183, 187 (D.C. Cir. 2026). But that is only a necessary factual predicate: the party asserting associational standing—whether a traditional membership organization or not—must still show that at least one of its members "would otherwise have standing to sue in their own right." *Id.* (*quoting Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343).

Plaintiffs' assertion that "[n]o individual participation is required" is also a red herring. Opp. 42. Even if it were true here, that is only one element of the associational-standing test— necessary, but not sufficient. It does not eliminate Plaintiffs' threshold obligation to show that at least one member has standing. *See Zeldin*, 174 F.4th at 187 (describing three requirements).

22

CHD also fails a second, independent requirement: The interests it seeks to protect must be germane to its purpose. CHD gestures to a handful of allegations about the "toxicological effects" of vaccines but does not explain how they connect to its stated goal to "end the epidemic of childhood chronic disease caused by toxic *environmental* exposures." Cplt. ¶¶ 45, 105 (emphasis added).

### III.    PLAINTIFFS CANNOT SEEK DECLARATORY AND INJUNCTIVE RELIEF

The request for declaratory and injunctive relief fails for multiple independent reasons.

*First*, it flunks at the threshold: Plaintiffs fail on the merits and for lack of Article III standing, each of which independently requires dismissal.

*Second*, text, structure, and legislative history confirm that RICO does not authorize private parties to obtain injunctive or declaratory relief. Mot. 41-43. Plaintiffs' central contention that Sections 1964 (b) and (c) are "parallel" is wrong, so there is no basis for any "parity of reasoning." Opp. 44. Section 1964(b) authorizes the Attorney General to "institute proceedings under this section"—a "clear cross-reference to the broad remedial powers authorized in Section 1964(a)." *Hengle v. Treppa*, 19 F.4th 324, 354 (4th Cir. 2021) (internal quotation marks omitted). By contrast, Section 1964(c), which governs private relief, contains no similar language, reflecting Congress's intent "to withhold from private plaintiffs the ability to invoke the injunctive power granted to the courts in Section 1964(a)." *Id.* Plaintiffs have no response—and ignore that the D.C. Circuit has recognized as much in dicta. *See Philip Morris*, 566 F.3d at 1145 ("Section 1964(b) reserves for the government the ability to 'institute' a cause of action for equitable remedies.").

With no statutory hook, Plaintiffs fall back on the argument that the RICO statute should be "liberally construed." (Opp. 45 (internal quotation marks omitted)). But "even a liberal construction of Section 1964 cannot import into the statute a remedy that Congress has chosen not

23

to provide." *Hengle*, 19 F.4th at 355. That carries particular force here, where the equitable remedies available under Section 1964(a) are sweeping and drastic (*e.g.*, corporate dissolution).

*Third*, and regardless, Plaintiffs lack standing to seek prospective relief. Article III requires more than past injury, *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015): Plaintiffs must show ongoing or imminent harm that is fairly traceable to the AAP (*id.*) and that judicial relief will "*likely* alleviate the particularized injury alleged." *West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017) (emphasis added; internal quotation marks omitted). They cannot do so.

The individual plaintiffs rely primarily on past harms, which cannot support injunctive relief. And to the extent either of the physician-plaintiffs alleges ongoing injury, that is not fairly traceable to the AAP (*supra*) and, in any event, fails redressability. Plaintiffs do not mention, much less grapple with, the "likely alleviate" standard. *West*, 845 F.3d at 1235. And their argument that injunctive relief "would assist their efforts to regain licensure" (Opp. 43) effectively acknowledges they can't meet it: their theory depends on multiple layers of speculation about the actions of independent state medical boards and other parties, who may be influenced by many other factors. That is insufficient: "[w]hen conjecture is necessary, redressability is lacking." *West*, 845 F.3d at 1237.

CHD also lacks standing for prospective relief. Even setting aside the issues above, the vague and conclusory allegations of some nebulous financial harm do not allege any certainly impending threat of injury—let alone one that the requested relief would "likely" redress.

Fourth, Plaintiffs have not plausibly pleaded entitlement to equitable or declaratory relief, an independent basis for dismissal. *See, e.g.*, *PhantomALERT v. Apple Inc.*, 762 F. Supp. 3d 8, 23

(D.D.C. 2025) (dismissing claim for injunctive relief where party "nowhere pleads the prerequisites to earn injunctive relief").[6]

Finally, Plaintiffs do not respond to Defendant's argument (Mot. 45) that they "may not carve out a particular question within that controversy and present it to the Court for adjudication via declaratory relief." *Harford Mut. Ins. Co. v. New Ledroit Park Bldg. Co.*, 313 F. Supp. 3d 40, 46 (D.D.C. 2018) (Kelly, J.) (citation modified). That argument is conceded.

## CONCLUSION

Defendant respectfully requests that the Court dismiss the complaint.

Dated: July 14, 2026

Respectfully submitted,

*/s/* Richard Sauber
Richard Sauber (Bar No. 385070)
Jack A. Herman (Bar No. 1033370)
Lauren Cassady Andrews (Bar No. 888314680)
Herbert Smith Freehills Kramer (US) LLP
2000 K Street NW, 4th Floor
Washington, DC 20006
Tel: (202) 775-4500
Fax: (202) 775-4510

*Counsel for American Academy of Pediatrics*

---

[6] While one court in this District recently held—citing Rule 54(c)—that a party need not plead a factual basis supporting entitlement to a particular form of relief, it acknowledged conflicting authority, including within this District. *See SEC v. Musk*, 826 F. Supp. 3d 35, 61-66 (D.D.C. 2026). But even if correct, Rule 54(c) would be of no help to Plaintiff CHD regardless, because it has made clear that it seeks only injunctive or declaratory relief and so its failure to adequately plead entitlement to those forms of relief therefore defeats its claim entirely. *Cf. Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002). In any event, Rule 54(c) would not bar dismissal where a particular form of relief is foreclosed regardless of the facts proved at trial, such as that the requested relief is legally unavailable or that Plaintiffs lack standing. *See Musk*, 826 F. Supp. 3d at 66 n.19.